GAY RIGHTS COALITION OF GEORGETOWN UNIVERSITY LAW CENTER, et al., Appellants,

and

District of Columbia, Intervenor–Appellant,

v.

GEORGETOWN UNIVERSITY, et al., Appellees.

Nos. 84–50, 84–51.

District of Columbia Court of Appeals.

Argued en banc Oct. 16, 1985.
Decided Nov. 20, 1987.

Michele A. Zavos and Jane L. Dolkart, Washington, D.C., filed an amicus curiae brief for the Women's Legal Defense Fund, Center for Constitutional Rights, Equal Rights Advocates and Lesbian Rights

Project, Law Ass'n for Women of George Washington University, Nat. Women's Political Caucus, Wider Opportunities for Women, and Women's Law Collective of Columbus School of Law at Catholic University, on behalf of appellants.

Arthur B. Spitzer, Washington, D.C., filed an amicus curiae brief, on behalf of appellees.

Elliot P. Hoffman, New York City, filed an amicus curiae brief for the Nat. Jewish Com'n on Law and Public Affairs (COLPA), on behalf of appellees.

J. Curtis Herge and George V. Biondi, McLean, Va., filed an amicus curiae brief for the Coalition for Religious Freedom, on behalf of appellees.

Richard A. Gross, with whom John F. Daly, Laura A. Foggan, Washington, D.C., Ronald E. Bogard, New York City, and Carol J. Jennings, were on brief, for appellants.

Charles H. Wilson, with whom Vincent J. Fuller, Nancy F. Preiss, and James C. Gregg, Washington, D.C., were on brief, for appellees.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom Inez Smith Reid, Corp. Counsel at the time the brief was filed, John H. Suda, Principal Deputy Corp. Counsel, at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for intervenor-appellant.

Shelley J. Gaylord, Madison, Wis., filed an amicus curiae brief for the Governor's Council on Lesbian and Gay Issues, State of Wisconsin, on behalf of appellants.

Burt Neuborne, New York City, and Gilbert Gaynor, filed an amicus curiae brief for the American Civil Liberties Union, on behalf of appellants.

Douglas N. Jewett, City Atty., Seattle, Wash., and Marlaina Kiner, Director of Human Rights, filed an amicus curiae brief for the City of Seattle, Washington, on behalf of appellants.

Charles J. Ogletree, filed an amicus curiae brief for Div. 5: Criminal Law and Individual Rights of the District of Columbia Bar, on behalf of appellants.

Abby R. Rubenfeld, Nashville, Tenn., filed an amicus curiae brief for the Lambda Legal Defense & Educ. Fund, on behalf of appellants.

Before PRYOR, Chief Judge, and MACK, NEWMAN, FERREN, BELSON and TERRY, Associate Judges, and NEBEKER,* Associate Judge, Retired.

MACK, Associate Judge:

In the District of Columbia, the Human Rights Act prohibits an educational institution from discriminating against any individual on the basis of his or her sexual orientation.[1] Two student gay rights groups contend that Georgetown University violated this statutory command by refusing to grant them "University Recognition" together with equal access to the additional facilities and services that status entails. The University, relying on the trial court's factual finding that Georgetown's grant of "University Recognition" includes a religiously guided "endorsement" of the recipient student group, re-

---

* Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

1. D.C.Code § 1–2520 (1987) provides:
 It is an unlawful discriminatory practice ... for an educational institution:
 (1) To deny, restrict, or to abridge or condition the use of, or access to, any of its *facilities and services* to any person *otherwise qualified, wholly or partially, for a discriminatory reason, based upon* the race, color, religion, national origin, sex, age, marital status, personal appearance, *sexual orientation,* family responsibilities, political affiliation, source of

income or physical handicap of any individual.... [Emphasis added.]
 Section 1–2501 provides:
 It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of [various characteristics including sexual orientation].
 Section 1–2502 (28) provides:
 "Sexual orientation" means male or female homosexuality, heterosexuality and bisexuality, by preference or practice.

sponds that the Free Exercise Clause of the First Amendment protects it from official compulsion to "endorse" an organization which challenges its religious tenets. Upholding the asserted constitutional defense, the trial court entered judgment in favor of Georgetown. The student groups appeal.

Our analysis of the issues differs from that of the trial court. At the outset, we sever the artificial connection between the "endorsement" and the tangible benefits contained in Georgetown's scheme of "University Recognition." With respect to the University's refusal to grant the status of "University Recognition," we do not reach Georgetown's constitutional defense. Contrary to the trial court's understanding, the Human Rights Act does not require one private actor to "endorse" another. Thus, Georgetown's denial of "University Recognition"—in this case a status carrying an intangible "endorsement"—does not violate the statute. Although affirming the trial court's entry of judgment for the University on that point, we do so on statutory rather than constitutional grounds.

We reach a contrary conclusion with respect to the tangible benefits that accompany "University Recognition." While the Human Rights Act does not seek to compel uniformity in philosophical *attitudes* by force of law, it does require equal *treatment.* Equality of treatment in educational institutions is concretely measured by nondiscriminatory provision of access to "facilities and services." D.C. Code § 1–2520 (1987). Unlike the "endorsement," the various additional tangible benefits that accompany a grant of "University Recognition" are "facilities and services." As such, they must be made equally available, without regard to sexual orientation or to any other characteristic unrelated to individual merit. Georgetown's refusal to provide tangible benefits without regard to

sexual orientation violated the Human Rights Act. To that extent only, we consider the merits of Georgetown's free exercise defense. On that issue we hold that the District of Columbia's compelling interest in the eradication of sexual orientation discrimination outweighs any burden imposed upon Georgetown's exercise of religion by the forced equal provision of tangible benefits.

Thus, on statutory rather than constitutional grounds, we affirm the trial court's conclusion that Georgetown need not grant "University Recognition" to—and thereby "endorse"—the student groups. The Human Rights Act does, however, mandate that the student groups be given equal access to any additional "facilities and services" triggered by that status. Georgetown's asserted free exercise defense does not overcome the Human Rights Act's edict that the tangible benefits be distributed without regard to sexual orientation. We affirm in part, reverse in part, and order the trial court to enter judgment accordingly.[2]

I

FACTUAL BACKGROUND

A. *Georgetown University*

In 1789, the year in which the Constitution was ratified and the federal government created, Georgetown University was established. Its founder was John Carroll, a Jesuit priest, a friend of George Washington and later, as Bishop of Baltimore, the first Roman Catholic prelate in the nation. "On this academy," he declared, "rests all my hope for the flourishing of our holy religion in the United States."

In 1805 Georgetown College, as it was then known, was formally committed to the control and guidance of the Society of Je-

---

**2.** Chief Judge Pryor and Judges Mack, Newman, Belson and Nebeker agree that the Human Rights Act does not require Georgetown to grant its particular form of "University Recognition" to the student groups. On that issue, the trial court's judgment is affirmed. However, Chief Judge Pryor and Judges Mack, Newman, Ferren and Terry conclude that the District of Colum-

bia's compelling interest in the eradication of sexual orientation discrimination requires Georgetown, despite its religious objection, to obey the Human Rights Act's mandate that the University provide equal tangible benefits to the student groups. On that issue, the trial court's judgment is reversed.

sus.[3] In 1815, Congress bestowed on Georgetown College the first university charter to be granted by the federal government. Act of March 1, 1815, 6 Stat. 152. This charter was signed by James Madison as president of the United States. By decree of the Holy See in 1833, Georgetown College was given the status of a Pontifical University. This grant from the Pope empowered the University to confer the highest ecclesiastical degrees in Philosophy and Sacred Theology. To this day, Georgetown remains one of only two universities in the nation with this distinction. In 1844, Georgetown College was incorporated by a special Act of Congress. Act of June 10, 1844, 6 Stat. 912. Its charter was amended in 1966 to allow it to operate as a nonprofit corporation and to adopt the name Georgetown University. Act of Oct. 4, 1966, Pub. L. No. 89–631, 80 Stat. 877.

Today, approaching the bicentennial it shares with the ratification of our Constitution, the college Carroll founded on the banks of the Potomac is a major private, co-educational university and the oldest Roman Catholic institution of higher learning in the United States. Its enrollment consists of roughly 10,000 students in several undergraduate, graduate and professional schools. Georgetown University also runs a hospital and sponsors research institutes and other educational endeavors.

### B. *Georgetown's Religious Tradition*

Through two centuries of growth, Georgetown University has been guided by the religious hope of its founder, John Carroll. All of its forty-six presidents have been Roman Catholic clergymen. On four occasions, the University has been headed by a bishop. In particular, Georgetown has continued a close relationship with the Jesuits. Since about 1825, without exception, members of that order have filled the presidential office.

At trial, Reverend Timothy S. Healy, S.J., Georgetown's president and a defendant in this case, testified that "until 1969 the general understanding was that the Society of Jesus owned the University and its property." In that year, the president and directors of Georgetown University signed an agreement with its Jesuit Community. With a few exceptions, the Jesuits relinquished their rights to University property. They also undertook to make periodic contributions to the University. Other provisions of the 1969 agreement sought to "guarantee the continued and effective presence of the Jesuits at Georgetown University." Among these were promises by the Jesuit Community to make themselves available for religious services, residential duties and teaching positions, and to take steps to ensure that highly qualified members of their order be assigned to the campus community. The agreement specified the desirability, "in order to preserve the Jesuit traditions of Georgetown University," that the University president be a member of the Society. Without confining deanships to their ranks, it was agreed that "qualified members of the Society of Jesus will be regularly appointed to such of those positions as may be practical." The office of University Chaplain was reserved for a Jesuit. In the words of President Healy, the 1969 agreement represented a "clear understanding that the University would continue to keep a very close affiliation with the Society of Jesus, to guarantee their presence at the University and to guarantee the meaning of the University in Jesuit terms that have existed up until that formal contract was drawn."

President Healy testified that throughout its existence Georgetown has invariably defined itself as a Roman Catholic institution. This perception is illustrated by some of the opening words in its undergraduate bulletin: "Georgetown is committed to a view of reality which reflects Catholic and Jesuit influences.... As an institution that is Catholic, Georgetown believes that all men are sons of God, called to a life of oneness with Him now and in eternity."

---

**3.** The Society of Jesus was founded in 1534 by St. Ignatius of Loyola. Since then it has become a major religious order stationed in all parts of the world. In this country, since the 18th century, it has been principally engaged in education. *See generally* J. AVELING, THE JESUITS (1982); T. CAMPBELL, THE JESUITS: 1534–1921 (1977).

Georgetown University, University Bulletin—Undergraduate Schools 1 (1980–81) (hereinafter "Undergraduate Bulletin"). According to its Law Center bulletin, "Georgetown's religious heritage is a cherished part of its distinctive quality." Georgetown University, Law Center Bulletin 31 (1980–81) (hereinafter "Law Center Bulletin"). The Faculty Handbook describes "Georgetown University as an American, Catholic, Jesuit institution of higher learning," seeking to "uphold, defend, propagate, and elucidate the integral Christian and American cultural heritage" through "certain established principles, specific ideals, and definite traditions." Georgetown University, Faculty Handbook vi (1971) (hereinafter "Faculty Handbook"). The "established principles" are "the demonstrated philosophical truths about the nature of man, the universe and God; the truths of Christian revelation and their crystallization through the centuries...." *Id.* Among the "specific ideals" are "the perfectability of society through the acquisition and practice by its members of the theological, intellectual, moral virtues and their derivatives [and] the value of service to the community as an expression of Christian democratic ideals." *Id.* And the "definite traditions" include "the Christian culture and conduct having their source and inspiration in the teachings and example of Christ...." *Id.*

Georgetown University is a member of several associations of Roman Catholic educational institutions. As a Pontifical University, it is one of only two American universities entered in the Annuario Pontificio, an annual listing by the Holy See of all such institutions throughout the world. Chapels are scattered throughout its properties and Masses offered several times each day. Almost all of its directors are Catholic, although there is no formal re-

quirement that they be so. During a five-year period just prior to trial, Jesuits made up between one third and one half of the board. Faculty members must "maintain a sympathetic attitude towards Catholic beliefs and practices...."[4] Georgetown has the largest number of ministers in residence among the Jesuit colleges and universities in the United States.

Roman Catholic doctrine influences some of Georgetown's policy decisions. Abortions and other proscribed procedures are not performed in the University hospital. Student newspapers may not carry advertisements for abortion clinics. Birth control devices may not be sold in the student stores. Cohabitation is forbidden between single students in the dormitories. In 1981, Georgetown returned a gift of $750,000 to the Libyan government due to the conflict between Roman Catholic teachings and that nation's perceived links with terrorist activity. Religious considerations, the trial court found, influenced Georgetown's denial of "University Recognition" and accompanying tangible benefits to the student groups.

### C. *Georgetown's Secular Educational Role*

Despite its historical identification with the Roman Catholic Church, Georgetown University's professed intention is to provide a secular education, albeit one that is informed by Christian values. Its founder, John Carroll, insisted from the very beginning that the college be open to students of every religious persuasion. Religious belief plays no role in admissions, graduation, class attendance, participation in sports or other student activities, or eligibility for financial aid, placement facilities, awards or honors programs. The Undergraduate Bulletin declares that Georgetown "imposes no religious creed on any faculty mem-

---

4. In a section headed "Religion and Ethical Norms," the Faculty Handbook states:

 While Georgetown University is operated under Catholic auspices, there is no regulation which requires all members of the Faculty to be members of the Catholic faith. A Faculty member is expected to maintain a standard of life and conduct consistent with the philosophy and objectives of the Universi-

ty. Accordingly, the integrity of the University requires that all Faculty members shall maintain a sympathetic attitude towards Catholic beliefs and practices, and shall make a sincere effort to appreciate such beliefs and practices. Members of the Faculty who are Catholics are expected to set a good example by the regular practice of Catholic duties. *Id.* at 12–13.

ber or any student, but it expects them to respect the religious convictions of each person." *Id.* at 1. The University motto is "Making of One—Jew and Gentile." Although undergraduate students must attend two courses in the Theology Department, neither need be taught from the Catholic perspective. Faculty members are not required to be Catholic, nor are they asked to propagate the Catholic faith or indoctrinate students with Catholic philosophy.

### D. *The Relationship between Georgetown's Religious Tradition and its Secular Educational Role*

From the foregoing, and from Georgetown's published materials, it appears that the University perceives itself as fulfilling a secular educational role without abandoning its religious heritage. This view is expressed in its Undergraduate Bulletin. While Georgetown reflects its Catholic and Jesuit influences,

[i]t neither wishes nor expects all its members to be Catholic, but it does assume that all of them share a basic, widely accepted view of humankind. It sees all men as essentially equal, as endowed with a human dignity always to be respected.... It seeks to open its arms, in the fullest sense of ecumenism, to those of all beliefs and all races.

*Id.* at 1. A similar idea is expressed by the Law Center: "The Law Center welcomes students of all religious beliefs and does not proselytize. On the other hand, Georgetown's religious heritage is a cherished part of its distinctive quality." Law Center Bulletin, *supra,* at 31.

President Healy has described the interrelationship between Georgetown's sec-ular educational role and its spiritual objectives:

Theology no longer has the sway in the University that it once had, nor can we any longer talk about it as the organizing base of the other academic disciplines. What we can talk about is a religious tradition which after 200 years must condition what the University is and does. Any university is a creature of time and is by its nature secular. Our job is to discover what impact the habit of belief in God has on the secular reality of a university, on its teaching, its learning, its research and its service.

Georgetown University, Annual Report 2 (1979). In a later report, President Healy voiced similar thoughts: "... Georgetown has the imperatives of its own secular being, but the Church reinforces, strengthens, and personalizes them." Georgetown University, Annual Report 4 (1981). Also, he notes, "[e]ducation remains principally a secular business, and the university is a secular entity with a clear secular job to do. The Church, however, can deeply influence how that secular job is done." *Id.* at 4–5.

### E. *The Recognition Criteria*

On October 13, 1977, the gay students of Georgetown University held a public meeting in a room on campus. Sometime later, the group chose a name, Gay People of Georgetown University (GPGU), and adopted a constitution.[5] After its formation, GPGU met weekly, its activities including lectures, discussions, film shows and social events.

Around the same time, a similar development occurred at the Law Center. There, a group known as the Gay Rights Coalition (GRC) of Georgetown University Law Center formed and adopted a constitution.[6]

---

5. The purposes of GPGU are:
 (1) Supportive
 To provide an atmosphere in which gay people can develop a sense of pride, self-worth, awareness and community.
 (2) Educational
 To provide information and encourage understanding and dialogue between gay and non-gay people.
 (3) *Developmental*

*To provide a forum for the development of responsible sexual ethics consonant with one's personal beliefs.*
 (4) *Social*
 *To establish a program of activities which reflect the above purposes.*
GPGU Constitution (emphasis added). Membership, regardless of sexual orientation, is open to students, faculty, staff members and alumni.

6. The purposes of GRC are to:

Unfortunately, in contrast to GPGU, the record is relatively barren with regard to GRC's origins and subsequent activities.

After a time, both student groups decided to seek the formal status and attendant privileges enjoyed by many other campus organizations. On the main campus, where GPGU is based, the procedures for doing so were established by written guidelines. When GPGU first initiated the recognition process, during academic year 1978–79, these criteria were contained in a document issued by the Student Activities Commission (SAC) under the name "What Your Club Needs to Know." This document was superseded in the fall of 1979 by another, more specific set of guidelines known as "Recognition Criteria: Student Clubs and Organizations" (hereinafter "Recognition Criteria"). This later document primarily clarified and expanded upon the criteria set forth in the earlier one; the two were not inconsistent. Hence, although GPGU in fact made two unsuccessful applications in successive academic years, one under each set of guidelines, we make no distinction between their applications and treat both as though they were governed by "Recognition Criteria." Also because the guidelines do not conflict, we reject the student groups' claim that "Recognition Criteria"—the later and more explicit of the two—is a "self-serving," pretextual document, adopted in response to GPGU's first application and designed to close the door on its second one.

"Recognition Criteria" sets forth a tiered system of support available to undergraduate student groups: "This support, in order to reach all the members of the community, is offered on three different levels." *Id.* at 1. Applications are initially submitted to SAC, an advisory body of the undergraduate student senate. The different levels of support are defined as follows:

"*Student Body Endorsement*": SAC grants this recognition representing the interest of the Student Government and the entire student body.

"*University Recognition*": SAC makes recommendations concerning this recognition. Final approval is granted through the University's Director of Student Activities.

"*University Funding*": is recognition in a monetary form.

*Id.*

The three tiers of recognition are listed in declining order of accessibility. The most accessible, "Student Body Endorsement," does not depend on approval by the University administration. It is available to any group which satisfies basic requirements as to size and composition and whose activities are "within the scope of the student body interest and concern, serving an educational, social, or cultural purpose." *Id.* at 2.

The more elusive "University Recognition," the status at issue in this case, requires approval by the University administration and may only be sought by groups that have already obtained "Student Body Endorsement." In order to obtain "University Recognition," such organizations have to satisfy two further conditions. They must:

(1) "be successful in aiding the University's educational mission in the tradition established by its founders (as outlined in the University's Statement of Education-

(1) Foster discussion and research on the effect of law on lesbians and gay men in such areas as:
 a. criminal law
 b. family law
 c. immigration law
 d. military and national security law
 e. labor and employment law
 f. free speech and association
 g. rights of gay students.
(2) *Provide lesbians and gay men entering the Law Center with information about Washington's gay community, including education-al, cultural, religious, social and medical services.*
(3) Disseminate information on the existence of *pro bono* work opportunities in the area of gay rights.
(4) Cooperate with other gay law student organizations in areas of gay rights law.
(5) Offer speakers and seminars on gay legal issues appropriate for the Law Center and the legal community.
GRC Constitution (emphasis added in paragraph (2)).

al Goals and Objectives[7])"; and

(2) "provide a broad service to the University community in the sense that the activities of the group may not be of an immediate and/or special interest." *Id.* at 3. "Recognition Criteria" describes "University Recognition" as Georgetown's "endorsement of the various co-curricular activities undertaken by a specific club." *Id.* at 1.

"University Funding," the third and least accessible tier of recognition, may be sought only by groups that have already obtained "University Recognition." Such groups, however, have no automatic right to direct financial support. *Id.* at 4. Lastly, and only implicitly, a fourth tier exists outside the scheme established by "Recognition Criteria"—that occupied by completely unrecognized campus groups, operating without even "Student Body Endorsement."

More than status is at stake. The facilities and services afforded to a student group by the University are dependent upon its level of recognition within this three-tiered scheme. A group with "Student Body Endorsement," but without "University Recognition," may:

(a) use University facilities;

(b) apply for lecture fund privileges;

(c) receive financial counseling from the SAC comptroller;

(d) use campus advertising; and

(e) petition to receive assistance from Student Government. *Id.* at 2-3. "University Recognition" entitles a group to four additional benefits. They may

(f) use a mailbox in the SAC office and request one in Hoya Station;

(g) use the Computer Label Service;

(h) use mailing services; and

(i) apply for funding.

*Id.* at 3. Success in obtaining direct financial support, a discretionary decision by the University, elevates a student group to "University Funding," the highest tier established by "Recognition Criteria."

No written guidelines such as "Recognition Criteria" were issued at the Law Center, where GRC was located. The University's treatment of GPGU's and GRC's respective applications was, however, indistinguishable. More importantly, the student groups do not suggest that any alternative criteria were ever in force at the Law Center. We have no basis on which to conclude that the eligibility factors to be applied to GRC are significantly different from the written guidelines set forth in "Recognition Criteria" at the main campus.

F. *The Student Groups' Attempts to Gain "University Recognition"*

GPGU made two attempts to gain "University Recognition." The first was in academic year 1978–79 and the other immediately afterwards in the following academic year. On both occasions it obtained only "Student Body Endorsement." Georgetown refused to grant it "University Recognition" or the accompanying tangible benefits.

SAC first considered and approved GPGU's application on January 30, 1979. The same day, SAC issued the following statement:

The SAC has granted a charter to the [GPGU] for the purpose of providing a forum where all students of Georgetown may come to understand the concerns of Gay Students.

The recommendation for a charter does not mean that the SAC is making any statement on the rightness or wrongness of homosexuality or is implying that the University is making such a statement.

---

7. Only one item of this description is contained in the record. It is entitled "A Draft Statement of the Educational Goals and Objectives of the Main Campus" and was prepared in September 1978 by the Office of the Executive Vice President for Academic Affairs. In six pages of single-spaced typeface, it notes that "Georgetown, by virtue of its Catholic and Jesuit origins, has a special and richly informed view of reality, one that celebrates human dignity in a Godly context." *Id.* at 1. The statement stresses the value of a liberal education in light of the "Georgetown ideal [of] the education of the whole person." *Id.* Among the essentials of a Jesuit liberal education, "[t]heological reflection and religious practice are encouraged and given priority." *Id.* at 3.

Within a week the Student Senate ratified both the action of SAC in approving a "Student Government Charter"[8] and the statement that accompanied it.

The following day William C. Schuerman, Associate Dean of Student Affairs, informed the Student Government that GPGU would not be recognized as an "official" activity of Georgetown University.[9] He wrote:

The administration recognizes that the issue is both an educational and pastoral one. It is an issue that the University has addressed in an understanding manner. The University has been and will continue to be sensitive to the concerns of its gay students and the problems they face on the campus and in our society. . . .

The University has acknowledged in a supportive way its gay students. These students may continue to organize, to express opinions, to publicize educationally related events. Gay students may use University facilities for educationally related purposes such as meetings, discussion groups, speakers, etc. The office and services of the Director of Student Activities are available to gay students for help and assistance in planning educationally related programs. All academic personnel and educational support services in the University are open and available to gay students for assistance and advice.

It is the position of the University that this access by gay students to University resources:

(1) Makes possible an atmosphere in which gay people as members of this University community can develop a sense of pride, self-worth and awareness.

(2) Provides for the dissemination of educational information that may encour-age understanding and dialogue between gay and non-gay people.

(3) Allows for forums and open expression of opinions helpful in the development of responsible sexual ethics consonant with individual personal beliefs.

(4) Allows students to gather together in an educational setting to share common interests and beliefs.[10]

*The University, however, will not endorse the [GPGU] as an "official" activity of its Student Affairs Programs.* The University will not contribute to the support of this organization:

(1) Through a grant of University funds.

(2) By providing subsidized office space, telephone service, office supplies, and equipment.

(3) By granting authorized use of the name Georgetown University.

Georgetown University is a private University with a history and tradition which is specifically Catholic. University administrators must often make decisions in light of the conscience and value system identified with this tradition. The University, in terms of this responsibility cannot concur with the argument of its Student Government in this particular case, that official acknowledgment would not imply endorsement.

This situation involves a controversial matter of faith and the moral teachings of the Catholic Church. "Official" subsidy and support of a gay student organization would be interpreted by many as *endorsement of the positions taken by the gay movement on a full range of issues.* While the University supports and cherishes the individual lives and rights of its students it will not subsidize this cause. *Such an endorsement*

---

8. According to "What Your Club Needs To Know," the criteria in force during that academic year, a "Student Government Charter" granted a group "official recognition as a legitimate activity of the student body." *Id.* at 3. The term "Student Government Charter" does not appear in "Recognition Criteria," but essentially the same attributes are contained in "Student Body Endorsement."

9. Although Dean Schuerman did not expressly say so, the student groups, the University and the trial court all treated his letter as a denial of "University Recognition."

10. In other words, Dean Schuerman claimed that the University's position allowed GPGU to achieve most, if not all, of the purposes set forth in its constitution. *See* GPGU Constitution (*quoted supra* note 5).

*would be inappropriate for a Catholic University.*

Memorandum from Dean W. Schuerman to the Student Government (Feb. 6, 1979) (emphasis added).

GPGU appealed Dean Schuerman's decision to the Dean of Student Affairs, William R. Stott, Jr., and met with him for that purpose. *See* letter from GPGU to Dean W. Stott, Jr. (Feb. 24, 1979). Dean Stott upheld the decision to "den[y] endorsement to the [GPGU] as an official activity of the University's Student Affairs Program." Letter from Dean W. Stott, Jr., to GPGU (Mar. 5, 1979). He continued:

The fact that *the University has chosen not to grant endorsement to the [GPGU]* as an approved student activity, does not indicate a lack of concern, a lack of sympathy for the Gay Student in particular, or students in general. It simply means that after the facts have been considered and discussion has taken place, *there remains a point of disagreement as to whether endorsement of the [GPGU] as a student activity is appropriate for a Catholic University.* The University's decision, therefore, is not a reflection on or a judgment of the personal choices of its members, but rather represents a judgment of what is appropriate for Georgetown as an institution.

*Id.* (emphasis added).

GPGU again appealed, this time to Reverend Aloysius P. Kelley, S.J., Executive Vice President for Academic Affairs. Taking issue with the equation of "recognition" and "endorsement," GPGU wrote:

We think it important to emphasize at the start that *what we are seeking is recognition, not endorsement, as Dean Stott's response seems to imply.* It is our belief, as well as that of the student government, that *official recognition of our organization would not be construed as an endorsement of homosexual activity.* Since this seems to be the major concern of the administration, we ask: "Is it not possible for the administration to issue a statement saying that,

in granting recognition to our group, it is *not* endorsing such activity?"

Letter from GPGU to Reverend A. Kelley, S.J. (Apr. 9, 1979) ("not" emphasized in original, remaining emphasis added).

After meeting with GPGU representatives, Reverend Kelley denied its appeal. He relied upon the position taken by Deans Schuerman and Stott, and then added:

As I tried to explain when we talked, I believe that our goals are essentially the same, but that the means to arrive at them are different. Georgetown will continue to show support for Gay Students but in a way which is deemed appropriate for this University. You mentioned that there may be additional ways in which the Administration could be supportive short of official recognition and I suggested that you discuss these with Mr. Schuerman.

Letter from Reverend A. Kelley, S.J., to GPGU (Apr. 9, 1979).

Reverend Kelley's denial of GPGU's appeal ended its attempt to gain "University Recognition" in academic year 1978–79.

GPGU renewed its efforts early in the following academic year. This time it made separate visits to SAC to request a "Student Government Charter" and, later, "University Recognition." SAC approved GPGU's request for a "Student Government Charter" on November 13 and its decision was ratified by the Student Senate on November 18, 1979. SAC accompanied its approval with the following statement:

The [GPGU] convinced the SAC, with both their written constitution and their oral presentation, that they represent a distinct group of students on this campus whose existence we as student representatives are bound to acknowledge. Furthermore, by enumeration of their educational functions (e.g. answering questions in nursing classes, enlightening RAs, etc.) the [GPGU] depicted itself as, to borrow from the criteria, "a positive force within the University community."

As had happened the previous year, Dean Schuerman wrote immediately to the Student Government to point out that the administration did not accept the action of

SAC as giving "official recognition" to GPGU. Memorandum from Dean W. Schuerman to the Student Government (Nov. 21, 1979). The reasons he gave were essentially borrowed from his letter of the previous year. Memorandum from Dean W. Schuerman to the Student Government (Feb. 6, 1979) (*quoted supra* at 19–21).

Undaunted, GPGU again appeared before SAC two weeks later and requested "University Recognition" to add to the "Student Body Endorsement" it had already received. Both SAC and the Student Senate voted in favor of GPGU despite the administration's recent announcement that it would not accede to this request. At the end of 1979, therefore, GPGU was awaiting the University's reaction to the favorable response it had won from the Student Government.

On January 15, 1980, in an effort to clarify its position, GPGU requested the administration to furnish it with a statement as to the group's status. This was provided by the Director of Student Activities, Debbie L. Gottfried. After repeating the administration's previous reasons for denying "University Recognition," she added:

> As I have told you and other gay students, the services of my office are available to you for help and assistance in planning educationally related programs. I cannot stress to you enough the sincerity behind this offer. I cannot offer any possibility of the University's changing its position on *what it feels would be interpreted as endorsement and official support of the full range of issues associated with this cause.*

Letter from D. Gottfried to GPGU (Jan. 18, 1980) (emphasis added); *see also* memorandum from Dean W. Schuerman to D. Gottfried (Jan. 16, 1980).

Both GPGU and the Student Government requested that this decision be reconsidered. Letter from the Student Government to Dean W. Schuerman (Feb. 5, 1980). As had happened the previous year, GPGU met with Dean Schuerman, but failed to persuade him that "University Recognition" was appropriate. Dean Schuerman wrote:

> In my judgment, *official recognition by the University of a gay student organization would be interpreted by many as endorsement, support, and approval of the positions taken by the gay movement on a full range of issues.* This would be inappropriate for a Catholic University. While I recognize your disagreement with this position, I was not dissuaded by your argument that the University could on the one hand grant official recognition (defined by Student Government's recently updated criteria as "endorsement of the various co-curricular activities undertaken by a specific club") and on the other hand, disclaim *"endorsement" of the major activities which, by definition, are associated with a gay organization.*
>
> ... [T]he University does not recognize the [GPGU] as an official activity of the Student Affairs program and will not subsidize this cause.

Letter from Dean W. Schuerman to GPGU (Feb. 21, 1980) (emphasis added).

Continuing in the pattern set the previous year, GPGU unsuccessfully appealed Dean Schuerman's decision to Dean Stott and Reverend Donald Freeze, S.J., Vice President for Academic Affairs and Provost. Letter from Dean W. Stott, Jr., to GPGU (Mar. 14, 1980); letter from Reverend D. Freeze, S.J., to GPGU (Mar. 31, 1980). This time it appealed, without success, all the way to President Healy. Letter from GPGU to President T. Healy, S.J. (Apr. 1, 1980); letter from President T. Healy, S.J., to GPGU (Apr. 29, 1980). The day after President Healy's ultimate denial of "University Recognition," this action was filed in Superior Court.

By then, a similar chain of events had taken place at the Law Center. On December 6, 1979, GRC had submitted its application to become a "recognized" student activity to the Law Center Committee on Student and Faculty Life (CSFL). Its petition was approved by CSFL on February 14, 1980. Two weeks later, David J. McCarthy, Jr., Dean of the Law Center,

told CSFL that he would not "implement either recognition or funding of the proposed organization." Memorandum from Dean D. McCarthy, Jr., to CSFL (Feb. 26, 1980). Dean McCarthy's reasons for denying GRC "official recognition" were couched in terms almost identical to those Dean Schuerman had given GPGU. *See* memorandum from Dean W. Schuerman to the Student Government (Feb. 6, 1979) (*quoted supra* at 19–21). After this action had been filed, President Healy informed Dean McCarthy that his earlier decision denying GPGU "University Recognition" on the main campus applied equally and for the same reasons to GRC at the Law Center. Letter from President T. Healy, S.J., to Dean D. McCarthy (May 8, 1980) ("The University's decision is not a reflection on or a judgment of the personal choices of its individual members but rather reflects a judgment of what is appropriate for Georgetown as an institution").[11] A letter to the same effect was sent to the Chancellor of the Medical Center, Georgetown University's one remaining campus, although no similar group there had sought "University Recognition." Letter from President T. Healy, S.J., to Chancellor M. McNulty (May 8, 1980).

Thus, at the time this action was filed, GPGU had obtained "Student Body Endorsement" at the Main Campus and GRC had obtained its apparent equivalent at the Law Center. Neither group had been successful in its attempts to obtain "University Recognition" or the additional benefits that status carries with it.

## II

### THE TRIAL COURT PROCEEDINGS

The two gay student groups and twenty individual members brought suit against Georgetown University, its president, and the dean of its Law Center. They alleged that the denial of "University Recogni-

tion," together with the increased access to facilities and services that status entails, violated the Human Rights Act. *See* D.C. Code § 1–2520 (1987) (*quoted supra* note 1). Georgetown defended itself by insisting that its denial of "University Recognition" was not "on the basis of" the sexual orientation of the students, but rather on account of the "purposes and activities" of the particular organizations they had formed. Georgetown also asserted that even if its actions were taken on the basis of sexual orientation, they were protected by the Free Exercise Clause of the First Amendment.[12]

The student groups moved for summary judgment. On March 9, 1981, the trial court partially granted their motion. Judge Leonard Braman found that Georgetown's denial of "University Recognition" violated the Human Rights Act. On the statutory issue as to whether Georgetown had discriminated on the basis of sexual orientation, he held, no material factual issue was in genuine dispute and the student groups were entitled to judgment as a matter of law. *See* Super.Ct.Civ.R. 56(c); *Howard v. Riggs National Bank*, 432 A.2d 701, 705–06 (D.C.1981). Judge Braman ordered that the only issue set for trial would be the validity of the University's claimed free exercise defense.

In so doing, Judge Braman found immaterial to the statutory discrimination issue Georgetown's claim that a grant of "University Recognition" would constitute an unwilling "endorsement" of the student groups.

Discrimination on the basis of sexual orientation having been found, and a statutory violation therefore established, the case proceeded to a nonjury trial on Georgetown's free exercise defense. After seven days of testimony, Judge Sylvia Bacon held that the statute was unconstitu-

---

11. Shortly afterwards, a substantial majority at a Law Center faculty meeting voted to endorse CSFL's approval of GRC's petition for "recognition."

12. Georgetown also counterclaimed to prevent the student groups from using the words

"Georgetown University" in their names. It has not appealed from the trial court's dismissal of the counterclaim. That issue is not before us and Judge Mack expresses no opinion, expressly or impliedly, thereupon.

tional as applied to the facts of this case: "the District of Columbia Human Rights Act must yield to the Constitutional guarantee of religious freedom."

Judge Bacon made several findings of fact. She described the three levels of recognition available to campus organizations and found that the student groups had achieved "Student Body Endorsement," together with its attendant tangible benefits, but had been denied "University Recognition" and the additional tangible benefits which accompany that status.

Judge Bacon also found that "Georgetown University is a religiously affiliated educational institution which serves both sectarian and secular purposes." In denying "University Recognition," Judge Bacon determined that Georgetown's administrators had applied the moral or normative teachings of the Roman Catholic Church, as these were established at trial through expert testimony and Church documents. *See* Archbishop John R. Quinn, A Pastoral Letter on Homosexuality (May 5, 1980); Sacred Congregation for the Doctrine of the Faith, Declaration On Certain Questions Concerning Sexual Ethics (Dec. 29, 1975). Under Catholic doctrine, sexual function has its true meaning and moral rectitude only in heterosexual marriage. Homosexual acts—as distinguished from a homosexual orientation—are morally wrong and must be viewed as "gravely evil and a disordered use of the sexual faculty." Persons of homosexual orientation have an obligation to "try as is reasonably possible to change if they find themselves in such orientation" and must in any event conform their conduct to the normative teachings on human sexuality. No believer affiliated with the Roman Catholic Church may condone, endorse, approve or be neutral about homosexual orientation, homosexual lifestyle or homosexual acts.

Judge Bacon found that "the major purpose of '[U]niversity [R]ecognition' is official endorsement, an endorsement which the University believes will conflict with the normative teachings of the Church on homosexuality." However, Judge Bacon acknowledged that, in addition to the "en-dorsement," a grant of "University Recognition" allows a student group access to additional facilities and services.

Judge Bacon also found that Georgetown's denial of "University Recognition" was based on its view, one not without foundation, that "the gay student organizations, as evidenced by their charters and their activities, were participating in and promoting homosexual life styles," and that Georgetown was religiously opposed to this type of group activity. University administrators acted upon a sincerely-held religious belief that official recognition of the two groups "would be inconsistent with Church normative teachings and with the basic obligation not to undermine the normative teachings of the Church." Finally, Judge Bacon found that without "University Recognition" clubs may be formed, meetings held on campus, and application made for lecture funds, and that in the District of Columbia there are other off-campus opportunities available to gay students.

In addition to her findings of fact, Judge Bacon made several conclusions of law. She held that Georgetown University is not so pervasively secular that it cannot separate secular and sectarian activities and that its receipt of federal funds for secular purposes neither required it to abandon its sectarian activities nor put it in violation of the Establishment Clause of the First Amendment. Moreover, its status as a church-affiliated educational institution allowed it to raise and rely on First Amendment guarantees of religious freedom. The religious beliefs in issue are sincerely held and central to the Roman Catholic faith and they impose affirmative commands upon its adherents. Judge Bacon held that enforcement of the Human Rights Act in this case would require Georgetown to act in a manner "inconsistent with its duties as a Catholic institution" and would therefore place a burden on the free exercise of religion. On the other hand, because there is no "national" policy requiring state intervention in matters relating to sexual orientation, the Human Rights Act does not further any "compelling" governmental interest which could

outweigh the burden on religious exercise. In the circumstances of this case, she held, the Human Rights Act is "a local enactment of well-motivated purpose but impermissible reach." Upholding Georgetown's free exercise defense, Judge Bacon dismissed the student groups' complaint.

## III

## THE HUMAN RIGHTS ACT VIOLATION

In granting partial summary judgment, Judge Braman found that Georgetown's denial of "University Recognition" and the attendant tangible benefits violated the Human Rights Act. At trial on the free exercise defense, Judge Bacon therefore proceeded from the premise of an established statutory violation. Without challenging the underlying finding of a Human Rights Act violation, Georgetown asks this court to affirm Judge Bacon's conclusion that the Human Rights Act is unconstitutional as applied.

"If there is one doctrine more deeply rooted than any other, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable." *Spector Motor Services, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). Thus, "if a case may be decided on either statutory or constitutional grounds, [the courts], for sound jurisprudential reasons, will inquire first into the statutory question." *Harris v. McRae*, 448 U.S. 297, 306–07, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784 (1980); *see also, e.g., New York City Transit Authority v. Beazer*, 440 U.S. 568, 582–83, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979); *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932). A constitutional issue

is presented in this case only if Judge Braman correctly concluded that the statute was violated. Before considering Judge Bacon's later ruling on the free exercise defense, we must ask ourselves whether the Human Rights Act was properly construed by Judge Braman.

■ The deeply rooted doctrine that a constitutional issue is to be avoided if possible informs our principles of statutory construction. We do not needlessly pit a statute against the Constitution. Insofar as its language permits, the Human Rights Act must be construed in a manner which protects its constitutionality. *E.g., United States v. Locke*, 471 U.S. 84, 92, 105 S.Ct. 1785, 1791, 85 L.Ed.2d 64 (1985); *Ellis v. Brotherhood of Railway Clerks*, 466 U.S. 435, 444, 104 S.Ct. 1883, 1890, 80 L.Ed.2d 428 (1984); *International Association of Machinists v. Street*, 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1789–90, 6 L.Ed.2d 1141 (1961); *Moore v. Coates*, 40 A.2d 68, 71 (D.C.1944); *see generally* SUTHERLAND STATUTORY CONSTRUCTION §§ 2.01, 45.11 (4th ed. 1985) (hereinafter SUTHERLAND). Moreover, it should be read, if it can be, so as to avoid difficult and sensitive constitutional questions concerning the scope of the First Amendment. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979); *see also, e.g., United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985); *Nova University v. Educational Institution Licensure Commission*, 483 A.2d 1172, 1179–80 (D.C.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1986); *see generally* SUTHERLAND, *supra*, at § 45.11.[13]

On the facts of this case, as found by Judge Bacon after trial, the particular scheme of "University Recognition" operat-

---

**13.** While none of the parties has raised this issue, amicus Arthur B. Spitzer argues forcefully that Judge Braman misconstrued the Human Rights Act. We cannot ignore the argument of an amicus curiae on this potentially dispositive issue. *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 697, 104 S.Ct. 2694, 2699, 81 L.Ed.2d 580 (1984); *Fry v. United States*, 421 U.S. 542, 545 n. 5, 95 S.Ct. 1792, 1794–95 n. 5, 44 L.Ed.2d 363 (1975). Avoidance of the constitutional issue by the correct statutory interpretation

would be the appropriate course even if it had not been briefed, *United States v. Albertini, supra*, 472 U.S. at 679–80, 105 S.Ct. at 2902; *United States v. Grace*, 461 U.S. 171, 175–76, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983), or if it had never been considered by the lower court, *Capital Cities Cable, Inc. v. Crisp, supra*, 467 U.S. at 697, 104 S.Ct. at 2699; *United States v. Clark*, 445 U.S. 23, 27–28, 100 S.Ct. 895, 899–900, 63 L.Ed.2d 171 (1980).

ing at Georgetown includes a religiously guided institutional "endorsement" of recipient student groups. Contrary to Judge Braman's earlier construction, the Human Rights Act does not require one private actor to "endorse" the ideas or conduct of another. The trial court's interpretation would defeat the plain language of the statute and simultaneously transform the Human Rights Act into a patent invasion of the First Amendment. The statute would be rendered both practically and legally unenforceable. Because the Human Rights Act does not require Georgetown to "endorse" the student groups, its denial of "University Recognition" did not violate the statute.

While the Human Rights Act does not require any "endorsement"—and therefore does not require the type of "University Recognition" offered by Georgetown—it does require equal access to the "facilities and services" attendant upon that status. D.C.Code § 1–2520 (1987). In this case the student groups have been denied four tangible benefits that also come with a grant of "University Recognition": officially approved use of a mailbox, use of the Computer Label Service, mailing services, and the right to apply for (but not necessarily to receive) funding. All of these tangible benefits, unlike an "endorsement," are "facilities and services" within the meaning of the Human Rights Act; the record supports Judge Braman's conclusion that they were denied on the basis of sexual orientation. *Id.* Tangible benefits having been denied upon an impermissible basis, we affirm, to that extent only, Judge Braman's finding that the Human Rights Act was violated; we reverse his holding that the denial of "University Recognition" was of itself a statutory violation.

A. *Judge Bacon's Factual Finding that "University Recognition" at Georgetown Includes an "Endorsement"*

■ Judge Bacon found as a fact that under the Georgetown scheme "University Recognition" benefits a student group in two ways. "The major purpose of '[U]niversity [R]ecognition' is official endorsement....", an "endorsement" which

Georgetown tenders in accordance with the normative teachings of the Roman Catholic Church. "University Recognition" also gives a student group access to certain tangible benefits. Unless "clearly erroneous," these factual findings are binding upon us for purposes of this appeal. D.C. Code § 17–305(a) (1981); *see Chaconas v. Meyers*, 465 A.2d 379, 384 (D.C.1983); *Blanken & Blanken Investments, Inc. v. Keg, Inc.*, 383 A.2d 1076, 1078 n. 4 (D.C. 1978); *Cunningham v. Cunningham*, 154 A.2d 124, 125 (D.C.1959).

Specifically, the student groups urge us to disregard as clearly erroneous Judge Bacon's factual finding that "University Recognition" at Georgetown includes an "endorsement." They point out that other groups with "University Recognition" occupy a broad range of the political, social and philosophical spectrum, and argue that Georgetown cannot claim that all of these organizations are strictly Roman Catholic in outlook. In particular, the student groups refer us to the recognized existence of such diverse bodies as the Jewish Students Association, the Organization of Arab Students, the Young Americans for Freedom, and the Democratic Socialist Organizing Committee.

At trial, the student groups challenged President Healy with evidence concerning the University's willingness to extend "University Recognition" to organizations whose members adhere to religions other than Catholicism. President Healy responded:

It is the understanding of the Roman Catholic Church that faiths other than the Roman Catholic Church are, to put it in the technical terms, carriers of grace and as such are good. The Roman Catholic Church would feel that they are incomplete, but in the context of a complex university, it is the clear and stated purpose of the Roman Catholic Church that those of other faiths receive the same pastoral and intellectual sustenance in their faith as far as it is possible for the University to grant it, given the multiplicity, as Catholic students receive from a Catholic university.

The student groups also sought to undermine Georgetown's claim of "endorsement" by pointing to views on artificial birth control, abortion, divorce and lesbianism associated with members of the Women's Rights Collective (WRC) and the Women's Political Caucus (WPC). However, one of their witnesses, Sister Mary K. Liston, stated that WPC, another campus group of which she was a member, had not and could not take a pro-abortion position "[b]ecause of the stand of the Catholic Church on the issue of abortion." Sona Jean Vandall, a representative of WRC, acknowledged that the only formally stated purpose of that organization is the eradication of policies and practices which alienate and discriminate against women. She further testified that views contrary to Roman Catholic teachings were carried in none of WRC's published information and that no such positions had been voted on by its membership. Referring to an occasion when WRC posted other organizations' notices concerning artificial birth control and abortion, President Healy testified that he referred the matter to a committee to "determine whether [these incidents were] an isolated instance or whether [they were] an essential part of the collective activity." After discussion with the various parties, he regarded the incidents in question as "such minor instances of activity as not to be of serious concern to the University." He concluded, on that basis, that withdrawal of WRC's "University Recognition" would not be appropriate.

With regard to the plaintiff student groups, President Healy saw the matter differently. He testified that the University does not distinguish between students on the basis of their sexual orientation and said that group activity merely promoting the legal rights of gay people would present no religious conflict. But, according to President Healy and other Georgetown representatives, including its theological expert, the purposes set forth in the GPGU Constitution described an organization for which "University Recognition" would be inappropriate for a Catholic institution.

"The statement that stopped me most," said President Healy, was GPGU's stated commitment to "the development of responsible sexual ethics consonant with one's personal beliefs." See GPGU Constitution (quoted supra note 5). Under Roman Catholic doctrine, as expert testimony established, responsible sexual ethics are not a question of personal belief. "The University cannot make that statement about any area of front line morality without insisting upon the objectivity of moral fact and that it is not left strictly to individual determination within any context which can reasonably be read as Catholic." Under Roman Catholic doctrine, contrary to GPGU's suggestion, sexual ethics are the subject of an absolute and unyielding moral law, one laid down by God.

President Healy also testified that GPGU's expressed intention to "establish a program of activities which reflect the above purposes," id., was "open-ended enough to involve the University in a host of positions and activities which together or singly it would find inappropriate." He had similar reservations about GRC's stated commitment to the provision of information to gay and lesbian law students concerning "Washington's gay community, including educational, cultural, religious, social and medical services." See GRC Constitution (quoted supra note 6). According to President Healy, GRC's association with the range of activities engaged in by the Washington gay community would "involve Georgetown University in positions it would not wish publicly to adopt."

Roman Catholic teachings establish "moral norms" which prevent believers from recognizing homosexual conduct, as distinguished from homosexual orientation, as anything other than sinful. President Healy added that the duty to obey these "moral norms"

would be more binding upon institutions, which have to act publicly and where there is an added moral consideration of leading others astray or giving scandal in the technical sense of the word, so that the binding authority of Roman Catholic teaching on an institution would, at least

in that dimension, be greater than it would be on an [individual].

Reverend Richard J. McCormick, S.J., Georgetown's theological expert, testified to the same effect. He said that a Roman Catholic university "has a duty to act in a way consistent with those teachings and not to undermine them in its public policies." Thus, "in its public policies and public acts," the University "ought not to adopt a public policy of explicit endorsement or implicit endorsement" of, for example, abortion, premarital intercourse, or homosexual conduct. Georgetown should not "in its public actions, policies, decisions, take a position that would equivalently establish another normative lifestyle equally valid with the one that is in a normative position." According to President Healy, a grant of "University Recognition" to GPGU and GRC would conflict with Georgetown's duty not to undermine the Roman Catholic teaching that "human sexuality can be exercised only within marriage...."

The trial court did not define precisely what it meant by "endorsement." For President Healy, "a position that the Church was *either neutral or approving* of the range of homosexual activities is unacceptable." (Emphasis added.) This statement reveals what we understand to be at stake. An official "endorsement," as symbolized by Georgetown's grant of "University Recognition," would express religious approval of or neutrality towards the student groups. Under the Georgetown scheme, "University Recognition" is reserved for groups that do not fundamentally challenge the "moral norms."

We cannot characterize as "clearly erroneous" Judge Bacon's finding that the scheme of "University Recognition" offered by Georgetown includes the type of "endorsement" just described. "Recognition Criteria" described it as an "endorse-ment." Georgetown administrators repeatedly testified that they understood it to have that effect. From the outset of its dealings with GPGU and GRC, Georgetown equated "University Recognition" with an "endorsement." Neither "Recognition Criteria" nor any evidence adduced at trial indicates that "University Recognition" is an automatic right. That status was granted in the University's discretion and some application of Roman Catholic doctrine was involved in the recognition process.

Our required deference to Judge Bacon's factual finding is not undercut by Georgetown's willingness to "endorse" a wide range of groups with extremely diverse goals and activities. For those whose common interest is a non-Catholic religious belief system, Georgetown's "endorsement" appears to have been granted in the spirit of ecumenism. For others, including WRC, the evidence permitted Judge Bacon to conclude that no "essential part of the collective activity" contravened Roman Catholic doctrine, and that the administration would withdraw "University Recognition" if there were more than "isolated instances" of unofficial activity inconsistent with those teachings. The trial court was therefore entitled to conclude that the University adopted an approving or at least neutral position towards all of the existing groups because it did not perceive them to be incompatible with its religious obligations. This comports with our understanding of what "endorsement" means in this case.

An appellate court may not usurp the role of the factfinder. We cannot label "clearly erroneous" Judge Bacon's "endorsement" finding, i.e., that "University Recognition" at Georgetown contains an expression of religious approval or neutrality towards a student group obtaining that status.[14]

14. An appellate court cannot select its facts. It deals with concrete cases and the facts found by the trial court set the limits of its decision. Here, a critical fact is the trial court's finding that Georgetown's particular scheme of "University Recognition" includes an institutional "endorsement" of the recipient student group.

Judge Ferren accepts that factual finding but ignores its First Amendment implications. *Post* at 112–15 & 129 note 15. Judge Terry, on the other hand, appears to agree with the entire court except Judge Ferren that the Human Rights Act requires no "endorsement." *Post* at 166–67.

## B. The "Endorsement" Distinguished from the Tangible Benefits

■ The distinction between the "endorsement" and the other benefits contained in Georgetown's scheme of "University Recognition" is fundamental. It is so from both a statutory and a constitutional perspective. In this case, the separateness of the benefits at issue is obscured by the fact that they are bundled together into a single package known as "University Recognition." Because the "endorsement" and the tangible benefits contained in that package are fundamentally distinct, we must sever the artificial connection between them in order to analyze the true issues.

■ The "endorsement" contained in "University Recognition" is an intangible. To a student group, it is no more than an expression of official approval or neutrality, a statement of Georgetown's tolerance towards organizations that pose no fundamental challenge to the "moral norms." The "endorsement" is a symbolic gesture, a form of speech by a private, religiously affiliated educational institution, an entity free to adopt partisan public positions on moral and ethical issues.[15] In speaking out on human sexuality, Georgetown is guided by a religious mission undertaken along with secular educational functions. The

"endorsement" contained in "University Recognition" assists the student group only by giving it Georgetown's imprimatur or, at least, nihil obstat. Quite different are the tangible benefits associated with "University Recognition." Unlike the "endorsement," the tangible benefits are "facilities and services," D.C. Code § 1–2520 (1987), and not an abstract expression of the University's moral philosophy. Their distinct characteristics are disguised only because both the "endorsement" and the additional tangible benefits are included in one package known as "University Recognition."

As amicus The Governor's Council on Lesbian and Gay Issues of the State of Wisconsin points out, "such a structure unnecessarily ties the University's religious beliefs to extension of benefits." Brief at 5–6. We agree. While the "endorsement" and the tangible benefits may be one for Georgetown's administrative purposes, they are not so in the eyes of the Human Rights Act, nor are they so in the eyes of the First Amendment. "The constitutionality of the statute," as the District of Columbia remarks, "cannot depend on the [U]niversity's internal linkages." Reply Brief at 3. We open up the package of "University Recognition" and examine its contents separately.[16]

---

15. A public university may not impose content-based restrictions on speech, and it may not use its student body recognition process to comment upon the rightness or wrongness of homosexual conduct. *Healy v. James,* 408 U.S. 169, 180–84, 92 S.Ct. 2338, 2345–47, 33 L.Ed.2d 266 (1972); *see also, e.g., Gay Student Services v. Texas A & M University,* 737 F.2d 1317, 1326–30 (5th Cir.1984), *cert. denied and appeal dismissed,* 471 U.S. 1001, 105 S.Ct. 1860, 85 L.Ed.2d 155 (1985); *Gay Lib v. University of Missouri,* 558 F.2d 848, 852–57 (8th Cir.1977); *Gay Alliance of Students v. Matthews,* 544 F.2d 162, 164–67 (4th Cir.1976); *Gay Students Organization of the University of New Hampshire v. Bonner,* 509 F.2d 652, 657–62 (1st Cir.1974); *Gay Activists Alliance v. Board of Regents of the University of Oklahoma,* 638 P.2d 1116, 1119–23 (Okla.1981). A private university, such as Georgetown, is under no such constitutional restrictions. *See, e.g., Williams v. Howard University,* 174 U.S.App.D.C. 85, 87, 528 F.2d 658, 660, *cert. denied,* 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed. 2d 123 (1976); *Greenya v. George Washington University,* 167 U.S. App.D.C. 379, 382–85, 512

F.2d 556, 559–62, *cert. denied,* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975); *Spark v. Catholic University of America,* 167 U.S.App.D.C. 56, 80–81, 510 F.2d 1277, 1281–82 (1975); *cf.* Cover, *The Supreme Court 1982 Term—Foreword: Nomos and Narrative,* 97 Harv.L.Rev. 4 (1983) (discussing obligation of courts to fully justify forced imposition of legal norms that threaten autonomy of cultural communities committed to alternative moral visions of society).

16. At no stage of this litigation have the parties requested that the "endorsement" and the tangible benefits be treated separately. The case has been litigated throughout on an "all or nothing" basis. The student groups nevertheless insist that they demand only equal tangible benefits and are unconcerned about the University's "endorsement." In the words of the District of Columbia: "The gay students and their associations do not ask for more than equal access to the incidental facilities and services which the trial court found had been discriminatorily denied; they do *not* seek university approval. ... [T]hey would be fully satisfied if the university

## C. *Applying the Human Rights Act to the "Endorsement" Element of "University Recognition"*

The Human Rights Act does not require one private actor to "endorse" another. Georgetown's denial of "University Recognition" to the student groups did not violate the statute.

■ There are two reasons why, as a matter of statutory construction, the Human Rights Act cannot be read to compel a regulated party to express religious approval or neutrality towards any group or individual. First, the statute prohibits only a discriminatory denial of access to "facilities and services" provided by an educational institution. D.C. Code § 1–2520 (1987). An "endorsement" is neither. The Human Rights Act provides legal mechanisms to ensure equality of *treatment*, not equality of *attitudes*. Although we fervently hope that nondiscriminatory attitudes result from equal access to "facilities and services," the Human Rights Act contains nothing to suggest that the legislature intended to make a discriminatory state of mind unlawful in itself. Still less does the statute reveal any desire to force a private actor to express an idea that is not truly held. The Human Rights Act demands action, not words. It was not intended to be an instrument of mind control. Judge Braman's construction of the statute, as requiring an insincere expression of opinion, conflicts with its literal meaning.

■ Second, as we have already pointed out, unless the language of the statute is plainly to the contrary, we must construe it so as to uphold its constitutionality. To read into the Human Rights Act a requirement that one private actor must "endorse" another would be to render the statute unconstitutional. The First Amendment protects both free speech and the free exercise of religion.[17] Its essence is that government is without power to intrude into the domain of the intellect or the spirit and that only conduct may be regulated. Interpreting the Human Rights Act so as to require Georgetown to "endorse" the student groups would be to thrust the statute across the constitutional boundaries set by the Free Speech Clause and also, where sincere religious objections are raised, the Free Exercise Clause. Nothing in the statute suggests, let alone requires, such a result.

Because similar interests are often implicated, the Supreme Court has relied on both the Free Speech Clause and the Free Exercise Clause to protect against government intrusion into the inner domain. The Court has made clear that the state is without power to regulate the intellect or the spirit; its rule is over actions and behavior only. In its initial decision interpreting the Free Exercise Clause, the Court described the division between opinion and action as "the true distinction between what properly belongs to the Church and what to the State." *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 163, 25 L.Ed. 244 (1878). With the adoption of the Free Exercise Clause, "Congress was deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive of good order." *Id.* at 164. The Court quoted with approval a statute drafted by Thomas Jefferson to protect religious freedom in Virginia: "[i]t is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." *Id.* (quoting 12 Hening's Stat. 84 (1784)). "[T]o suffer the civil magistrate to intrude his [or her] powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty." *Id.* The Court conclud-

___

permits equal access to the incidental privileges *without* university 'recognition.'" Supplemental Brief at 3 (emphasis in original). On the other hand, it is towards a compelled "endorsement" that Georgetown's religious objection is directed.

17. The First Amendment provides, in relevant part: "Congress shall make no law ... prohibiting the free exercise [of religion]; or abridging the freedom of speech...." U.S. Const. amend. I.

ed, as a matter of constitutional principle, that "[l]aws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." *Reynolds, supra,* 98 U.S. at 166.[18]

■ That principle has been emphatically reaffirmed in a later free exercise case: "the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut, supra* note 18, 310 U.S. at 303–04, 60 S.Ct. at 903 (citations omitted). The principles embraced within the "absolute" core of the clause, freedom of conscience, thought and expression of religious belief, as "sacred private interests, basic in a democracy," *Prince v. Massachusetts,* 321 U.S. 158, 165, 64 S.Ct. 438, 441, 88 L.Ed. 645 (1944), cannot be forced to jostle for position with other values regarded by the state as more deserving.

A number of free speech cases have expanded the idea that government cannot force one to embrace a repugnant philosophy. Initially, these decisions implicated religious objections, but the Supreme Court has since made clear that the protection against forced speech also extends to matters of a secular nature. In *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), children attending public schools were required to salute the United States flag upon pain of expulsion and possible criminal penalties against their parents. This symbolic gesture was an affront to the religious beliefs of Jehovah's Witness-

es. "To sustain the compulsory flag salute," observed the Court, "we are required to say that a Bill of Rights which guards the individual's right to speak his [or her] own mind left it open to public authorities to compel him [or her] to utter what is not in his [or her] mind." *Id.* at 634, 63 S.Ct. at 1183. The Constitution precludes such a result: "the action of the local authorities in compelling the flag salute and pledge transcend[ed] constitutional limitations on their power and invad[ed] the sphere of intellect and spirit which it is the purpose of the First Amendment to our constitution to reserve from *all* official control." *Id.* at 642, 63 S.Ct. at 1187 (emphasis added). The state has no "power to force an American citizen publicly to profess any statement of belief." *Id.* at 634, 63 S.Ct. at 1183. Only one member of the Court preferred to reach this result by emphasizing the religious nature of the objections: "Official compulsion to affirm what is contrary to one's religious beliefs is the antithesis of freedom of worship." *Id.* at 646, 63 S.Ct. at 1189 (Murphy, J., concurring).

In a later free exercise case concerning a Sunday closing statute challenged by Orthodox Jews, *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (plurality opinion), the Court carefully distinguished *Barnette* before upholding the regulation. It stressed that "[c]ertain aspects of religious exercise cannot, *in any way,* be restricted or burdened by either federal or state legislation.... The freedom to hold religious beliefs and opinions is *absolute.*" *Braunfeld, supra,* 366 U.S. at 603, 81 S.Ct. at 1146 (emphasis added). A "compulsory flag salute requires *affirma-*

---

18. As early as 1813, one court at least partly anticipated the Supreme Court's distinction between religiously motivated actions and the underlying beliefs or the expression of those beliefs. Departing from the English common law, a New York court held that the state constitution protected a Roman Catholic priest against compulsion to reveal in testimony confidences he had received in the confessional. *People v. Philips* (N.Y.Ct.Gen.Sess. June 14, 1813), *reported in* W. SAMPSON, THE CATHOLIC QUESTION IN AMERICA (New York 1813 and photo. reprint 1974). The court relied upon the First Amendment, as well as the state constitution, even though it was

not until 1940 that the Supreme Court made the federal free exercise guarantee directly applicable to the states through the Fourteenth Amendment. *See Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The *Philips* court held: "Although we differ from the witness and his brethren, in our religious creed ... [t]hey are protected by the laws and constitution of this country, in the full and free exercise of their religion, and this court can never countenance or authorize the application of insult to their faith, or of torture to their consciences." W. SAMPSON, *supra,* at 114.

tion of a belief and an attitude of mind." Id. at 605–06, 81 S.Ct. at 1147 (quoting Barnette, supra, 319 U.S. at 633, 63 S.Ct. at 1183) (emphasis added in Braunfeld). In contrast to the flag salute cases, however, the Braunfeld statute did not outlaw "the holding of any religious belief or opinion, nor [did] it force anyone to embrace any religious belief or to say or believe anything in conflict with his [or her] religious tenets." Id. at 603, 81 S.Ct. at 1146; accord, Wallace v. Jaffree, 472 U.S. 38, 48–55, 105 S.Ct. 2479, 2486–89, 86 L.Ed.2d 29 (1985) ("the First Amendment was adopted to curtail the power of Congress to interfere with the individual's freedom to believe, to worship, and to express himself [or herself] in accordance with the dictates of his [or her] own conscience"); Wisconsin v. Yoder, 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972) ("under the Religion Clauses beliefs are absolutely free from the state's control"); Gillette v. United States, 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971) ("the Free Exercise Clause bars 'governmental regulation of religious beliefs as such' ... or interference with the dissemination of religious ideas" (emphasis in original; citations omitted)); Sherbert v. Verner, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) ("The door of the First Amendment stands tightly closed against any government regulation of religious beliefs as such.... Government may neither compel affirmance of a repugnant belief ... nor penalize or discriminate against individuals or groups because they hold views abhorrent to the authorities" (emphasis in original; citations omitted)). Similarly, in Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), the Court held that a statute requiring a declaration of belief in God as a test for public office violated the Free Exercise Clause. The state regulation "unconstitutionally invade[d] the appellant's freedom of religion and therefore [could not] be enforced against him." Id. at 496, 81 S.Ct. at 1684.

The Court relied on broader free speech principles, as it had in Barnette, when it upheld the challenge of Jehovah's Witnesses whose religion forbade them from com-

pliance with a governmentally compelled exhibition of vehicle license plates bearing the state motto "Live Free or Die." Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). The question there was "whether the State may constitutionally require an individual to participate in the dissemination of an ideological message." Id. at 713, 97 S.Ct. at 1434. The answer was no. Speech may no more be officially prescribed than it may be proscribed. "The right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." Id. at 714, 97 S.Ct. at 1435. The Wooley Court explained that freedom from compelled expression is an essential element of a society dedicated to free speech. "A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" Id. at 714, 97 S.Ct. at 1435 (citing Barnette). A state measure forcing one to be an instrument for fostering public adherence to a repugnant point of view invades the sphere of intellect and spirit which the First Amendment reserves from all official control. Id. at 715, 97 S.Ct. at 1435.

The Supreme Court's most recent pronouncement on the right against compelled expression came in a free speech case without religious overtones. Pacific Gas & Electric Co. v. Public Utilities Commission, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion). A public utility company was ordered by the California Public Utilities Commission to include in its billing envelopes the speech of a third party with whom the utility disagreed. The state regulation in Pacific Gas & Electric did not require the utility to voice any "endorsement," but merely to serve as a vehicle for the views of a ratepayers' organization. Id. at 906–07, 911 n. 11. Furthermore, the utility's objections were not religiously based, so that only the Free

Speech Clause and not the Free Exercise Clause was implicated. *Id.* at 908–10. Finally, the utility engaged primarily in commercial speech relating to its business interests, although its newsletter also carried recipes, stories about wildlife conservation and other matters of public concern. *Id.* at 907–08. Despite these limitations, the Court upheld the utility's objection to the challenged regulation. The degree of intrusion upon the utility's First Amendment rights was doubtless considerably less than Judge Braman's construction of the Human Rights Act would impose upon Georgetown. In contrast to a heavily regulated public utility, Georgetown's stock-in-trade is in ideas; as a private, nonprofit, religiously affiliated educational institution seeking to implement its own vision of education, it is entitled to favor particular views on moral, ethical, philosophical, political and social issues.

"For corporations as for individuals," wrote the *Pacific Gas & Electric* plurality, "the choice to speak includes within it the choice of what not to say," *id.* at 912 (citing *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974)), because "[c]orporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster," *id.* at 907 (quoting *First National Bank v. Bellotti,* 435 U.S. 765, 783, 98 S.Ct. 1407, 1419, 55 L.Ed.2d 707 (1978)). "The essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas.... There is necessarily ... a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Id.* at 909 (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 559, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985) (quoting *Estate of Hemingway v. Random House, Inc.,* 23 N.Y.2d 341, 348, 296 N.Y.S.2d 771, 778, 244 N.E.2d 250, 255 (1968) (emphasis in original)). The Public Utilities Commission therefore could not compel the public utility to "assist in disseminating the speaker's message" or to "associate with speech with which [the public utility] may disagree." *Id.* at 911.[19]

19. In one unspoken respect, *Pacific Gas & Electric* differs from the *Barnette/Wooley* line of cases upon which it relied. The *Pacific Gas & Electric* plurality, having found a burden on the utility's speech, held that the government regulation could still be valid "if it were a narrowly tailored means of serving a compelling state interest," 106 S.Ct. at 913, but found no such interest present in that case. In *Barnette/Wooley,* as we have seen, the protection against compelled speech was absolute. The cases may be reconciled, however, by focusing on three factors, each of which puts Georgetown factually closer to *Barnette/Wooley* than to *Pacific Gas & Electric.*

First, no "endorsement" was threatened in *Pacific Gas & Electric.* The utility was required to act as a vehicle for the views of another, but not to express its approval or tolerance of them. 106 S.Ct. at 907, 911 n. 11. Thus, the burden on the utility's First Amendment rights was of a degree considerably less intrusive than it is here. *See id.* at 915 (Marshall, J., concurring); *id.* at 917–20 (Rehnquist, J., joined by White and Stevens, JJ., dissenting); *id.* at 922–24 (Stevens, J., dissenting). Second, although we express no view as to the constitutional significance of this distinction, no religious objections were at issue in *Pacific Gas & Electric,* so that the Free Exercise Clause was not implicated as it would be here by the trial court's construction of the Human Rights Act. *Id.* at 908–10. Finally, the *Pacific Gas & Electric* Court was divided as to the legal weight to be attached to the utility's commercial nature. *Compare id.* at 909, 912 (plurality opinion) *with id.* at 917 (Marshall, J., concurring); *id.* at 920–22 (Rehnquist, J., dissenting); *id.* at 922–24 (Stevens, J., dissenting). We believe that Georgetown, as a private, religiously affiliated university, whose existence is devoted to the generation of ideas rather than profit, has an interest considerably greater than that of a public utility in not being forced to publicly embrace moral positions with which it disagrees. *Cf. Miami Herald Publishing Co. v. Tornillo, supra,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (no balancing test applied in striking down right-of-reply statute burdening newspaper's First Amendment rights). This is not a question of government regulating speech by a business corporation, as in *Pacific Gas & Electric,* but of imposing official orthodoxy on controversial issues of religious, moral, ethical and philosophical importance, upon an entity whose role is to inquire into such matters. The First Amendment not only ensures that questions on difficult social topics will be asked, it also forbids government from dictating the answers.

Georgetown is accordingly shielded from a threatened "endorsement" by the absolute protection of *Barnette/Wooley,* rather than by the qualified protection of *Pacific Gas & Electric.*

In *Pacific Gas & Electric* the Supreme Court clarified the line between compelled expression and mere accommodation of another's speech. It distinguished *Prune-Yard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), in which the owner of a shopping center set up as a public forum was required by state law to admit pamphleteers. "Notably absent from *PruneYard*," said the Court,

> was any concern that access to this area might affect the shopping center owner's own right to speak: the owner did not even allege that he objected to the content of the pamphlets; nor was the right of access content-based. *PruneYard* thus does not undercut the proposition that forced associations that burden protected speech are impermissible.

*Pacific Gas & Electric, supra,* 106 S.Ct. at 910. In sharp contrast to the threatened "endorsement" here, the *PruneYard* Court had stressed the unlikelihood that the pamphleteers' views would be identified with those of the shopping center owner and also emphasized that no specific message was being dictated by the government in that case. 447 U.S. at 74, 100 S.Ct. at 2037. But Georgetown's scheme of "University Recognition" cannot be analogized to a public forum, nor can its campus be equated with "a business establishment that is open to the public to come and go as they please." *Id.*

Far from *PruneYard*'s required accommodation of another's speech, this case raises the specter of compelled expression in violation of the First Amendment. A grant of "University Recognition" by Georgetown includes an "endorsement" of student groups it considers broadly compatible with Roman Catholic doctrine. To that extent, "University Recognition" is speech. Government compulsion to grant "University Recognition" would threaten both the free speech and free exercise guarantees of the First Amendment. Al-

though a compelling state interest may justify regulation of religiously motivated conduct, nothing can penetrate the constitutional shield protecting against official coercion to renounce a religious belief or to endorse a principle opposed to that belief. "The very purpose of a Bill of Rights is to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majority and officials and to establish them as legal principles to be applied by the courts." *Barnette, supra,* 319 U.S. at 638, 63 S.Ct. at 1185. Georgetown's right to express opinions based on Roman Catholic teachings includes the right to do so by way of granting "University Recognition" to groups it regards as consonant with that belief system. Individuals will not always agree with Georgetown's choices as to what groups are deserving of its approval, but its right to freely express its views is nonetheless protected by the First Amendment.

Freedom of expression is a right to which we all lay equal claim, irrespective of the content of our message. This is easily illustrated. Suppose that the Gay University of America (GUA) is established as a private educational institution. Part of its mission is to win understanding and acceptance of gay and bisexual persons in an intolerant society. Although open to everyone, regardless of sexual orientation, GUA does expect its faculty, staff and students to maintain a sympathetic attitude towards gay practices and the philosophies that support them. GUA has, as the trial court finds, a system of "University Recognition" through which it expresses its approval or tolerance of various student groups desiring that status. But the GUA administration refuses to grant "University Recognition" to the Roman Catholic Sexual Ethics Association (RCSEA). In that situation, the Human Rights Act's ban on discrimination based on religion could not avail the Catholic student group, for the

---

*Cf.* Harpaz, *Justice Jackson's Flag Salute Legacy: The Supreme Court Struggles to Protect Intellectual Individualism,* 64 TEXAS L.REV. 817, 902–12 (1986) (first tier of proposed two-tiered analysis of compelled expression cases concerns those "in which government compulsion creates a ser-

ious risk of forced conformity to government-favored ideas" by directly requiring individuals "to engage in speech against their will"; in such cases, no government justification would suffice if its "purpose is to encourage a particular idea").

simple reason that the statute does not require GUA to give expressions of approval or tolerance. Insincere statements of opinion are not what the Human Rights Act requires. On the other hand, the statute would require equal distribution of any attendant tangible benefits if GUA's denial of these was based on the religion of RCSEA members. Georgetown's protection against compelled expression is no more and no less.

The trial court's construction of the Human Rights Act would transform the statute into a violation of the First Amendment. It would compel Georgetown to "endorse" the student groups despite the Supreme Court's warning that a religious actor may not be forced to "say ... anything in conflict with [its] religious tenets." *Braunfeld, supra*, 366 U.S. at 603, 81 S.Ct. at 1146. This construction of the Human Rights Act is required neither by its language nor by its purpose of ensuring equal *treatment*—treatment concretely measured by access to "facilities and services," not by the educational institution's expressed approval of the "purposes and activities" of recipient student groups.[20]

Georgetown's obligation under the statute is not to express a particular point of view. It is to make tangible benefits available to its students without regard to their sexual orientation. The Human Rights Act does not require Georgetown to grant "University Recognition" and its accompanying intangible "endorsement" to the student groups.

### D. *Applying the Human Rights Act to the Tangible Benefits Contained in "University Recognition"*

Although the student groups were not entitled to summary judgment on the ground that Georgetown's denial of "University Recognition"—including an "endorsement"—violated the Human Rights Act, the statute does require Georgetown to equally distribute, without regard to sexual orientation, the tangible benefits contained in the same package. If discrimination appears from the record, this court may sustain the statutory ruling "on a ground different from that adopted by the trial court." *Max Holtzman, Inc. v. K & T Co.*, 375 A.2d 510, 513 n. 6 (D.C.1977); *see also Liberty Mutual Insurance Co. v. District of Columbia*, 316 A.2d 871, 875 (D.C. 1974); *Wells v. Wynn*, 311 A.2d 829, 829 n. 2 (D.C.1973). Our review of the record reveals no genuine dispute that the tangible benefits were denied on the basis of sexual orientation. The Human Rights Act was violated to that extent.[21]

The Human Rights Act cannot depend for its enforcement on a regulated actor's purely subjective, albeit sincere, evaluation of its own motivations. "Bias or prejudice

---

**20.** The Human Rights Act does, of course, guarantee equal status apart from that conferred by compelled expression. In this case, the student groups would be entitled to "University Recognition," regardless of sexual orientation, if that status did not include an unwilling "endorsement."

**21.** Georgetown does not contend that the tangible benefits constitute a forced subsidy of speech to which it is opposed. *See, e.g., Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Judge Belson, joined by Judge Nebeker, therefore argues an issue that it is not before us. *Post* at 67–72 & note 14; *see also* Judge Ferren, joined by Judge Terry, *post* at 51–52 & 67 note 9. Even if it were presented, *Abood* nowhere stands for the proposition that forced subsidization is always unconstitutional. That case concerned the unwilling subsidization of offensive speech. The student groups here engage in a wide range of activities and on the record before us we have no knowledge what proportion of those endeavours, if any, is devoted to advocacy of the specific theory of sexual ethics to which Georgetown objects. Even if *Abood* applied, it would mean at most that the tangible benefits could be withheld up to that undetermined extent only.

Similarly, the unfounded assumption that the student groups are exclusively engaged in advocacy of the idea which Georgetown finds repugnant blinds Judge Belson and Judge Nebeker to the existence of Georgetown's sexual orientation discrimination. Along with amicus Arthur B. Spitzer, they fail to recognize unambiguous signs, discussed in the text, that Georgetown took the predominantly homosexual composition of the student groups into account in denying them tangible benefits. Contrary to the views of Judge Belson and Judge Nebeker, Georgetown's simultaneous objection to an idea it finds morally offensive is not enough to relieve it from a finding of discrimination under the Human Rights Act.

is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence...." *Crawford v. United States,* 212 U.S. 183, 196, 29 S.Ct. 260, 265, 53 L.Ed. 465 (1909). It is particularly difficult to recognize one's own acts as discriminatory. Apart from organizations that failed to meet purely technical requirements such as a minimum membership, the record shows that Georgetown never denied "University Recognition" to a student group that was not mainly composed of persons with a homosexual orientation. Where, as here, those possessing characteristics identified by the legislature as irrelevant to individual merit are treated less favorably than others, the Human Rights Act imposes a burden upon the regulated actor to demonstrate that the irrelevant characteristic played no part in its decision. Georgetown failed to present facts that could show it was uninfluenced by sexual orientation in denying the tangible benefits.

One nondiscriminatory reason asserted by Georgetown for its denial of the tangible benefits contained in "University Recognition" was that it could not give its accompanying "endorsement" to the student groups without violating its religious principles. But as the Human Rights Act, properly construed, requires no direct, intangible "endorsement," Georgetown cannot avoid a finding of discrimination on that ground. The remaining nondiscriminatory reasons asserted by Georgetown may be summarized as follows: the "purposes and activities" of the student groups fell outside the boundaries set by "Recognition Criteria," rendering them ineligible for the tangible benefits they sought and not "otherwise qualified" within the meaning of the statute, D.C. Code § 1–2520 (1987); and, in any event, the denial of tangible benefits was based on the "purposes and activities" of the student groups, not on the homosexual status of their members, so that the sexual orientation of the students involved played no part in the decisionmaking process, *id.*

In this case, the nondiscriminatory reasons asserted by Georgetown have the effect of fusing together what would normally be two separate inquiries—are the student groups "otherwise qualified" for the tangible benefits they seek, and, if so, did Georgetown deny those tangible benefits due to the sexual orientation of their members? Here, because the answer to both of those distinct questions is determined by objective reference to the "purposes and activities" of the student groups, what are normally two separate inquiries collapse into one: did the homosexual orientation of the group members cause them to be treated differently from other applicants?

■ We are not bound by Georgetown's subjective perception of the "purposes and activities" to which it objected. Georgetown must view the "purposes and activities" of a student group in a way which is free from impermissible reliance upon factors unrelated to individual merit. Accordingly, if the homosexual status of group members entered into Georgetown's assessment of the "purposes and activities" of the student groups, albeit unconsciously, the denial of tangible benefits was itself based on sexual orientation. Put differently, it would be irrelevant that Georgetown saw itself as doing nothing more than applying neutral guidelines established by "Recognition Criteria" if sexual orientation had in fact influenced how those standards were applied.

In denying GPGU's application for "University Recognition" Georgetown adverted to that group's expressed purpose (one of four) to "provide a forum for the development of responsible sexual ethics consonant with one's personal beliefs." *See* GPGU Constitution (*quoted supra* note 5). That purpose is at odds with Roman Catholic teachings. But GRC's constitution contained no comparable statement; Georgetown's stated objection was to GRC's much broader intention to "[p]rovide lesbians and gay men entering the Law Center with information about Washington's gay community, including educational, cultural, religious, social and medical services." *See* GRC Constitution (*quoted supra* note 6). Because GRC's purposes include an asexual commitment to serving the broad range of needs experienced by

homosexual students, but no statement as to the propriety of homosexual conduct, Georgetown's objection to that organization must to some extent have been prompted by the sexual orientation of its members.

That Georgetown's treatment of the gay student groups was not exclusively influenced by a specific objection to "purposes and activities" inconsistent with Roman Catholic dogma was further evidenced by Debbie Gottfried, the University's Director of Student Activities. In clarifying GPGU's status after it had obtained "Student Body Endorsement," but had failed to obtain "University Recognition," Gottfried wrote that the University would not change its position "on what it feels would be interpreted as endorsement and official support of *the full range of issues associated with this cause.*" Letter from D. Gottfried to GPGU (Jan. 18, 1980) (emphasis added). At no time has Georgetown defined what it meant by "the full range of issues" associated with the gay student groups, despite its insistence that Roman Catholic doctrine favors the provision of equal civil and political rights to homosexually oriented persons and that its religious objection was directed only to the promotion of homosexual conduct. Gottfried's statement was later repeated by Dean Schuerman, who wrote that the University would not lend its endorsement, support or approval to "the positions taken by the gay movement *on a full range of issues* " or "the major activities and issues which, *by definition,* are associated with *a gay organization.*" Letter from Dean W. Schuerman to GPGU (Feb. 21, 1980) (emphasis added). Similarly, when Dean McCarthy turned down GRC's application at the Law Center, he wrote that the University would not lend its official subsidy and support to a gay law student organization because that "would be interpreted by many as endorsement of the positions taken by the gay movement on *a full range of issues.*" Letter from Dean D. McCarthy, Jr., to GRC (Feb. 26, 1980) (emphasis added). Georgetown thus ascribed to the student groups not only "purposes and activities" which they may have had, but also a host of others automatically assumed to be a necessary attribute of their homosexual orientation.

Other conclusive evidence that Georgetown took homosexual orientation into account in its recognition procedures is supplied by the fact that on the same day as he denied "University Recognition" to GRC at the Law Center, President Healy wrote an essentially identical letter to the Chancellor of the Medical Center, despite the fact that no homosexually oriented students there had ever applied for such status. President Healy wrote:

I am sure that you are aware that the Gay Students on the Main Campus have appealed Father Freeze's decision to me. That appeal has recently been denied.... Since you may be presented with a similar situation at the Medical Center, I want to point out that this decision applies equally to the Medical Center.

Letter from President T. Healy, S.J., to Chancellor M. McNulty (May 8, 1980). This action amounted to an adverse decision without *any* consideration on the merits, in light of criteria neutral to sexual orientation, of the "purposes and activities" of whatever group might be formed sometime in the future. It is explicable only if Georgetown considered the predominantly homosexual orientation of some future student group at the Medical Center, and not just its specific "purposes and activities," to be a factor of intrinsic relevance to a grant of "University Recognition." That a predominantly homosexual orientation would be fatal to a bid for tangible benefits at the Medical Center establishes beyond any doubt that Georgetown was not oblivious to sexual orientation in its application of "Recognition Criteria."

It is apparent from this correspondence, all of which was before Judge Braman when he granted summary judgment on the discrimination issue, that Georgetown's denial of tangible benefits was not closely tied to specific "purposes and activities" of the student groups promoting the homosexual conduct condemned by Roman Catholic doctrine. The conclusion is inescapable that the predominantly gay composition of the student groups played at least some

role in their treatment by Georgetown. By objecting to the student groups' assumed connection, "by definition," to a "full range of issues" associated with the "gay movement," rather than to specific "purposes and activities" inconsistent with its Roman Catholic tradition, Georgetown engaged in the kind of stereotyping unrelated to individual merit that is forbidden by the Human Rights Act. In short, the record reveals no genuine doubt that Georgetown's asserted nondiscriminatory basis for its action was in fact tainted by preconceptions about gay persons. Georgetown did not apply "Recognition Criteria" on an equal basis to all groups without regard to the sexual orientation of their members.

Judge Braman's finding that Georgetown discriminated on the basis of sexual orientation is further supported by his express reliance on another provision of the Human Rights Act. The effects clause provides that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 1–2532 (1987). Under that section, despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason. As the legislative history demonstrates, the Council imported into the Human Rights Act, by way of the effects clause, the concept of disparate impact discrimination developed by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

In *Griggs*, decided shortly before the Human Rights Act was passed in its original form as a municipal regulation, the Supreme Court interpreted the federal Civil Rights Act of 1964 as prohibiting not only intentional discrimination, but also practices which prejudice protected groups and are not supported by some independent, nondiscriminatory justification. *Griggs* was expressly relied upon by the drafters of the Human Rights Act when the original regulation was adopted. Dr. Marjorie Parker, chairwoman of one of the committees that proposed the law to the pre-Home Rule City Council, explained to Council members that because the District regulation "parallels the Civil Rights Act," the public could look to the federal model to answer many of their questions concerning the administration and enforcement of the Human Rights Act. District of Columbia City Council, Committee Report on Title 34, "The Human Rights Law," 1 (Oct. 15, 1973) (available in the District Building) (hereinafter "Parker Report II"); *see also* District of Columbia City Council, Committee Report on Title 34, "The Human Rights Law," 2 (Aug. 7, 1973) (available in the District Building) (hereinafter "Parker Report I"). The Parker Report II specifically cited *Griggs* and noted that it "upheld the applicability of the Civil Rights Act in cases of *unintentional* discrimination." *Id.* at 3 (emphasis in original).

During the passage of the bill, the Council retained the effects clause despite opposition from local employers. A submission from the Metropolitan Washington Board of Trade and the C & P Telephone Company resulted in the preparation of a memo distributed to Council members reaffirming the Parker Report's interpretation: "The Supreme Court in *Griggs v. Duke Power* held that *unintentional* discrimination is just as liable under the Civil Rights Act as intentional discrimination." District of Columbia City Council, Memorandum on Proposed Draft Clarifications: Title 34, at 5 (Oct. 11, 1973) (available in the District Building) (emphasis in original). The memo added that "[w]hile unintentional discrimination would be unlawful [under the Human Rights Act], a finding of such would probably prevent any judgment of damages against the perpetrator." *Id.* The Council made only inconsequential changes to the wording of the effects clause as originally proposed.

A Human Rights Act violation was established with regard to Georgetown's denial of the tangible benefits. The evidence before Judge Braman may not permit the conclusion that Georgetown consciously denied benefits due to the sexual orientation of the student groups involved. It is nonetheless evident that the University allowed the homosexual orientation of the individuals involved—not just the "purposes and

activities" of their student organizations—to creep into its decisionmaking. By failing to confine its objections to "purposes and activities" which it found offensive for reasons *independent* of the sexual orientation of the students, Georgetown discriminated. The position that "a gay organization" is "by definition" associated with a "full range of issues" reveals that sexual orientation was a factor in Georgetown's denial of tangible benefits. That statement established an intentional violation. D.C. Code § 1–2520 (1987); and, in any event, under the effects clause the Human Rights Act also prohibits unintentional discrimination, *id.* § 1–2532. Finally, none of the Human Rights Act's narrowly drawn exceptions avails Georgetown here.[22]

The Human Rights Act having been violated with respect to the tangible benefits, we proceed to Georgetown's free exercise defense.

## IV

### GEORGETOWN'S FREE EXERCISE DEFENSE

Georgetown claims that the Free Exercise Clause of the First Amendment exempts it from the Human Rights Act's edict that it distribute the tangible benefits equally without regard to sexual orientation. We disagree.

 In the trial court, due to Judge Braman's prior statutory construction, Judge Bacon premised her free exercise analysis on the mistaken belief that compliance with the Human Rights Act would require Georgetown to provide a religious "endorsement" as well as tangible benefits. The true issue is a much more limited one. It is whether the forced distribution of various tangible benefits without regard to sexual orientation, severed from the direct "endorsement" required by a compelled grant of "University Recognition," imposes an unconstitutional burden on Georgetown's exercise of religion.[23] The answer is no.

### A. *The Free Exercise Clause*

 The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. CONST. amend. I. This terse check on

---

**22.** *See* D.C.Code § 1–2503(b) (1987) (permitting religious or political organizations, in order to promote their religious or political principles, to give preference to persons of the same religious or political persuasion); *see also id.* § 1–2503(a) ("business necessity" exception in cases of unintentional discrimination); *id.* § 1–2513(a) (exception in employment practices for bona fide seniority or employment benefit systems); *id.* § 1–2513(b) (exception in police officer and firefighter cadet programs for minimum and maximum age limits); *id.* § 1–2518 (exception in rental or leasing practices for owner-occupied accommodations); *id.* § 1–2521(a) (exception in education practices for single-sex schools below graduate level); *id.* § 1–2524 (exception for approved affirmative action plans).

**23.** The student groups contend, on the one hand, that Georgetown functions as a secular educational institution and meets none of the established criteria for religious education which would permit it to invoke the Free Exercise Clause. We disagree. *Tilton v. Richardson,* 403 U.S. 672, 687, 91 S.Ct. 2091, 2100, 29 L.Ed.2d 790 (1971) (institution may have both secular and sectarian characteristics); *see also* L. TRIBE, AMERICAN CONSTITUTIONAL LAW §§ 14–6, –7 (1978) (definition of religion more liberal under Free Exercise Clause than under Establishment Clause); Note, *Towards a Constitutional Defini-*

*tion of Religion,* 91 HARV.L.REV. 1056, 1083–89 (1978) (same). On the other hand, they argue that Georgetown is barred from asserting its free exercise defense by the Establishment Clause of the First Amendment. Again, we disagree. *Granfield v. Catholic University of America,* 174 U.S.App.D.C. 183, 191–93, 530 F.2d 1035, 1043–45 (no standing to assert Establishment Clause claim when seeking only "incomplete and transitory enforcement of the prohibitions of the clause" and without making the responsible government official party to the litigation), *cert. denied,* 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). We also reject the student groups' contention that the University's acceptance of certain federal funding on condition that it not be used for "religious worship or a sectarian activity," 20 U.S.C. § 1132e(c) (1982), operates as a waiver of its right to raise a free exercise defense. *Murphy v. Villanova University,* 547 F.Supp. 512, 520–21 (E.D.Pa.1982), *aff'd,* 707 F.2d 1402 (3d Cir.1983) (no standing to sue for breach of federal statute in absence of private cause of action); *California v. Sierra Club,* 451 U.S. 287, 292–93, 101 S.Ct. 1775, 1778–79, 68 L.Ed.2d 101 (1981) (setting forth standards for implying private cause of action under federal statute).

government power has given rise to a number of controlling principles. One who invokes the Free Exercise Clause in order to gain exemption from a governmentally imposed obligation must initially establish that forced compliance with the regulation will impose a burden on his or her religious exercise. Although not all burdens on religious exercise are unconstitutional, an exemption accommodating the religious practice must be granted unless the government can demonstrate that it has a compelling or an overriding interest in enforcing the challenged regulation. If so, the court must assure itself that the promotion of the compelling governmental objective outweighs the burden imposed upon the practice of religion and, moreover, that the challenged regulation is the least restrictive means by which the government can attain its compelling end. *See, e.g., Bob Jones University v. United States,* 461 U.S. 574, 602–04, 103 S.Ct. 2017, 2034–35, 76 L.Ed.2d 157 (1983); *United States v. Lee,* 455 U.S. 252, 257–60, 102 S.Ct. 1051, 1055–56, 71 L.Ed.2d 127 (1982); *Thomas v. Review Board,* 450 U.S. 707, 718–19, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Wisconsin v. Yoder, supra,* 406 U.S. at 219–21, 92 S.Ct. at 1535–36; *Sherbert v. Verner, supra,* 374 U.S. at 402–09, 83 S.Ct. at 1793–96.

### B. *The Burden on Georgetown's Religious Exercise*

◼ The first stage of our inquiry is to decide whether state compulsion to distribute, without regard to sexual orientation, various tangible benefits associated with "University Recognition"—use of a mailbox, access to the Computer Label Service, mailing facilities, and the ability to apply for (but not necessarily to receive) funding —would interfere with Georgetown's practice of the Roman Catholic religion. *See, e.g., Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 305–06, 105 S.Ct. 1953, 1964, 85 L.Ed.2d 278 (1985); *United States v. Lee, supra,* 455 U.S. at 256–57, 102 S.Ct. at 1054–55.

The parties have not fully developed the extent of the burden that would be imposed on Georgetown's religious exercise by compulsion to grant the tangible benefits without "University Recognition." This case has been litigated on the "all or nothing" basis reflected in the trial court's construction of the Human Rights Act. It is nevertheless undisputed that Georgetown has consistently refused to furnish the additional tangible benefits to the student groups, and throughout has linked its refusal to Roman Catholic teachings. Georgetown is apparently opposed to extending the additional tangible benefits because of its belief that establishing another normative lifestyle conflicting with the "moral norms" would violate its obligations as a Roman Catholic institution. This objection is not "so bizarre, so clearly nonreligious in nature as not to be entitled to protection under the Free Exercise Clause." *Thomas v. Review Board, supra,* 450 U.S. at 715–16, 101 S.Ct. at 1431. Thus, while the threat of a direct "endorsement" has been defused, and Georgetown's primary religious fear abated accordingly, it would be inappropriate to dwell exclusively on that fact and conclude that no burden had been shown. From the record, particularly its correspondence with the student groups, we conclude that Georgetown's sincere religious objections go beyond the direct, intangible "endorsement" and extend to distribution of the contested tangible benefits even without a grant of "University Recognition."

In these circumstances, especially given the "all or nothing" manner in which this case has been litigated, we accept that the threat of enforcement of the Human Rights Act with regard to the tangible benefits imposes a burden on Georgetown's religious practice sufficient for it to invoke the Free Exercise Clause.

### C. *The Compelling Governmental Interest in Eradicating Sexual Orientation Discrimination*

◼ Next, if the burden on Georgetown's religious practice is not to render the Human Rights Act unconstitutional as applied, we must determine whether the District of Columbia has a compelling or overriding governmental interest in the eradication of sexual orientation discrimina-

tion. *Hobbie v. Unemployment Appeals Commission,* — U.S. ——, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); *Bob Jones University v. United States, supra,* 461 U.S. at 603–04, 103 S.Ct. at 2034–35; *United States v. Lee, supra,* 455 U.S. at 257–58, 102 S.Ct. at 1055; *Thomas v. Review Board, supra,* 450 U.S. at 718–19, 101 S.Ct. at 1432. "[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder, supra,* 406 U.S. at 215, 92 S.Ct. at 1533. We conclude that the District of Columbia's stake in the eradication of sexual orientation discrimination is one such interest.

At the outset, we note that the District of Columbia Council is unmistakably of this opinion. In enacting the Human Rights Act, the Council placed sexual orientation discrimination among the category of social evils traditionally occupied by discrimination based on race, color, religion, national origin, sex, age, and so forth. *See, e.g.,* D.C.Code § 1–2501 (1987). In the Council's view, all forms of discrimination based on anything other than individual merit are equally injurious, to the immediate victims and to society as a whole.

The driving force behind the adoption of this legislation was the necessity for remembering, appropriately, what is embodied in our Bill of Rights—the respect for individual dignity in a diverse population. As the legislative history of the original 1973 regulation reveals:

> [W]e would emphasize that our intent in this regulation is far-reaching. We are committed to the basic principle that each and every person seeking access to facilities and opportunities in the District of Columbia has a right to be considered for such access on the basis of individual merit and a right to expect reasonable accommodations to be made, in so considering, in deference to individual uniqueness. Somehow, in this country, we have tended to develop as a nation of people who find the differences among us very discomforting. This is especially ironic when we recall the reasons and the necessity for the founding of our nation in the first place. At this time in our history, and doubtless to a greater extent in the future, our population is diverse beyond describing. The day is long past, if, in fact, it ever existed, when we could identify groups of people who supposedly share common attitudes, characteristics, abilities or limitations. It is, then, in this spirit and through this regulation that we attempt to support the rights of individuals in all their diversity and potential.

Parker Report I, *supra,* at 2.

The Council determined that a person's sexual orientation, like a person's race and sex, for example, tells nothing of value about his or her attitudes, characteristics, abilities or limitations. It is a false measure of individual worth, one unfair and oppressive to the person concerned, one harmful to others because discrimination inflicts a grave and recurring injury upon society as a whole. To put an end to this evil, the Council outlawed sexual orientation discrimination in employment, D.C. Code § 1–2512 (1987), in real estate transactions, *id.* §§ 1–2515 to –2517, in public accommodations, *id.* § 1–2519, in educational institutions, *id.* § 1–2520, and elsewhere, *id.* § 1–2511. Such comprehensive measures were necessary to ensure that "[e]very individual shall have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District, and to have an equal opportunity to participate in all aspects of life...." *Id.* Only by eradicating discrimination based on sexual orientation, along with all other forms of discrimination unrelated to individual merit, could the District eliminate recurrent personal injustice and build a society which encourages and expects the full contribution of *every* member of the community in all their diversity and potential.

In 1977, armed with the legislative power newly granted to it by Home Rule, the Council elevated its earlier regulation onto a statutory footing. *See* D.C.Code §§ 1–

2501 to –2557 (1987).[24] In so doing, it reaffirmed its belief that enforcement of the Human Rights Act is a matter of vital importance to the District. The committee report notes that enactment of the original human rights regulation as a statute would "affirmatively and forcefully convey to the executive and administrative agencies of the District Government the importance which the Council places on vigorous enforcement of its provisions." Council of the District of Columbia, Committee Report on Bill 2-179, "The Human Rights Act of 1977," at 3 (July 5, 1977) (available in the District Building). Enactment of the Human Rights Act was intended to "underscore the Council's intent that the elimination of discrimination within the District of Columbia should have 'the highest priority'...." *Id.* at 3. Among the statute's basic purposes is "reinforcement of the Council's view that the Human Rights Act is among our most important laws and is to be vigorously enforced by all agencies and officials of the District Government...." *Id.* at 1. From the legislative history, there can be no doubt that the Council regards the eradication of sexual orientation discrimination as a compelling governmental interest. *Cf. Howard University v. Best,* 484 A.2d 958, 978 (D.C.1984) (sex discrimination); *Greater Washington Business Center v. District of Columbia Commission on Human Rights,* 454 A.2d 1333, 1337 (D.C.1982) (same).

 While not lightly to be disregarded, the Council's strong feelings do not resolve the issue whether its ban on sexual orientation discrimination represents a compelling governmental interest. That is a question of law and "[i]t is emphatically the province of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). Here, the question presented is a novel one. Although it is well settled that government has a compelling interest in the eradication of other forms of discrimination, such as that based on race, *e.g., Bob Jones University v. United States, supra,* 461 U.S. at 604, 103 S.Ct. at 2035, or sex, *e.g., Roberts v. United States Jaycees,* 468 U.S. 609, 625, 104 S.Ct. 3244, 3253, 82 L.Ed. 2d 462 (1984), no appellate court has had to answer that question in the context of sexual orientation discrimination.

We approach our task, therefore, with more than a little trepidation. Our society is built upon a heterosexual model. We are met at the outset with centuries of attitudinal thinking, often colored by sincerely held religious beliefs, that has obscured scientific appraisal and stunted the growth of legal theories protecting homosexual persons from invidious discrimination. We know one basic fact—that homosexual and bisexual citizens have been part of society from time immemorial. These orientations, like that of heterosexuals, have cut across all diverse classifications—race, sex, national origin, and religion, to name but a few. After careful reflection, we cannot conclude that one's sexual orientation is a characteristic reflecting upon individual merit.

Modern research on sexual orientation began with the investigation of Alfred C. Kinsey and his associates into human sexu-

---

**24.** Since the District of Columbia's pioneering legislation in this area, similar statutory protections have been enacted in 1982 by the State of Wisconsin. *See* codification in scattered sections of WIS.STAT.ANN. (listed in West General Index 1986 under "Discrimination—sexual orientation"). Many other states have executive orders prohibiting sexual orientation discrimination in public employment. In addition, a considerable and growing number of cities and counties nationwide have some form of gay rights ordinance. *See generally* NATIONAL GAY TASK FORCE, GAY RIGHTS PROTECTIONS IN THE UNITED STATES AND CANADA (1985). This mounting response to the problems gay people face may be compared to the local antidiscrimination measures which paved the way for the federal Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1982). *See generally, e.g.,* Rosen, *The Law and Racial Discrimination in Employment,* 53 CALIF. L.REV. 729, 775–76 (1965); Sutin, *The Experience of State Fair Employment Commissions—A Comparative Study,* 18 VAND.L.REV. 965 (1965); *cf. New York State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country").

al behavior. From his study of twelve thousand white males, still the largest of its kind, Kinsey reported that only 50% had neither overt nor psychic homosexual experiences after the onset of adolescence. A. KINSEY, W. POMEROY & C. MARTIN, SEXUAL BEHAVIOR IN THE HUMAN MALE 650–51 (1948). Another 37% had had at least some overt homosexual experience to the point of orgasm between adolescence and old age, while the remaining 13% reacted erotically to other males without having physical contacts. Id. Almost half of his sample had both heterosexual and homosexual experiences at some point during their lives. Id. Kinsey's findings challenged the popular assumption that the vast majority of people are either exclusively heterosexual or exclusively homosexual and suggested that instead individual sexual responses and behavior fall somewhere between these extremes for some 46% of the population. See id. While stressing the existence of a continuum, for convenience Kinsey adopted a seven-point scale, with zero denoting the exclusively homosexual and six the exclusively heterosexual. Id. at 636–50. The Kinsey scale continues to be relied upon today. Shortly afterwards, Kinsey found a similar diversity of sexual responses and behavior among women. A. KINSEY, W. POMEROY, C. MARTIN & P. GEBHARD, SEXUAL BEHAVIOR IN THE HUMAN FEMALE 473–74 (1953). At a minimum, Kinsey's research revealed the complexity and diversity of human sexual orientations and prompted considerable further inquiry.

As yet, there is no scientific agreement as to the origins of heterosexual, bisexual or homosexual orientation. Although various biological, psychoanalytic and social learning theories have been advanced, none has won common acceptance. See J. MONEY & A. EHRHARDT, MAN AND WOMAN, BOY AND GIRL 229 (1972) (hereinafter MAN AND WOMAN, BOY AND GIRL); Acosta, Etiology and Treatment of Homosexuality, 4 ARCHIVES SEXUAL BEHAV. 9, 13–18 (1975); MacCulloch & Waddington, Neuroendocrine Mechanisms and the Aetiology of Male and Female Homosexuality, 139 J. BRIT. PSYCHIATRY 341, 341 (1981). On the other hand, several popular theories have been disproved. A. BELL, M. WEINBERG & S. HAMMERSMITH, SEXUAL PREFERENCE—ITS DEVELOPMENT IN MEN AND WOMEN 210–11 (1981) (hereinafter SEXUAL PREFERENCE—ITS DEVELOPMENT IN MEN AND WOMEN). Some researchers posit that sexual orientation may have multiple roots. Id. It is generally agreed, however, that individual sexual orientation develops at least by adolescence, id. at 186–87, 211, 222, if not during childhood, id.; M. SAGHIR & E. ROBINS, MALE & FEMALE HOMOSEXUALITY 17–31 (1973); Marmor, Overview: The Multiple Roots of Homosexual Behavior, in HOMOSEXUAL BEHAVIOR: A MODERN REAPPRAISAL 3, 19–21 (J. Marmor ed. 1980); Storms, Theories of Sexual Orientation, 38 J. PERSONALITY & SOC. PSYCHOLOGY 783 (1980); Warren, Homosexuality and Stigma, in HOMOSEXUAL BEHAVIOR: A MODERN REAPPRAISAL, supra, at 125–26, or even earlier, MAN AND WOMAN, BOY AND GIRL, supra, at 235.

It was found in one study of almost fifteen hundred heterosexual and homosexual men and women that homosexual adults had typically experienced sexual feelings in that direction about three years before engaging in intimate homosexual activity. SEXUAL PREFERENCE—ITS DEVELOPMENT IN MEN AND WOMEN, supra, at 187–88. There is no reliable evidence that adult homosexual orientation—the attempt is never made in the opposite direction—can be "cured." Id. at 217; W. CHURCHILL, HOMOSEXUAL BEHAVIOR AMONG MALES 283–89 (1967); Coleman, Changing Approaches to the Treatment of Homosexuality: A Review, in HOMOSEXUALITY: SOCIAL PSYCHOLOGICAL AND BIOLOGICAL ISSUES 81–82 (W. Paul & J. Weinrich eds. 1982); Marmor, Clinical Aspects of Homosexuality, in HOMOSEXUAL BEHAVIOR: A MODERN REAPPRAISAL, supra, at 277. The Alfred C. Kinsey Institute for Sex Research has concluded from its empirical studies that

[H]omosexuality is as deeply ingrained as heterosexuality.... [E]xclusive homosexuality probably is so deeply ingrained that one should not attempt or expect to change it. Rather, it would probably make far more sense simply to

recognize it as a basic component of a person's core identity.... Neither homosexuals nor heterosexuals are what they are by design. Homosexuals, in particular, cannot be dismissed as persons who simply refuse to conform. There is no reason to think it would be any easier for homosexual men or women to reverse their sexual orientation than it would be for heterosexual readers to become predominantly or exclusively homosexual.

SEXUAL PREFERENCE—ITS DEVELOPMENT IN MEN AND WOMEN, *supra,* at 190, 211, 222.

The idea that homosexuality is a form of mental disorder has been widely abandoned. *See* Resolution of the House of Representatives of the American Psychological Association (1975); Resolution No. 7514 of the American Public Health Association (1975); Resolution of the American Psychiatric Association (Dec. 15, 1973). Rejection of this notion followed upon studies revealing that heterosexual and homosexual men and women performed equally on standard psychological tests and were similarly free of psychopathology. *E.g.,* M. FREEDMAN, HOMOSEXUALITY AND PSYCHOLOGICAL FUNCTIONING (1971); Hooker, *The Adjustment of the Male Overt Homosexual,* 21 J. PROJECTIVE TECHNIQUES 18 (1957). Gay people do experience particular psychological stresses, however, due to prejudice against them in social settings. *See* A. BELL & M. WEINBERG, HOMOSEXUALITIES—A STUDY OF DIVERSITY AMONG MEN AND WOMEN 195–216 (1978) (hereinafter HOMOSEXUALITIES—A STUDY OF DIVERSITY AMONG MEN AND WOMEN).

Just as it is impossible to typecast heterosexually oriented persons (or, for that matter, members of racial minorities or women), gay people cannot be neatly pigeonholed into any recognizable category. *Id. passim.* A homosexual orientation tells nothing reliable about abilities or commitments in work, religion, politics, personal and social relationships, or social activities, except to the extent that in many areas the lives of gay people are frequently conditioned by the attitudes of others. *Id.* at 139–216. It is often forgotten that "homosexuality encompasses far more than peo-

ple's sexual proclivities. Too often homosexuals have been viewed simply with reference to their sexual interests and activity. Usually the social context and psychological correlates of homosexual experience are largely ignored, making for a highly constricted image of the persons involved." HOMOSEXUALITIES—A STUDY OF DIVERSITY AMONG MEN AND WOMEN, *supra,* at 24–25; *see also* Paul, *Social Issues and Homosexual Behavior: A Taxonomy of Categories and Themes in Anti–Gay Argument* (discussing false stereotypes affecting gay people) in HOMOSEXUALITY: SOCIAL, PSYCHOLOGICAL AND BIOLOGICAL ISSUES, *supra,* at 29, 46–52.

Despite its irrelevance to individual merit, a homosexual or bisexual orientation invites ongoing prejudice in all walks of life, ranging from employment to education, and for most of which there is currently no judicial remedy outside the District of Columbia or the State of Wisconsin. *See generally* Rivera, *Queer Law: Sexual Orientation Law in the Mid–Eighties (Part II),* 11 U. DAYTON L.REV. 275 (1986) (citing cases); *id. (Part I),* 10 U. DAYTON L.REV. 459 (1985) (same); Rivera, *Recent Developments in Sexual Preference Law,* 30 DRAKE L.REV. 311 (1980–81) (same); Rivera, *Our Straight–Laced Judges: The Legal Position of Homosexual Persons in the United States,* 30 HASTINGS L.J. 799 (1979) (same). Illustrative is a 1950 Senate investigation into the employment of homosexual persons and "other moral perverts" in the federal government. It concluded that even one "sex pervert in a government agency tends to have a corrosive influence upon his fellow employees.... One homosexual can pollute a government office." SENATE COMMITTEE ON EXPENDITURES IN THE EXECUTIVE DEPARTMENTS, EMPLOYMENT OF HOMOSEXUALS AND OTHER SEX PERVERTS IN GOVERNMENT, S.DOC. No. 241, 81st Cong., 2d Sess. 3–5 (1950). As a result of this reasoning it was not until 1975 that the federal government lifted its ban on the employment of homosexual workers. *See generally* Slovenko, *The Homosexual and Society: A Historical Perspective,* 10 U. DAYTON L.REV. 445, 451 (1985). Erupting into

violence, social prejudice sometimes takes the form of unprovoked attacks on those perceived to be gay. *See* NATIONAL GAY TASK FORCE, ANTI-GAY/LESBIAN VICTIMIZATION (1984); Harry, *Derivative Deviance: The Cases of Extortion, Fag–Bashing, and Shakedown of Gay Men,* 19 CRIMINOLOGY 546 (1982); Russo & Humphries, *Homosexuality and Crime,* in 2 ENCYCLOPEDIA OF CRIME AND JUSTICE 866, 869–70 (S. Kadish ed. 1983).

Such discrimination has persisted throughout most of history. *See generally* V. BULLOUGH, HOMOSEXUALITY: A HISTORY (1979); J. KATZ, GAY/LESBIAN ALMANAC: A NEW DOCUMENTARY (1983); J. KATZ, GAY AMERICAN HISTORY (1976); HISTORICAL PERSPECTIVES ON HOMOSEXUALITY (S. Licata & R. Petersen eds. 1981) *(reprinting* 6 J. HOMOSEXUALITY (1980–81)). In perhaps its most virulent form, prejudice against gay people led to the Nazi concentration camps. There, homosexual prisoners were distinguished, like their unfortunate fellows, by a cloth badge, in their case one which singled them out for unusual atrocities. *See* Lautman, *The Pink Triangle—The Persecution of Homosexual Males in Concentration Camps in Nazi Germany,* in HISTORICAL PERSPECTIVES ON HOMOSEXUALITY, *supra,* at 141.

Although by no means a prerequisite to our conclusion of a compelling governmental interest, we note parenthetically that sexual orientation appears to possess most or all of the characteristics that have persuaded the Supreme Court to apply strict or heightened constitutional scrutiny to legislative classifications under the Equal Protection Clause. *See* J. ELY, DEMOCRACY AND DISTRUST 162–64 (1980); L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 15–13, at 944 n. 17 (1978); Note, *The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification,* 98 HARV.L.REV. 1285 (1985); Note, *An Argument for the Application of Equal Protection Heightened Scrutiny to Classifications Based on Homosexuality,* 57 SO.CAL.L.REV. 797 (1984); *cf. Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 2846 n. 8, 92 L.Ed.2d 140 (1986) (no Equal Protection Clause claim raised in unsuccessful "right to priva-cy" challenge to sodomy statute as applied to gay defendant); *Gay Law Students Association v. Pacific Telephone & Telegraph Co.,* 24 Cal.3d 458, 474–75, 595 P.2d 592, 602, 156 Cal.Rptr. 14, 24 (1979) (equal protection guarantee of state constitution violated by public utility's exclusion of gay people from employment opportunities).

If we were to measure these characteristics as against these standards we would find that scientific literature characterizes sexual orientation as a status which is "determined by causes not within the [individual's] control," *see Mathews v. Lucas,* 427 U.S. 495, 505, 96 S.Ct. 2755, 2762, 49 L.Ed.2d 651 (1976) (discussing illegitimacy), and one not generally subject to change, *see Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (plurality opinion) (discussing sex, race and national origin); *Parham v. Hughes,* 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979) (plurality opinion) (same). Obviously, one is no less heterosexual, bisexual or homosexual merely because he or she is celibate. Homosexually and bisexually oriented persons have been "subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *See Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) (per curiam) (discussing elderly). Sexual orientation "bears no relation to the individual's ability to participate in and contribute to society," *see Mathews v. Lucas, supra,* 427 U.S. at 505, 96 S.Ct. at 2762, and "[d]iscriminations are not to be supported by merely fanciful conjecture," *Hartford Co. v. Harrison,* 301 U.S. 459, 462, 57 S.Ct. 838, 840, 81 L.Ed. 1223 (1937). This country has a "long and unfortunate history" of discrimination based on sexual orientation. *See Frontiero v. Richardson, supra,* 411 U.S. at 682, 684, 93 S.Ct. at 1769 (discussing sex discrimination); *see also Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 312–13, 96 S.Ct. at 2566; (discussing age discrimination); *San Antonio Independent School District v. Rodriguez,*

411 U.S. 1, 28–29, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973) (discussing wealth discrimination). Finally, due to the legal and social penalties commonly triggered by public acknowledgement of homosexuality or bisexuality, persons so oriented may constitute "discrete and insular minorities" whose interests have traditionally been neglected by "the operation of those political processes ordinarily to be relied upon to protect minorities." *See United States v. Carolene Products Co.,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938); *see also Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 313, 96 S.Ct. at 2567 (discussing elderly); *Graham v. Richardson,* 403 U.S. 365, 372, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971) (discussing aliens).

The compelling interests, therefore, that any state has in eradicating discrimination against the homosexually or bisexually oriented include the fostering of individual dignity, the creation of a climate and environment in which each individual can utilize his or her potential to contribute to and benefit from society, and equal protection of the life, liberty and property that the Founding Fathers guaranteed to us all.

Speaking of discrimination in other areas, the United States Commission on Civil Rights has noted that discrimination hurts society in ways that are subtle, and often unseen:

> Discriminatory actions by individuals and organizations are not only pervasive, occurring in every sector of society, but also cumulative, with effects limited neither to the time nor the particular structural area in which they occur. This process of discrimination, therefore, extends across generations, across organizations, and across social structures in self-reinforcing cycles, passing the disadvantages incurred by one generation in one area to future generations in many related areas.
>
> \* \* \* \* \* \*
>
> [The interlocking process of discrimination, started by past events, now routinely bestows privileges on some and penalties on others.] This process is also self-perpetuating. Many normal, seemingly neutral, operations of our society create stereotyped expectations that justify unequal results; unequal results in one area foster inequalities in opportunity and accomplishment in others; the lack of opportunity and accomplishment confirms the original prejudices or engenders new ones that fuel the normal operations generating unequal results.
>
> ... [T]he process of discrimination involves many aspects of our society. No single factor sufficiently explains discrimination, and no single means will suffice to eliminate it. We must continuously examine such elements of our society as our history of *de jure* discrimination, deeply ingrained prejudices, inequities based on economic and social class, and the structure and function of all our economic, social, and political institutions in order to understand their part in maintaining or countering discriminatory processes.
>
> It may be difficult to identify precisely all aspects of discriminatory processes and assign those parts their appropriate weight. But understanding how discrimination works starts with an awareness that it is a process, and that to avoid perpetuating it, we must carefully assess the context and consequences of our everyday actions.

U.S. COMMISSION ON CIVIL RIGHTS, AFFIRMATIVE ACTION IN THE 1980S: DISMANTLING THE PROCESS OF DISCRIMINATION 12–14 (1981); *see also* Brest, *The Supreme Court 1975 Term—Forward: in Defense of the Antidiscrimination Principle,* 90 HARV.L.REV. 1, 8 (1976) ("Decisions based on assumptions of intrinsic worth and selective indifference inflict psychological injury by stigmatizing their victims as inferior. Moreover, because acts of discrimination tend to occur in pervasive patterns, their victims suffer especially frustrating, cumulative and debilitating injuries").

"As long as homosexual men and women, as well as other groups of people who are simply seen as 'different' from the majority of American citizens, continue to be viewed through stereotypical thinking, our

society will pay the price inevitably exacted by fear and ignorance." HOMOSEXUALITIES—A STUDY OF DIVERSITY AMONG MEN AND WOMEN, *supra*, at 25; *see also EEOC v. Mississippi College*, 626 F.2d 477, 489 (5th Cir.1980) ("the government has a compelling interest in eradicating discrimination in all forms"), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981); *Russell v. Belmont College*, 554 F.Supp. 667, 677 (M.D.Tn.1982) ("this nation has a strong public policy against discrimination not only on the basis of sex but in all forms"); *cf.* address by Melvin Boozer to 1980 Democratic National Convention ("I know what it means to be called a nigger, and I know what it means to be called a faggot, and I can sum up the difference in one word: none"), *quoted in* Pearson, *Homosexual Rights Activist Melvin Boozer Dies at 41*, The Washington Post, Mar. 10, 1987, at B6, col. 1.[25]

We consider that the Council of the District of Columbia acted on the most pressing of needs when incorporating into the Human Rights Act its view that discrimination based on sexual orientation is a grave evil that damages society as well as its immediate victims. The eradication of sexual orientation discrimination is a compelling governmental interest.

D. *Balancing the Compelling Governmental Interest against the Burden on Religious Exercise*

■ Given that the District of Columbia has a compelling governmental interest in eradicating sexual orientation discrimination, we must determine whether that interest outweighs the burden enforcement of the Human Rights Act would impose on Georgetown's religious exercise.

In this case, compelling equal access to the tangible benefits, without requiring the intangible "endorsement" contained in "University Recognition," imposes a relatively slight burden on Georgetown's religious practice. As Georgetown itself concedes, "[t]he only tangible benefits plaintiffs could receive by the grant of official recognition are relatively insignificant— such as mailing and computer labeling services." Supplemental Brief at 2. It then argues that "[s]uch minor perquisites cannot outweigh the substantial burden on the University's religious liberty that would flow from compelled recognition of the student groups." *Id.* But its argument fails because the "substantial burden" to which it refers—compulsion to grant the intangible "endorsement" contained in "University Recognition"—is not required by the Human Rights Act. By Georgetown's own admission, what the Human Rights Act actually does require—equal distribution of the tangible benefits—is considerably less burdensome.

Our conclusion that the burden on religious liberty does not outweigh the District's compelling interest receives additional support from the facts that Georgetown voluntarily gives the student groups the fewer tangible benefits that come with "Student Body Endorsement" and that it has never objected to the student groups meeting on campus. Without interference from the Georgetown administration, the student groups are an active force in the university community. GPGU, for example, has held campus meetings almost weekly, hosting discussions, speakers, and educational and social events. Finally, the

---

**25.** Judge Bacon erred in holding that only a "national" policy against discrimination based on sexual orientation could constitute a compelling governmental interest. *See Roberts v. United States Jaycees, supra,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (state law against sex discrimination, more extensive than its federal counterpart, furthered compelling governmental interest and outweighed First Amendment burden); *Braunfeld, supra,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (state Sunday closing law furthered compelling governmental interest and outweighed First Amendment burden); *Prince v. Massachusetts, supra,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed.2d 645 (state child labor law furthered compelling governmental interest and outweighed First Amendment burden); *see also District of Columbia v. John R. Thompson Co.,* 346 U.S. 100, 109, 73 S.Ct. 1007, 1012, 97 L.Ed. 1480 (1953) (District of Columbia has same power as state to enact "legislation which prohibits discrimination"); *cf. Whalen v. Roe,* 429 U.S. 589, 597, 97 S.Ct. 869, 875, 51 L.Ed.2d 64 (1977) ("we have frequently recognized that individual states have broad latitude in experimenting with possible solutions to problems of vital local concern").

burden imposed upon Georgetown's religious exercise is further diminished by the parties' representations that GPGU has already been given a mailbox, one of the tangible benefits theoretically in dispute.

E. *Enforcement of the Human Rights Act is the Least Restrictive Means Available*

 Finally, even though the District of Columbia's compelling interest in eradicating sexual orientation discrimination outweighs the burden that compliance with the Human Rights Act would impose on Georgetown's religious exercise, the statute can be enforced only if it is the least restrictive means of attaining that goal. *Thomas v. Review Board, supra,* 450 U.S. at 718, 101 S.Ct. at 1413.

Here, that condition is met. To tailor the Human Rights Act to require less of the University than equal access to its "facilities and services," without regard to sexual orientation, would be to defeat its compelling purpose. The District of Columbia's overriding interest in eradicating sexual orientation discrimination, if it is ever to be converted from aspiration to reality, requires that Georgetown equally distribute tangible benefits to the student groups. Other than compelling the equal provision of tangible benefits, there are no available means of eradicating sexual orientation discrimination in educational institutions that would be less restrictive of Georgetown's religious exercise.

## V

### CONCLUSION

The Human Rights Act does not require a grant of "University Recognition" because, in the particular scheme at Georgetown University, that status includes a religiously based "endorsement" of the recipient student group. But the Human Rights Act does demand that Georgetown make its "facilities and services" equally available without regard to sexual orientation. Those "facilities and services" include the tangible benefits that come with "University Recognition." Georgetown denied tangible benefits on the basis of sexual orientation and in so doing violated the Human Rights Act. The University's free exercise defense does not exempt it from compliance with the statute, because the District of Columbia's compelling interest in eradicating sexual orientation discrimination outweighs any burden that equal provision of the tangible benefits would impose on Georgetown's religious exercise. On statutory rather than constitutional grounds, we therefore affirm the trial court's holding that Georgetown is not required to grant the student groups "University Recognition." We reverse the trial court's ruling that the Free Exercise Clause relieves Georgetown from its statutory obligation to provide the tangible benefits without regard to sexual orientation. We order the trial court to enter judgment accordingly.

*So ordered.*

PRYOR, Chief Judge, concurring:

I adopt the holdings of Judge Mack's opinion, but write briefly to make clear what I perceive to be the effect of our decision.

Initially, we are met with the threshold question of whether we can reconcile the District of Columbia Human Rights Act, D.C. Code § 1–2520 (1981), with competing constitutional protections without declaring the Act invalid. Although we inevitably must invoke constitutional principles in order to decide critical questions, I agree that we legitimately accomplish our task here by a construction of the Act, which does not require us to rule it, or any part of it, invalid.

Balancing the governmental interest in deterring unlawful institutional discriminatory practices, against the University's own rights under the free exercise clause of the first amendment, I conclude, in the present circumstances, that nothing in the Act requires the University, over its constitutional objections, to publicly associate itself or affirmatively support the goals or activities of the gay student organizations. There is no compelling reason to require the University to do so. Nor is it unlawfully discriminatory for the University to fail to do so.

The consequence of this holding necessarily means that Georgetown's refusal to allow the student groups to use its name is not unlawful discrimination. For the same reasons, the student groups cannot demand the grant of University funds for the advocacy of its causes. In the circumstances, compelled financial support amounts to compelled affirmative support. Again, the failure to so act does not constitute unlawful discrimination and does not violate the Act.

There remains, of course, the question of what tangible facilities the University may grant or deny. Conceptually there is a critical difference between the premise that Georgetown should not be compelled to publicly adopt or support the activities of the groups, as contrasted to allowing the use, as is so with other student groups, of basic facilities available to other members of the University community. Thus, the fair access to meeting halls and related basic needs would not, in my opinion, intrude unduly upon the University's rights.

Lastly, I would observe that our Human Rights Act is broad and comprehensive. It covers a wide range of possible discriminatory practices. Necessarily our decisions will reflect the nature of the asserted discrimination, the presence or absence of historic conditions which surround the question, legislative intent, and case precedent. For me, the decision in this instance reflects those considerations and does not, in any way, signal a weakening of the purposes the Act was intended to serve.

NEWMAN, Associate Judge, concurring, with whom Associate Judges MACK, FERREN and TERRY, join as to Part VI:

I join the court's conclusions that Georgetown University has violated the District of Columbia Human Rights Act by denying the tangible benefits associated with "University Recognition" to the student groups Gay People of Georgetown University (GPGU) and Gay Rights Coalition (GRC) on the prohibited ground of their sexual orientation, and that the University's free exercise defense is of no avail. I write separately to clarify the court's holding as I understand it, and to differ with the approach of the lead opinion (authored by Judge Mack) to analyzing the free exercise claim.

I.

As I understand the court's decision today, it affirms in part and reverses in part decisions of the trial court. It upholds Judge Braman's finding of discrimination in violation of the Human Rights Act to the extent that that finding was based on the University's withholding of material benefits from the gay student groups. To the extent that Judge Braman's ruling had encompassed the denial of whatever intangible benefits are connected with "University Recognition," the court's opinion today reverses that holding as a matter of statutory construction. Finally, today's decision reverses Judge Bacon's determination that enforcement of the Human Rights Act in the circumstances of this case would work an unconstitutional infringement of the University's rights under the free exercise clause of the first amendment.

The Human Rights Act requires educational institutions to provide "facilities and services" on an equal basis without regard to various characteristics of the persons served, including their sexual orientation. That these "facilities and services" can include only tangible items should be apparent from the plain language of the statute, and, as the lead opinion notes, lead op. at 32, from our obligation to construe statutes in a manner as to avoid constitutional questions. *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932). Therefore, in analyzing the constitutional claim, we need concern ourselves only with those *tangible* benefits that accompany a student group's elevation from one with "Student Body Endorsement" to one with "University Recognition." We are told that these benefits consist of: officially approved use of a mailbox; use of the Computer Label Service; use of mailing services; and the opportunity to apply for funding. That these facilities and services were denied to the plaintiffs in this case on the impermissible basis of their

sexual orientation cannot seriously be disputed on this record.

## II.

As for Georgetown's free exercise defense, I believe that the lead opinion wrestles unduly with the question of whether the District's interest in enforcing its anti-discrimination statute is a "compelling" governmental interest, as required for it to withstand first amendment scrutiny. *See Thomas v. Review Board*, 450 U.S. 707, 718, 101 S.Ct. at 1413 (1981). The legislature of the District of Columbia has spoken with unmistakable clarity of the importance with which it regards the eradication of discrimination on the basis of sexual orientation and other inappropriate criteria. In enacting the legislation, the Council sought to "underscore [it's] intent that the elimination of discrimination within the District of Columbia should have 'the highest priority'" (citations omitted). Council of the District of Columbia, Committee Report on Bill 2–179, "The Human Rights Act of 1977," at 3 (July 5, 1977). While the lead opinion recognizes this expressed interest of the District of Columbia Council, *see* lead op. at 67–71, it appears to give that legislative determination no deference whatsoever, instead engaging in its own de novo evaluation of the importance of the interest, *id.* at 71–82.

While the ultimate constitutional question is, of course, for the judiciary alone to decide, the kind of legislative-like weighing of interests revealed by the lead opinion is inappropriate here. For even in constitutional adjudication "a court cannot lightly dispute a determination by the political branches that the ... interests at stake are compelling...." *Finzer v. Barry*, 255 U.S.App.D.C. 19, 28, 798 F.2d 1450, 1459 (1986), *cert. granted sub nom. Boos v. Barry*, — U.S. —, 107 S.Ct. 1282, 94 L.Ed.2d 141 (1987) (free speech clause). While courts have not delineated the precise contours of this deference, they have recognized, sometimes implicitly, that some measure of deference is warranted. *See, e.g., Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society") (free exercise clause).

There may be sound reasons why courts have avoided defining explicitly a particular standard of deference to legislative findings when assessing a constitutional claim. The Supreme Court has recognized that "[a]nnounced degrees of 'deference' to legislative judgments, just as levels of 'scrutiny' which this Court announces that it applies to particular classifications made by a legislative body, may all too readily become facile abstractions used to justify a result." *Rostker v. Goldberg*, 453 U.S. 57, 69–70, 101 S.Ct. 2646, 2654, 69 L.Ed.2d 478 (1981). My quarrel with the lead opinion is simply that it fails to recognize any measure of deference at all.

## III.

There are two reasons why the courts do not sit as super-legislatures to divine the importance of governmental interests. The first is that the government bears the burden of proof in seeking to uphold the constitutionality of a statute; when a fundamental right is at stake, the burden is on the government to show the existence of a compelling interest. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978); *Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976). Therefore, infringement of a free exercise interest can be justified "only by proof by the State of a compelling interest." *Hobbie v. Unemployment Appeals Commission*, — U.S. —, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987). If a court could substitute completely its judgment for that of the state, it would render this burden of proof nugatory. *See Thomas, supra*, 450 U.S. at 719, 101 S.Ct. at 1432; *Sherbert v. Verner*, 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed. 2d 965 (1963) (refusing to credit state interests that were not supported by the record or not raised below).

The second reason why we owe some measure of deference to the government's

determination of the importance of its interest is a recognition of the expertise of the political branches in making such assessments. As this second reason suggests, our deference on the question of what is a "compelling" governmental interest is necessarily of a limited nature. "The deference we owe is not to the government's *legal* judgment that the statute is constitutional, but to their factual discussion of the nature and depth of the ... interests that are involved." *Finzer, supra,* 255 U.S.App.D.C. at 29, 798 F.2d at 1460 (emphasis in original).

Hence, this court in considering a constitutional claim for a religious exemption from the narcotics laws "cho[ ]se not to accept appellant's suggestions that in balancing competing interests, we take into account evidence minimizing dangers from marijuana abuse," and reasoned that "[t]his court will not substitute its judgment for that of the legislature...." *Whyte v. United States,* 471 A.2d 1018, 1021 (D.C.1984). Similarly, in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court, while upholding a free exercise claim by Amish children and their parents for exemption from aspects of Wisconsin's compulsory education requirements, cautioned that "courts must move with great circumspection" in creating religious exemptions from generally applicable requirements since "courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." *Id.* at 235, 92 S.Ct. at 1543. If legislatures, as distinguished from courts, have expertise in the dangers of drug abuse and the educational needs of children, then certainly they have expertise warranting judicial deference on the social necessity of antidiscrimination legislation.

The District of Columbia Council was confident of both the "importance and noncontroversial character" of the Human Rights Act's purposes. Council of the District of Columbia, Committee Report of Bill 2–179, *supra,* at 1 (noting that twelve of the thirteen Council Members had co-sponsored the bill). We owe that legislative assessment some degree of deference.

## IV.

Whatever measure of deference courts may give to a legislative judgment, that deference is especially appropriate where, as here, there is evidence of record that the legislature was aware of competing claims of constitutional magnitude. *See Rostker, supra,* 453 U.S. at 72–74, 101 S.Ct. at 2655–56 (constitutionality of Congress' exclusion of women from military draft supported by legislative record revealing that the exclusion was a considered legislative choice and not enacted " 'unthinkingly' " or as the " 'accidental byproduct of a traditional way of thinking about females' ") (citations omitted).

The Supreme Court's free exercise decisions suggest that the Court may give more deference to the legislative choice when a religious objector seeks exemption from a statutory scheme that already admits of some exception for religious adherents. For example, in *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed. 2d 127 (1982), the Court refused to extend the social security tax's exemption for *self-*employed Amish to other Amish employers and employees. In so doing, the Court noted that "Congress has accommodated, to the extent compatible with a comprehensive national program, the practices of those who believe it a violation of their faith to participate in the social security system.... Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs.... Congress drew a line...." *Id.* at 260–61, 102 S.Ct. at 1057.[1]

---

1. Similarly, in *Gillette v. United States,* 401 U.S. 437, 461–62, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971), the Court refused to extend the Selective Service Act's conscientious objector exemption to those who espoused a religious objection not to "war in any form" but only to particular wars.

In enacting the Human Rights Act, the District of Columbia Council included a section that permits religious institutions to discriminate in favor of co-religionists when doing so is designed to further the institution's religious principles.[2] Political organizations similarly are permitted to discriminate in favor of those of the same political persuasion.[3] By incorporating these exceptions into the Human Rights Act, the District of Columbia Council signaled its awareness of the special role that religious and political belief plays in our constitutional order. At the same time, however, in prohibiting discrimination on grounds other than religion or political affiliation, or in any circumstances other than those embraced by the terms of these exceptions, the Council made plain that no further exception should be tolerated. In taking this view, our legislature implicitly determined that the importance of outlawing discrimination on the basis of sexual orientation outweighs competing religious claims. This least restrictive means determination, along with the Council's assessment of the overall importance of the governmental interest, is entitled to at least a modicum of this court's deference.[4]

## V.

By failing to walk that "middle ground between a judicial House of Lords and the abandonment of any limitation on the other branches," a court is likely to forget "what are surely the main qualities of law, its generality and its neutrality." Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 HARV.L.REV. 1, 16 (1959). By engaging in a legislative-like ab initio assessment of the importance of the asserted governmental interest, a court risks ignoring the more traditional judicial task of comparing like cases to determine the appropriate outcome in the instant one. In so doing, it would forget "the very essence of [the] judicial method to insist upon attending to such other cases." *Id.* at 15. A brief review of the Supreme Court's free exercise jurisprudence assures us that the government has met its burden of demonstrating that its interest in enforcing the Human Rights Act outweighs Georgetown University's claim for religious exemption.

The Supreme Court has held a variety of governmental interests sufficient to sustain facially neutral laws or regulations challenged by religious objectors under the free exercise clause. In *Goldman, supra,* 106 S.Ct. at 1314, the Court held that the military's interest in "uniformity" permitted it to enforce its dress regulations to prohibit an Orthodox Jewish serviceman from wearing a yarmulke while on duty. In *Lee, supra,* 455 U.S. at 260, 102 S.Ct. at 1057, the "broad public interest in maintaining a sound tax system" prevented exemption from the Social Security tax for an Amish employer employing other Amish. In *Braunfeld v. Brown*, 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961), the state's interest in "improving the health, safety, morals and general well-being of ... citizens" permitted enforcement of Sunday closing laws against merchants who observed a Saturday Sabbath. In *Prince v. Massachusetts*, 321 U.S. 158, 165, 64 S.Ct. 438, 441–42, 88 L.Ed. 645 (1944), the "interests of society to protect the welfare of children" permitted the state to

---

2. D.C.Code § 1–2503(b) (1981) provides:
 Nothing contained in the provisions of this chapter shall be construed to bar any religious or political organization, or any organization operated for charitable or educational purposes, which is operated, supervised or controlled by or in connection with a religious or political organization, from limiting employment, or sales, or rental of housing accommodations, or admission to or giving preference to persons of the same religion or political persuasion as is calculated by such organization to promote the religious or political principles for which it is established or maintained.

3. *See* note 2, *supra.*

4. Some commentators suggest that the least restrictive means/compelling interest assessment is a single inquiry. *See* Note, *Religious Exemptions Under the Free Exercise Clause: A Model of Competing Authorities*, 90 YALE L.J. 350, 359 n. 55 (1980). Others caution against equating the state's interest in denying an exemption to a religious objector with its generalized interest in maintaining the underlying rule or program, L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 14–10, at 855 (1978).

apply its child labor law to bar a Jehovah's Witness from distributing religious literature on the streets.

By contrast, in those cases in which the Court has upheld a free exercise challenge and required the government to make exception to its general scheme in order to accommodate a religious objector, it has made clear that the government presented only the weakest of interests to support its refusal to make such an accommodation. In *Thomas, supra,* 450 U.S. at 719, 101 S.Ct. at 1432, and *Sherbert, supra,* 374 U.S. at 407, 83 S.Ct. at 1795, the Court found that the states' asserted interests were without support in the record or had not been raised below. These cases involved the denial of unemployment compensation to employees who had left their employment rather than comply with a job task, *Thomas,* or work schedule, *Sherbert,* that conflicted with religious beliefs. The states argued that granting compensation would lead to fraudulent claims and dilution of the fund. *See* 450 U.S. at 718–19, 101 S.Ct. at 1432; 374 U.S. at 407, 83 S.Ct. at 1795.

In *Yoder, supra,* the Court determined to uphold the free exercise claim because to reject it "would do little to serve those interests" that the state had advanced in favor of enforcement of its law. 406 U.S. at 222, 92 S.Ct. at 1536. *Cf. Bellotti, supra,* 435 U.S. at 787–88, 98 S.Ct. at 1422 ("However weighty [the state's] interests may be ..., they either are not implicated in this case or are not served at all ... by the prohibition....") (footnote omitted). Taking into consideration the Amish way of life and the fact that the Amish were willing to comply with the state's requirements up through the eighth grade, the Court concluded that "Wisconsin's interest in compelling the school attendance of Amish children to age 16 emerges as somewhat less substantial than requiring such attendance for children generally." *Yoder, supra,* 406 U.S. at 228–29, 92 S.Ct. at 1540.

The Court in *Yoder* was also confident that no "harm ... to the public safety, peace, order, or welfare" would result from exempting the religious objectors from application of the law. *Id.* at 230, 92 S.Ct. at 1540. *Cf. Whyte, supra,* 471 A.2d at 1021 (refusing to grant religious exemption since "plainly enforcement of the CSA [Controlled Substances Act] directly operates to protect the public from the dangers of drug abuse and its repurcussions"). Moreover, the Court was mindful that it was dealing with a "way of life that ... interferes with no rights or interests of others," *Yoder, supra,* 406 U.S. at 224, 92 S.Ct. at 1537. *See also West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 630, 63 S.Ct. 1178, 1181, 87 L.Ed. 1628 (1943) ("The freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual"). By contrast, what is particularly compelling about the governmental interest asserted in this case is that it directly pits the civil rights of others against the claims of the religious objector.

While government cannot compel religious or other belief, *Braunfeld, supra,* 366 U.S. at 603, 81 S.Ct. at 1146, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), it can require persons and institutions to comport their behavior to secular moral norms. *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 164, 25 L.Ed. 244 (1878) (refusing to exempt Mormons from application of antipolygamy statute). Nondiscrimination is such a secular norm. *See Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 257, 85 S.Ct. 348, 357, 13 L.Ed.2d 258 (1964) (public accommodations laws are designed to combat the "moral and social wrong" of discrimination). In a series of recent decisions, the Supreme Court has extinguished any doubt that the enforcement of antidiscrimination laws is a compelling governmental interest when poised against a first amendment objection. In *Bob Jones University v. United States,* 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983), the Court recognized that the government's "fundamental, overriding interest in eradicating racial discrimination in education" outweighed the free exercise claim of a private religious school that challenged the denial of tax-exempt status. In *Roberts v. United States Jay-*

*cees,* 468 U.S. 609, 626, 104 S.Ct. 3244, 3254, 82 L.Ed.2d 462 (1984), the Court held that Minnesota's law "[a]ssuring women equal access to ... goods, privileges, and advantages clearly furthers compelling state interests." *Roberts* permitted the state to enforce its public accommodations law to require a private organization to admit women members in the face of a freedom of association claim. Most recently, in *Board of Directors of Rotary International v. Rotary Club of Duarte,* —— U.S. ——, 107 S.Ct. 1940, 1948, 95 L.Ed.2d 474 (1987), confronted by a similar challenge to the application of a California statute, the Court reaffirmed that "public accommodations laws 'plainly serv[e] compelling state interests of the highest order,'" quoting *Roberts, supra,* 468 U.S. at 624, 104 S.Ct. at 3253.

Finally, the Supreme Court has indicated that the compass of the right to free exercise of religion is measured not only by the importance of the governmental interest but by the nature of the burden imposed on the religious objector. *See, e.g., Braunfeld, supra,* 366 U.S. at 606, 81 S.Ct. at 1147 (cautioning against "strik[ing] down, without the most critical scrutiny, legislation which imposes only an indirect burden on the exercise of religion, i.e., legislation which does not make unlawful the religious practice itself"). I do not understand Georgetown to argue that discrimination against any persons or groups is a tenet of its faith. Rather, it claims that providing the disputed facilities and services to the gay student organizations infringes the University's religious interest in embracing a particular doctrine of sexual ethics. Therefore, to require the University to make available its facilities and services in an even-handed manner works, at most,[5] an *indirect* infringement of its religious interest. For just as enforcement of the prohibition against discrimination on the basis of political affiliation does not signify endorsement of any particular political party,

enforcement of the Human Rights Act's ban on discrimination on the basis of sexual orientation does not signify endorsement by the government or by the covered entity of any particular doctrine of sexual ethics. *Cf. Wooley v. Maynard,* 430 U.S. 705, 717, 97 S.Ct. 1428, 1436, 51 L.Ed.2d 752 (1977) ("State's interest [wa]s to disseminate an ideology"); *Barnette, supra,* 319 U.S. at 631, 63 S.Ct. at 1182 (state action involved "compulsion ... to declare a belief"). Rather, it simply recognizes as irrelevant a person's sexual orientation in the provision of facilities and services by an educational institution.

### VI.

Finally, I note that Judge Belson, concurring in part and dissenting in part, has determined that there is a constitutional distinction between the Human Rights Act's stricture against sexual orientation discrimination and its bar against racial discrimination. While expressly acknowledging that "[i]n evaluating the District of Columbia's governmental interest in eradicating discrimination based on sexual orientation, it is appropriate to give great weight to the judgment of the District of Columbia Council," J. Belson's op. at 160, he nonetheless chooses to ignore the legislative judgment. He finds—contrary to the law's text and history—that it is "reasonable to postulate" that the Council did not intend the various grounds of discrimination to be regarded equally. *Id.* at 161. From this assumption he goes on to conclude that the District's interest in eliminating sexual orientation discrimination is a less than compelling governmental interest. Judge Belson would therefore have the University prevail on its free exercise claim.

In Judge Belson's view, "it cannot be said that the goal of eliminating discrimination on the basis of sexual orientation ... has attained the same high priority as public policy, in the District of Columbia or

---

5. Arguably, given the court's construction of the Act, there has been *no* infringement of a religious interest in this case. I am willing to assume, however, with the lead opinion, *see* lead op. at 31–32, that the University has met the threshold requirements for bringing a free exercise claim. *See Tony & Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 303, 105 S.Ct. 1953, 1963, 85 L.Ed.2d 278 (1985); *Lee, supra,* 455 U.S. at 256–57, 102 S.Ct. at 1055.

nationally, as has the goal of eliminating racial discrimination." *Id.* The Council's actions, however, baldly contradict this assessment as to the public policy of the District of Columbia. Whether or not his is an accurate observation about *national* policy has no relevance to our consideration of the question in this case; plainly, an interest need not be national in scope to be compelling. *See* lead op. at 82 note 25. Moreover, an interest need not be identical in weight to some other compelling interest to be compelling itself.

The legislature of the District of Columbia regarded as one of its first priorities after attaining home rule to enact an antidiscrimination statute that includes sexual orientation as a co-equal prohibited ground of discrimination. *See id.* at 69–70. Indeed, as Judge Belson himself observes, "neither he statutory language nor [the Act's] legislative history indicates whether the Council intended to assign any hierarchy to the several proscribed bases for discrimination." J. Belson's op. at 160–61. It is precisely this fact, i.e., that the Council made no distinction among the various prohibited grounds while at the same time it emphasized that the elimination of discrimination was of the "highest priority," *see ante* at 41, citing Council of the District of Columbia, Committee Report of Bill 2–179, that provides the basis for concluding that the governmental interest asserted here is a compelling one.

Our statute, like the Minnesota public accommodations act scrutinized by the Supreme Court in *Roberts*, "reflects th[is jurisdiction's] strong historical commitment to eliminating discrimination and assuring its citizens equal access to publicly available goods and services." 468 U.S. at 624, 3253. The District of Columbia Human Rights Act and those of the various states "provide[] the primary means for protecting the civil rights of the historically disadvantaged" when the federal government fails to offer such protection, *id.* (noting the role of states in protecting civil rights in the period before 1957). The District of Columbia Council, determining to pioneer where the federal government, and indeed many state governments, have not, has

chosen to include sexual orientation discrimination within the ambit of those forms of discrimination that it deems anathema in this jurisdiction. *See generally id.* (evolution of antidiscrimination legislation has involved progressive broadening of scope of facilities covered and groups protected). This provision, no less than the Act's more traditional prohibitions, deserves the deference of this court.

## VII.

### Postscript

In light of Judge Ferren's opinion, concurring in the result in part, and dissenting in part, I reemphasize that the only issues in this case are: first, what does the Human Rights Act require; and, second, does enforcement of the Act violate Georgetown's first amendment rights? The answer to the first question is that the Human Rights Act compels educational institutions in the District of Columbia to provide "facilities and services" on an equal basis without regard to the sexual orientation of the persons served. Such facilities and services necessarily include only tangible items. The answer to the second question is that enforcement of the Act as thus construed does not unconstitutionally infringe the University's rights under the first amendment. I reject Judge Ferren's view that I ought to decide that which is not before us in this case, specifically, the use of the University's name by the gay student groups.

FERREN, Associate Judge, with whom TERRY, Associate Judge, joins, concurring in the result in part and dissenting in part:

I continue to subscribe to the views expressed in the opinion of the division vacated by the en banc court, *Gay Rights Coalition of Georgetown University v. Georgetown University*, 496 A.2d 567, 587 (D.C. 1985) (*Gay Rights I*). Thus, I continue to believe that Georgetown University may not lawfully refuse to accord the plaintiff gay rights groups "University recognition," which means (1) *status* equal to that of the other student groups formally recog-

nized by the university, including permission to use the university name, and (2) the *tangible benefits* uniformly available to other recognized groups such as office space, supplies and equipment, a telephone, computer label and mailing services, student advertising privileges, financial counseling, and the opportunity to apply for lecture fund privileges and for other funding. I therefore concur, as far as it goes, in the result proposed by Judge Mack, joined by Chief Judge Pryor and Judge Newman, requiring the university to make the second category of (tangible) benefits available to the gay rights groups. But I respectfully dissent from the views of those three colleagues, as well as Judges Belson and Nebeker, who would deny the first category of (intangible) relief plaintiffs have requested.[1]

Georgetown has not cross-appealed the trial court's ruling that the university has violated the Human Rights Act. Nonetheless, five of my colleagues have addressed the statute. Judges Mack, Pryor, and Newman distinguish between two types of impact: while agreeing that Georgetown has violated the Act in a "tangible" respect, they justify Georgetown's "intangible" discriminatory conduct by saying the Act does not reach it. In contrast, Judges Belson and Nebeker, while not accepting this dichotomy, doubt that Georgetown has violated the Act in any respect but conclude a remand would be necessary to determine whether their surmise is true. They leave open the possibility that, if improperly motivated, Georgetown has violated the Act by failing to accord not only the tangible, facilities benefits but also the intangible, recognition status. As to the constitutional issue, Judges Mack, Pryor, and Newman conclude that the Act, as far as it reaches, does not violate Georgetown's first amendment

rights, whereas Judges Belson and Nebeker believe that no application of the Act to Georgetown on this record can survive a constitutional defense. None of these analyses is persuasive.

I propose to show, in Part I, why Judges Mack, Pryor, and Newman erroneously distinguish between tangible and intangible benefits in evaluating the reach of the Human Rights Act and in sustaining the constitutionality of the Act only as to the former. Next, in Part II, I reject Judge Belson's contention, adopted by Judge Nebeker, that although the Human Rights Act enjoins discrimination based on "preference or practice," it can never reach discrimination directed at "speech" or "advocacy." It can, since one's speech is an essential part of who one is as a person and thus reflects one's preference or practice. Furthermore, even assuming the validity of Judge Belson's distinction, the Act can extend to discrimination directed at speech, depending on the motive behind, or the means of accomplishing, the discrimination.

As to the constitutional issue, which I believe is the only issue in the case, *Gay Rights I*, 496 A.2d at 568, I address in Part III why the free exercise clause of the first amendment does not accord Georgetown the right, in derogation of the Human Rights Act, to withhold from the gay rights groups the complete "University recognition"—the intangible, official status with attendant tangible benefits—they seek. Basically, Georgetown does not have an absolute first amendment right to withhold any aspect of such recognition, and, on this record, the university does not otherwise have that right because a compelling governmental interest substantially outweighs whatever burden the Act places on Georgetown's exercise of its religious beliefs.

---

1. As I understand the plethora of opinions in this case, five judges agree that the free exercise clause of the first amendment does not stand in the way of a Human Rights Act requirement that Georgetown permit the plaintiff gay rights groups to use university facilities—the so-called tangible benefits—on the same basis that other University-recognized groups are permitted to do so. Two judges would hold that the Act, unhindered by the Constitution, requires Georgetown to grant the plaintiffs complete "University recognition," *i.e.,* not only the tangible benefits but also the intangible benefits of a status equal to that of other officially recognized student groups. Finally, as I understand the record and the opinions in this case, the plaintiff groups are not legally barred from using the university's name. *See infra* note 3.

Finally, in Part IV, I discuss why Judge Belson's effort, joined by Judge Nebeker, to protect Georgetown on first amendment grounds from having to grant plaintiffs access to the tangible benefits is altogether misplaced. As Judge Belson acknowledges, the university expressly waived at oral argument any first amendment objection to providing such benefits (called "relatively insignificant" in its brief). His analysis, therefore, is altogether gratuitous. In any event, the Supreme Court cases on which Judge Belson relies actually support plaintiffs' position.

## I.

### A.

On appeal, both at division and en banc, Georgetown University has never questioned the trial court's ruling that the university's refusal to "recognize" the two gay rights groups as official student organizations violates the District of Columbia Human Rights Act's prohibition against discrimination by an educational institution as to use of its "facilities and services" based upon "sexual orientation." D.C. Code § 1–2520(1) (1987). In fact, Georgetown has stated in its brief a desire "not to appeal separately that ruling" and thus has sought to defend itself on appeal solely on the ground that the Act, as applied, is unconstitutional under the free exercise clause of the first amendment.

Judge Mack, however, citing the "deeply rooted doctrine that a constitutional issue is to be avoided" to the extent possible, attempts to decide the case first under the Act and, as a consequence, purports not to reach the constitutional question insofar as it pertains to the intangible, status element of "university recognition." *Ante* at 16, & n. 13.[2] She argues that compelled "University recognition" of gay rights groups would constitute compelled speech endorsing the groups' values, that the university has an absolute first amendment right not to be forced to speak in any way, and that the Human Rights Act, therefore, cannot properly be construed to require the university to speak in derogation of its religious principles. Because, however, the Act expressly mandates nondiscriminatory access to "facilities and services," Judge Mack finds she must squarely face the first amendment problems with forcing the university to provide tangible benefits. She concludes that the District of Columbia's compelling interest in enforcing the Act substantially outweighs Georgetown's first amendment interest in withholding facilities support from student gay rights groups. As a result, according to Judge Mack, the plaintiffs are entitled to gain tangible benefits from this litigation but no acknowledged status.[3]

---

2. When parties have not raised a statutory issue or a court of appeals has not passed upon it, the Supreme Court has commonly addressed the issue to "'ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided.'" *United States v. Grace*, 461 U.S. 171, 175–76, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932)). Almost invariably, however, the Court has asked the parties to brief the statutory issue. *See, e.g., United States v. Albertini*, 472 U.S. 675, 679–80, 105 S.Ct. 2897, 2902, 86 L.Ed.2d 536 (1985); *Capitol Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 697–98, 104 S.Ct. 2694, 2699, 81 L.Ed.2d 580 (1984); *University of California Regents v. Bakke*, 438 U.S. 265, 281, 98 S.Ct. 2733, 2743, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.). *But see Grace*, 461 U.S. at 176, 103 S.Ct. at 1706 (statutory issue apparently raised for first time at oral argument but that did not resolve case and Court reached constitutional issues). In the present case, the only brief we have on the statutory issue supporting Georgetown was volunteered by amicus curiae Arthur Spitzer. Appellants filed a response in their reply brief.

3. Although Judge Mack holds that the student groups have no right to the status of "University recognition," she notes that the university has dropped its counterclaim to prevent the plaintiff groups' use of the university's name. *Ante* at 14 n. 12. By thus indicating that this issue no longer is alive, Judge Mack necessarily implies that this litigation does not preclude the plaintiff groups from continuing to identify themselves by reference to their affiliation with the university, *e.g.*, the "Gay People of Georgetown University." I agree. Inherent in my own analysis, joined by Judge Terry, is a conclusion that the plaintiff groups may continue to use the Georgetown University name. I see nothing in any of the other opinions, aside from Chief Judge Pryor's, that would indicate otherwise.

In reality, however, Judge Mack, as well as Chief Judge Pryor and Judge Newman who join her, do address and resolve the constitutionality of both the tangible and intangible elements of "University recognition." In construing the Act not to apply to the plaintiffs' requested status as a "recognized" group, Judge Mack does not rely exclusively on a statutory ground for decision in the classic sense that constitutional concerns need not be addressed, *e.g.*, when the court relies exclusively on plain language, on legislative history, or on a dispositive legal doctrine. *See, e.g., Capitol Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (federal preemption doctrine obviates need to reach first amendment issue). Rather, she declines to find a "recognition" requirement in the Act primarily because of her expressed desire to "protect[ ] its constitutionality" as applied. *Ante* at 16.[4] This desire to save the statute from constitutional infirmity reflects a doctrine quite different from the doctrine favoring a statutory over a constitutional ground for decision when both are independently available; for Judge Mack, a constitutional analysis determines the statutory analysis. Accordingly, whether this court concludes that the Act stops short of requiring "University recognition" in order to preserve its constitutionality, or were to hold instead that the Act does extend to status but is unconstitutional as applied, the result would essentially be the same: either approach depends on a lengthy constitutional analysis. As a practical matter, therefore, in seeking to " 'ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided,' " *United States v. Grace*, 461 U.S. 171, 175–76, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983) (citation omitted), Judge Mack has provided a clear answer: it is "no."

Moreover, the theoretical tools Judge Mack and her colleagues employ to show that denying the status of "University recognition" does not violate the Human Rights Act are inadequate to the task. As elaborated below, the Human Rights Act demands more than nondiscriminatory access to tangible benefits; and, in any event, the distinction drawn between tangible and intangible benefits does not serve to enhance the constitutionality of the Act. As I see it (and to this extent I agree with Judges Belson and Nebeker), compelled "University recognition" either is constitutional in both its aspects or is altogether unconstitutional; there is no middle ground.

### B.

If Judge Mack and her colleagues are correct—if gay rights groups must have access to tangible benefits equal to that of other groups but may lawfully be excluded from the list of officially "recognized" student groups having access to the same benefits—then the Act permits a "separate but equal" access to university facilities and services reminiscent of the justification that once permitted blacks on public buses, but only in the back. The Act's protections are not so narrow.

The Human Rights Act, D.C.Code § 1–2520 (1987), provides in relevant part:

> It is an unlawful discriminatory practice, subject to the exceptions in § 1–2503(b), for an educational institution:
>
> (1) to deny, *restrict*, or to abridge or *condition the use of, or access to*, any of its facilities and services to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the race, color, religion, national origin, sex, age, marital status personal appearance, *sexual orientation*, family responsibilities, political affiliation, source of income or physical handicap of any individual. . . . [Emphasis added.]

---

**4.** Although Judge Mack does state, in one conclusional paragraph, that the trial court's "construction of the statute ... conflicts with its literal meaning," *ante* at 21, she apparently concedes that the statutory language itself does not plainly foreclose plaintiffs' request for "recognition" in connection with their use of university facilities and services; the "literal meaning" of the statute has to be derived with the help of ten pages of constitutional analysis. *Ante* at 21–25.

Judge Mack agrees with the trial court that Georgetown University has denied facilities and services to the student gay rights groups on the basis of sexual orientation. By stating, however, that the Act does not require the university to accord the status, in contrast with the tangible benefits, of "University recognition," Judge Mack ignores the fact that her own interpretation, just as clearly, will result in discrimination that violates the Act: it will "restrict ... or condition the use of, or access to, ... facilities and services ... based upon sexual orientation." As a result of this court's decision today incorporating Judge Mack's proposed result, *supra* note 1, the gay rights groups' access to tangible benefits will be restricted to and conditioned upon their not receiving the same University citizenship rights inherent in every other group's use of the same facilities and services. To me, that conditional access is an obvious affront to human dignity, amounting to a form of discrimination at least as intolerable as the denial of tangible facilities and services. *Cf. Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (actionable sexual harassment under Title VII of Civil Rights Act of 1964 not limited to "economic" or "tangible" discrimination but includes "hostile environment" as well). I have no difficulty concluding that withholding such a significant form of citizenship in a university community results in a demeaning, and thus conditional, access to facilities and services that violates the plain language of the statute.

An analogy to a similar form of discrimination helps underscore the point. Suppose, hypothetically, that a local private college religiously wedded to the views of the clergy who once offered a Biblical defense of slavery,[5] or to the more recently expressed views of Bob Jones University,[6] sought to limit black student groups to the tangible benefits of student activities by stressing that, because of their racial inferiority and/or their advocacy of racial intermarriage, they could not be officially "recognized" by the college on a par equal with other groups, such as a student chapter of the local Masonic lodge. Or, suppose that the same local college admitted self-acknowledged homosexuals to all degree-granting programs but carried them on all official college rosters, including the commencement program, under the exclusive heading of "evil" students. I cannot imagine anyone seriously would contend that the Human Rights Act does not prohibit such second-class, restricted access to college facilities and services—that the Act tolerates such a "hostile environment." *Meritor Savings Bank*, 477 U.S. at ——, 106 S.Ct. at 2409.

It appears to me, therefore, that because the Act expressly bars discrimination on the basis of sexual orientation as well as race, sex, age, and other specified characteristics—and because it does not say that one form of discrimination may be less unlawful than another—the Act thus clearly proscribes all aspects of Georgetown's non-recognition of student gay rights groups, just as it would proscribe similarly discriminatory treatment of racial groups.[7] I therefore perceive no basis in Judge Mack's opinion for disturbing the trial court's ruling that Georgetown's refusal to accord "University recognition," as such, violated the Human Rights Act. Again, it follows: the only substantial question is

**5.** *See, e.g.,* J. Fletcher, Studies on Slavery; J. Priest, Bible Defense of Slavery ...; Rev. T. Stringfellow, Slavery, Its Origin, Nature and History: Its Relation to Society, to Government, and to True Religion; Rev. F.A. Ross, Slavery Ordained of God, all cited in A. Craven, The Coming of the Civil War 162–63 & 453 n. 14 (2d ed. 1957).

**6.** *See Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

**7.** Judge Mack's view that the Act simply does not reach Georgetown's decision not to "recognize" the student groups makes the university's motive for its decision irrelevant. Thus, even if the university were to claim it acted out of hatred for homosexuality, rather than out of a religious obligation not to be institutionally associated with the plaintiff groups, the Act, according to Judge Mack's analysis, would equally protect Georgetown's right not to grant "University recognition." Similarly, under such reasoning, a motive of racial hatred in no way would undercut a university's right under the Act not to "recognize" a black or Asian or Hispanic student organization.

whether the free exercise clause of the first amendment protects any aspect of Georgetown's discriminatory policy.[8]

### C.

Just as Judge Mack's distinction between tangible and intangible benefits is not helpful in defining the reach of the Human Rights Act, it provides little enlightenment for resolving the constitutional question that is at the heart of Judge Mack's statutory analysis. Judge Mack distinguishes tangible from intangible benefits because she believes that compelling the university to give equal access to the intangible benefit of "recognition" would force it to speak in conflict with its religious tenets, whereas government-ordered access to tangible benefits would compel only conduct, not speech. The difference is critical, Judge Mack contends, because the first amendment absolutely forbids the government to compel speech but does not necessarily bar compelled conduct burdening religious practice. Consequently, she says, only the demand to provide the status of "University recognition" automatically violates the free exercise clause; requiring the mere "conduct" of giving equal access to tangible benefits, while burdening Georgetown's free exercise rights, is nonetheless constitutionally permitted if justified by a compelling state interest. *See ante* at 20–22.

### (1)

As elaborated in *Gay Rights I* and later in this opinion, I do not believe that either the intangible or the tangible benefits of "University recognition," if required, would violate Georgetown's free exercise rights. But, if Judge Mack were correct that compelled verbal "recognition" of the student groups would be a compelled religious stand in violation of the first amendment, I do not comprehend how enforcement of student access to visible, tangible benefits such as an office, a telephone, mailing services, and advertising privileges financed by the university would be any less evidently an unconstitutional requirement. Forced financial support for particular ideas is, in general, no less a required endorsement than compelled verbal support: depending on the circumstances, compelled financial support may well constitute an infringement of first amendment protections. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 235–36, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (1977). Judge Mack's analysis virtually ignores this constitutional reality.

### (2)

Furthermore, contrary to Judge Mack's premise, even if one views forced "recognition" as a form of compelled speech, it is not for that reason automatically unconstitutional. Judge Mack equates "recognition" with "endorsement" and "endorsement" with "speech," which she asserts the government cannot compel even when its actions are grounded in a compelling state interest such as ending discrimination based on sexual orientation. Her analysis is too simple, for it glides over a crucial question: assuming that "recognition" is a form of "endorsement," what exactly is it an endorsement *of*—a student group's values or, instead, merely a group's right to exist on campus and to advocate its values? The former is speech; the latter may not be.

Judge Mack states that "recognition" constitutes "endorsement," meaning "religious approval of or neutrality towards the student groups." *Ante* at 19. She treats the question as a factual issue settled by the trial court subject only to the clearly erroneous standard of review. On the contrary, however, the nature of the "endorsement" that "recognition" represents is ultimately a legal rather than a purely

---

**8.** Theoretically, there is a possibility that the level of constitutional scrutiny of discrimination based on sexual orientation may be less strict than the level of scrutiny applicable to discrimination based on race, when the government's interest in enforcing the Human Rights Act is weighed against the interest of a party who asserts a constitutional right to discriminate. But that possibility—which I need not address— has no bearing on whether the Act would make the discrimination unlawful; the issue, rather, would be whether unlawful discrimination of one sort, but not of another, would be excused on constitutional grounds.

factual question, and, in any case, the trial court did not supply the answer.

It should be obvious that the constitutional significance of an act, such as the giving of "University recognition," is a question of law which the court of appeals must evaluate in detail. The constitutional significance of an act as "speech" or as "endorsement" of a particular moral or ideological position, therefore, must be understood as an objective question. If the actor's subjective view of what an act means were to determine whether compelling the act is unconstitutional, then every private actor would hold a veto over all our civil rights laws; an employer, for example, could interpret having to hire members of all races on an equal footing as a statement of approval of their moral equality—a statement which, under Judge Mack's analysis of free speech or free exercise immunity, the employer could not be compelled to make. There is no simple legal standard for translating the constitutional concepts of speech and endorsement into an empirical question of fact comparable, for example, to the question of a person's motive for an act of discrimination. The constitutionality of compelling a given act suggests questions too intimately bound up with a history of Supreme Court opinions addressing a great variety of demands on private actors to be treated as an ordinary factual issue for resolution in the trial court.

In the present case, therefore, we may accept the trial court's finding of fact that Georgetown sincerely views "recognition" as "endorsement," but that only begins the

inquiry. Thus, Judge Mack's deference to the trial court's finding only serves to avoid a responsibility that this court must squarely face: to argue through the controversial problem of what "recognition" means constitutionally—an analysis that this court is in as good a position as the trial court to make, since the question is, fundamentally, one of law.[9]

Furthermore, even if the trial court's characterization of "recognition" as "endorsement" were purely a finding of fact, the trial court simply did not make the kind of finding Judge Mack claims it made. In Judge Bacon's order upholding Georgetown's free exercise defense, the judge stated that "[t]he major purpose of 'university recognition' is official endorsement, an endorsement which the University believes will conflict with the normative teachings of the Church on homosexuality." This finding does not specify what kind of moral or ideological position such "recognition" is an "endorsement" of. Moreover, the trial court's order provides no basis for believing the court itself understood its finding to be one of *constitutional* fact or even of constitutional significance. The trial court's order, therefore, cannot provide the foundation for Judge Mack's constitutional argument that "recognition" means endorsement of the sort absolutely forbidden by the Constitution.

(3)

Turning to the constitutional question itself, I agree with Judge Mack that regulations literally compelling someone to speak moral or ideological statements are directly and extremely intrusive upon the individu-

---

9. Judge Mack gives two reasons for concluding the trial court's finding that "recognition" means "endorsement" is not clearly erroneous: first, that Georgetown itself viewed "recognition" as a form of endorsement, thus of speech; and, second, that granting "University recognition" is a discretionary decision by the university. *Ante* at 19. Neither reason is applied consistently in the opinion, for both factors apply equally to the tangible benefits resulting from "University recognition." Judge Mack concludes that forced provision of tangible benefits does not violate the constitutional prohibition on compelled endorsement, but Georgetown itself made clear that it views having to give tangible benefits also as a compelled endorse-

ment, and the granting of such benefits is just as discretionary with the university as is the granting of the intangible benefit of "recognition." Moreover, neither reason is persuasive ground for Judge Mack's assumption that "recognition" amounts to spoken endorsement of homosexuality in the sense that reciting the pledge of allegiance to the flag amounts to spoken endorsement of patriotic values. As elaborated in the text above, the constitutional significance of "recognition" cannot be determined by Georgetown's subjective interpretation of that act, and, in any case, the trial court never stated its finding in such precise terms as Judge Mack requires to justify her conclusion.

al's freedom of belief and expression; probably no countervailing state interest could render such compulsions constitutional. *See West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (holding states cannot force schoolchildren to say pledge of allegiance to flag); *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961) (holding government cannot require declaration of belief in God as condition of holding public office). In contrast, however, regulations requiring one actor to provide a forum for, and in this way to subsidize, the speech of another may prove far less intrusive on first amendment rights than a regulation forcing a person to speak with his or her own voice; therefore, a state interest may well exist sufficient to justify such compelled support of someone else's views. *See Pacific Gas & Electric Co. v. Public Utilities Commission,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) ("Notwithstanding that it burdens protected speech," law requiring public utilities to include in billing envelopes statements regarding energy issues prepared by others "could be valid if it were a narrowly tailored means of serving a compelling state interest"); *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (mandatory contributions to Social Security, despite religious objections, did not violate first amendment because compelling state interest justified that burden on religion); *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (state law requiring shopping center to permit distribution of pamphlets on its property did not violate owner's first amendment rights); *Abood, supra* (although public employee's mandatory union dues may not, consistent with first amendment, be used to support "ideological activities unrelated to collective bargaining," such mandatory dues may be used to support collective bargaining even though such activities are highly ideological to some members of union).

Judge Mack argues from the premise that requiring Georgetown to give "recognition" is constitutionally the same as requiring school children to recite the pledge of allegiance to the flag (*Barnette*) or state office-holders to affirm their belief in God (*Torcaso*). Only in this way can she conclude that, in this case, we have a simple example of compelled speech absolutely forbidden by the Constitution. But, in equating compelled "recognition" with the forced ideological statements at issue in *Barnette* and *Torcaso*, Judge Mack has pulled one sentence about "endorsement" from the trial court order and made it the linchpin of a sophisticated constitutional theory on which the trial court itself did not rely. In fact, however, that trial court finding is perfectly consistent with the view expressed in *Gay Rights I,* 496 A.2d at 573–74, that on this record "recognition" represents, at most, official "endorsement" of the gay student groups' right to organize on campus and pursue their own moral agenda. Thus, requiring Georgetown to "recognize" the gay rights groups may amount to no more than compelled "tolerance" by one entity of the beliefs and speech of another (the kind of forced toleration that is at the very heart of all our civil rights laws) and, to the extent such "recognition" brings tangible benefits, compelled subsidization of another's speech.[10]

Judge Mack's assumption that "recognition" means "endorsement" of a recognized group's values, then, slides over the central question whether legally compelled "recognition" constitutes forced speech expressing approval of or neutrality toward another's values, or merely amounts to required toleration of someone else's speech. A precise answer to this question is essential because Supreme Court decisional law has created this distinction. Cases like *Pacific*

**10.** It is interesting to note that the trial court did not develop or rely upon the theory of compelled "speech" absolutely forbidden by the Constitution. Instead, the court accepted that compelled recognition is "contrary to Catholic religious beliefs" and proceeded to inquire whether the government's interest in combatting discrimination against student gay rights groups was, under the circumstances, sufficient to justify the burden. The trial court concluded it was not.

*Gas & Electric, Lee,* and *Abood,* on which Judge Mack herself relies, along with *PruneYard,* which she attempts to distinguish, establish beyond doubt that a compelling state interest can, in some circumstances, justify forcing a private actor such as Georgetown to provide a forum and related support for someone else's speech with which it does not agree. I agree with the trial court (Judge Braman) that the Human Rights Act clearly protects the student groups' right to equal treatment on campus. I also accept Georgetown's claim that "recognizing" the gay rights groups, even to the extent of compelled toleration, burdens its exercise of religion. Contrary to the course Judge Mack has taken, however, I conclude, as did the trial court (Judge Bacon), *supra* note 10, that there is no absolute constitutional bar on such compelled "recognition." Instead, as elaborated below, a compelling state interest may overcome the specific burden that official toleration (rather than merely the *de facto* toleration Georgetown now practices by permitting student body endorsement) would impose on the university.

(4)

In sum, in making a constitutional distinction between tangible and intangible benefits, Judge Mack does not discuss why compelled provision of tangible benefits for a group with an announced cause is not constitutionally equivalent to compelled verbal support.[11] Nor does Judge Mack satisfactorily explain why cases such as *Pacific Gas & Electric* and *Abood,* on which she explicitly relies, do not support the student groups' claim to "recognition" status, given her conclusion that eradicating discrimination based on sexual orientation is a compelling state interest. The lesson I draw from the long line of Supreme Court decisions on which Judge Mack relies is that no formal distinction between intangible and tangible benefits, or between "speech" and "conduct," can resolve the constitutionality of requiring Georgetown to grant the status and the benefits of "University recognition."

D.

Despite Judge Mack's purported reliance on statutory construction for part of her analysis, I have tried to show that her interpretation of the reach of the Act is too limited. I have also tried to show, in any event, that her interpretation is entirely governed by constitutional analysis that fails to define "recognition" or "endorsement" with sufficient precision and that further suffers from internal inconsistency in attempting to create a meaningful distinction between tangible and intangible aspects of "University recognition." Thus, we need to take a fresh look at the only real issue on appeal: "whether Georgetown's unwillingness to 'recognize' the gay rights groups—as that concept is to be understood—must be excused on the ground that the Human Rights Act, as applied, impermissibly interferes with the University's constitutional right to the free exercise of religion." *Gay Rights I,* 496 A.2d at 568. I return to this central question in Part III. First, however, I wish to address Judge Belson's effort to show that, although he believes a remand would be necessary to clarify the university's motives, the Human Rights Act would not bar Georgetown's actions toward the gay rights groups if motivated solely by a desire to suppress advocacy of homosexual conduct.

---

11. Judge Mack notes the university has not argued on appeal that a legal requirement to provide tangible facilities and services, in contrast with intangible "recognition" or "endorsement," violates first amendment rights. *See ante* at 26 n. 21. In Georgetown's supplemental brief for en banc argument, I find only such statements as "this case involves much more than simply the question of access to facilities" and "[t]he few additional tangible benefits plaintiffs could obtain by the grant of official recognition are minimal at best." I find no concession that the university's free exercise defense does not embrace compelled provision of tangible benefits of any kind. It is true that, as noted in Part IV *infra,* at oral argument Georgetown expressly disavowed reliance on an argument that compelled provision of the tangible benefits at issue violated the first amendment. But Georgetown's decision to waive any separate first amendment defense to providing tangible benefits in no way saves the sharp theoretical distinction, on which Judge Mack so heavily relies, between compelled endorsement and compelled subsidization of another's speech.

## II.

In contrast with Judge Mack, Judge Belson reads the Human Rights Act in a way that may not proscribe any of Georgetown's discriminatory conduct. He argues that the Act's reference to "sexual orientation" only forbids discrimination based on sexual "preference or practice," not discrimination based on "advocacy," meaning "promotion of ideas or activities." *Post* at 65. If Georgetown engaged only in the latter sort of discrimination, he says, it did not violate the Act. But for his disposition of the appeal on constitutional grounds, on the assumption that Georgetown has violated the Act, Judge Belson would remand for further proceedings to clarify the university's motives.

There are two problems with Judge Belson's analysis. First, given the trial court findings on which he relies—and which are supported by the record—no remand is necessary to determine the university's motives for purposes of evaluating whether Georgetown has violated the Human Rights Act. Indeed, on the basis of the findings by both trial judges in the statutory and constitutional phases of the proceedings—which Judge Belson himself suggests we can rely on for purposes of analyzing all issues in this case—the student groups are entitled to prevail on the statutory issue. Second, Judge Belson incorrectly argues that the Act can never, consistent with the Constitution, interdict discrimination directed at "speech" or "advocacy."

## A.

According to Judge Belson, Georgetown claims it denied "University recognition" because it disagreed with the ideas the gay rights groups were propagating, not because the groups were composed primarily of homosexuals. Judge Belson perceives, however, that the trial court (Judge Braman) mistakenly understood the Human Rights Act to forbid discrimination against a group on account of its advocacy. *Post* at 65. Consequently, suggests Judge Belson, the trial court appears to have concluded, erroneously, that Georgetown's own stated reasons for its actions violated the

Act, and thus, he says, the court improperly granted summary judgment for the students on the statutory issue. Judge Belson further suggests, however, that this court can evaluate the appropriateness of summary judgment under the Act by reference to additional findings by Judge Bacon in connection with her evaluation of Georgetown's free exercise defense. *Post* at 66–67. Judge Belson then acknowledges that Judge Bacon's findings do not warrant summary judgment for the university under the Act; they do not establish that the only basis for the university's discrimination was the student groups' promotion of ideas or of activities. Accordingly, he concludes, but for the appropriateness of disposing of the case solely on constitutional grounds, he would remand to the trial court "for findings of fact and conclusions of law addressed specifically to the statutory issues," *post* at 66–67, in particular the university's motives.

Judge Belson is correct in noting, *post* at 67 n. 9, that Judge Bacon found "the President of Georgetown University, the Dean of the Law Center, and defendants' expert witness"—in attempting to justify Georgetown's discriminatory actions on religious grounds—applied Catholic teachings with two realities in mind: "[t]he gay student organizations, as evidenced by their charters and their activities, *were participating in* and promoting homosexual life styles." (Emphasis added.) We thus have an express finding of discrimination based not only on advocacy ("promoting") but also, in Judge Belson's words, *post* at 65, on "status as a member of a protected group" ("participating" in homosexual lifestyles). It is not clear, therefore, why Judge Belson fails to acknowledge that Judge Bacon supplied a supplementary finding sufficient to sustain Judge Braman's ruling that the university violated the Human Rights Act. Judge Mack's lengthy analysis of the record, *ante* at 26–29, unquestionably validates the finding that the university was motivated not merely by aversion to the gay rights groups' "promotion of ideas or activities," *post* at 65, but also by disdain for their status, *i.e.*, their sexual "preference or

practice." D.C.Code § 1–2502(28) (1987) (definition of "sexual orientation" quoted by Judge Belson, *post* at 65).

Given my colleagues' emphasis on statutory analysis, it is important to emphasize that, if the full court were to come to grips with the question whether summary judgment or a remand is the more appropriate avenue for resolution of the statutory issue on this record, we would unanimously agree, at least as to tangible benefits, that the university is not entitled to judgment. Moreover, even if a remand were required, the only practical purpose, according to Judge Belson's analysis, would be to determine whether Georgetown's *only* motive in denying "University recognition" was to block advocacy; if the motives were mixed—if one of the reasons for the university's discriminatory withholding of recognition was an aversion to homosexual preference or practice—then Judge Belson himself, I gather, would agree the Act has been violated, since the statute bars discrimination if "wholly or partially" based upon "sexual orientation." *Id.* § 1–2520.

Finally, I understand Judge Belson to agree that if, upon remand, the court were to find that the university's motives were mixed, then the university would have violated the Act by withholding the intangible (status), as well as the tangible (facilities), benefits; he does not join in Judge Mack's reading of the Act that would exclude a requirement of nondiscriminatory, verbal recognition from the reach of the Act. Thus, four of the seven judges on this case (Belson, Nebeker, Ferren, Terry) agree that if Georgetown was motivated, in part, by an aversion to the plaintiff groups' homosexual preference or practice—as Judges Mack, Pryor, Newman, Ferren, and Terry agree it was—then the university's failure to accord recognition status, as well as facilities support, violated the Human Rights Act.

Judge Bacon has made findings of fact indicating mixed motives, and the record supports those findings. Judge Belson, however, does not face up to that reality; inexplicably, he leaves room for the possibility that Georgetown, despite Judge Bacon's findings that augment Judge Braman's, may not have violated the Act. And yet, in shifting to his constitutional analysis, he adopts as a working "premise" what the record and the trial court's findings, at best, establish for the university: that Georgetown denied recognition to the student groups "in large part," but not exclusively, "because of the groups' sponsorship and promotion of ideas and activities." *Post* at 67. That record-based premise, drawn from sound trial court findings that the university discriminated by reference both to advocacy and to lifestyle, clinches the argument that Georgetown has violated the Act in denying "University recognition." No remand would be necessary to establish that violation.

### B.

There is a more general, though fundamental weakness of Judge Belson's analysis—of his unqualified proposition that the Act cannot be construed to forbid the suppression of "speech" or "advocacy." The distinction between discrimination based on advocacy and on status will not work. Part of who a person is, is what he or she says; to deny the right to speak is to deny an essential aspect of one's person. In this sense, therefore, an asserted right to discriminate against someone's advocacy of homosexuality is clearly a claimed right to discriminate against the person on the basis of one's sexual "preference" and thus "sexual orientation." D.C.Code §§ 1–2502(28), –2520(1) (1987).

Assume, however, it is true, as Judge Belson contends, that the Act does not forbid discrimination motivated solely by a desire to prevent the speech activities of a group. Two caveats are in order. First, the means chosen to discriminate against advocacy (here, non-recognition of the plaintiff groups) does not necessarily prove that the underlying motive is merely to prevent the propagation of a repugnant doctrine on campus. The university's action may be directed solely at speech activities (let us assume it is), but that action may still be illegal under the Act if motivated, even in part, by dislike for those

who prefer or practice homosexuality. I believe Judge Belson agrees.[12]

Second, even if the university were motivated solely by a desire to shut down offensive speech activities, the means chosen to counter repugnant speech might nonetheless violate the Act. Even if the Act were construed not to forbid discrimination against homosexual ideas, it unquestionably does forbid discrimination against homosexuals because of their ideas. Discrimination that goes beyond the ideas to the person violates the Act no matter what the motive. See D.C.Code § 1-2532 (1987) (any practice having "effect or consequence" of violating Act is unlawful). Accordingly, even if censorship in this context, when properly motivated, were lawful, an act excluding or degrading a group to accomplish censorship would not be lawful.

As indicated, I believe any effort to distinguish under the Act between legal discrimination against ideas and illegal discrimination against persons fails to take into account that ideas—and advocacy—are an essential part of the person. But even if the distinction could be made, it is not easy to draw, in part because means capable of achieving the former may amount to the latter. I believe Judge Belson has overlooked, both in his analysis and in its application, the possibility that Georgetown's refusal to recognize the plaintiff groups, if only because of an aversion to their advocacy, is likely to be—indeed, inevitably is in the context of a university—an overly broad response that effectively discriminates against persons in violation of the Act.

Because every member of the court, for one reason or another, proceeds to decide the case on the premise that the Human Rights Act has been violated, no more analysis of the Act itself would be useful. I therefore turn to the constitutional issue. As I see it, the Act cannot constitutionally require Georgetown to approve, condemn, or even express its neutrality toward the moral value of homosexuality, but the Act constitutionally may, and does, require that Georgetown tolerate others in the university environment who espouse that moral value; and, given the nature of a university, such toleration presupposes "University recognition"—as I now shall elaborate.

### III.

The fundamental question is: whether plaintiffs' request for "University recognition"—meaning full citizenship as student groups at Georgetown University—may be denied, even though in violation of the Human Rights Act, because of Georgetown's first amendment rights. I developed my argument why the answer is "no"—why Georgetown's constitutional defense fails—in the division opinion over two years ago, Gay Rights I, 496 A.2d at 574-82, and I will not repeat it all here. But as to the crucial issue—indeed, the principal conceptualization that divides the court—I want to emphasize again that, on this record, "University recognition" or "endorsement" of the plaintiff student groups does not mean, explicitly or implicitly, a statement of approval—or even of neutrality—toward homosexuality, gay rights, or related matters. Because of the nature of the university, the Human Rights Act in no way compels Georgetown to take a position in violation of its right to free exercise of religious beliefs.

In context—and context is critically important—the Act only requires Georgetown not to discriminate against student groups that wish to express their own views in what I believe we may call, without fear of contradiction, a typical private university marketplace of ideas, which inherently stands for freedom of expression. That marketplace is analogous, for constitutional purposes, to the shopping center in

12. As Judge Bacon's findings, buttressed by Judge Mack's analysis of the record, make clear, Georgetown's motive cannot be characterized solely as a desire to frustrate speech; the university has made clear that the ultimate reason it does not want to be seen as approving advocacy of the moral dignity of homosexuality is precise- ly that Catholic orthodoxy condemns those who practice a homosexual lifestyle. Of course, that one's hostility to a group of people is grounded in moral or religious objections makes it no less illegal under the Human Rights Act than would hostility founded in mere emotional animus.

*PruneYard, supra.* There, the Supreme Court held that the first amendment rights of the shopping center owner did not justify barring pamphleteers from exercising their own free speech rights in the common areas open to the public. A legal requirement that Georgetown make its university-wide forum available on a nondiscriminatory basis to all student citizens of the university does not, in my view, imply in any way that the university corporation/administration itself can be reasonably identified with the views of any particular student organization or that the university, as such, has a position—pro, con, or neutral—on any particular message a student group happens to spread. The Human Rights Act, therefore, does not require Georgetown to espouse any view or to intimate even a neutral opinion.[13]

The Human Rights Act's demands, as they bear on Georgetown University, stand in sharp contrast with laws that have compelled individuals to utter particular speech, *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (compelled ideological message on state license plate); *Torcaso v. Watkins, supra* (required oath of belief in God for notaries public); *West Virginia State Board of Education v. Barnette, supra* (compelled pledge of allegiance to flag), or to disseminate a message of others in a "hitherto private forum," *Pacific Gas & Electric,* 475 U.S. at 12 n. 8, 106 S.Ct. at 910 n. 8 (1986) (plurality opinion) (compelled inclusion of flyer from ratepayer's organization with utility bill to customers); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (required inclusion in newspaper of reply by political candidate whose character and record newspaper had assailed).

There is a recognized constitutional distinction between a requirement that others be permitted to express what are clearly their own ideas in your forum, when you manifestly provide a public forum (*Prune-Yard*), and a requirement that you must express the ideas of others (*Wooley; Torcaso; Barnette*) or must spread, and thus implicitly affirm, those ideas in your own private forum, absent a dissociative statement (*Pacific Gas & Electric; Tornillo*). For reasons elaborated at division, *Gay Rights I,* 496 A.2d at 577–82, I believe the *PruneYard* analysis is controlling here.[14] While there obviously are differences between a private university and a private shopping center, the fact that each, for entirely different reasons, has become a traditional forum for the expression of diverse, often conflicting ideas provides a context compelling a conclusion that, *by definition,* even a private university proprietor cannot *reasonably* be associated with any idea it does not affirmatively embrace. At most, therefore, "University recognition" of a gay rights group implies no more than the university's "official tolerance," *Gay Rights I,* 496 A.2d at 574, of still another student organization in a pluralistic environment—a tolerance to be expected, indeed taken for granted, in any university that purports to be open to free expression of ideas, and thus a tolerance that implies no university position whatsoever about the ideas any group stands for.[15] To tolerate another's values or

---

**13.** It is interesting to note that Georgetown has accepted federal funds for various purposes, representing, as required by statute, that no project assisted with those funds shall ever be used for "a sectarian activity." 20 U.S.C. § 1132e(c) (1982). Even if this statutory responsibility, as such, does not have a direct bearing on Georgetown's refusal to recognize the student groups for religious reasons, I do believe the university's acceptance of federal funds under this condition amounts to a representation, on which students reasonably can be expected to rely, that sectarian concerns will not derogate from the tolerance of all points of view reasonably to be expected in a university community—especially from a governing authority that manifestly is willing to expand its facilities, and thus its educational mission, with the help of public money.

**14.** Judge Mack's and Judge Belson's efforts to distinguish *PruneYard* are, to me, unpersuasive primarily because they do not deal with the nature of a university.

**15.** The university equates "recognition" with "endorsement" meaning "approval." I have previously noted that the trial court's finding that " '[t]he major purpose of "university recognition" is official endorsement' " is "not 'clearly erroneous.' " (Citations omitted.) *Gay Rights I,* 496 A.2d at 572. But, as also noted, this finding

speech is not to approve of them; nor is it to express indifference or neutrality. It is simply an expressed willingness to let someone else have a say without indicating what you think about it.[16] This distinction between toleration and endorsement (or, more generally, between toleration and taking a position of some sort) lies at the heart of the first amendment's demand that government tolerate dissident beliefs and speech; it is equally essential to our civil rights statutes. Conceptually, perhaps, one could quibble about whether government-compelled toleration amounts to forced conduct or forced speech; but, for constitutional purposes, the salient point is that, in context, such "University recognition" does not suggest the university is taking a position on the group that it tolerates/recognizes. Thus, required "recognition" does not run afoul of the absolute protection against compelled utterances accorded by *Wooley, Barnette,* and *Torcaso.* As I see it, therefore, only in *refusing* to recognize a student group expressly for

ideological or theological reasons is the university making a statement about the group's ideas and thus making its own position known.[17]

Obviously, the Human Rights Act does not get in the way of Georgetown's first amendment right to make any statement it wants to make condemning the views of a group of its own students. But, even more importantly, in officially recognizing the gay rights groups, Georgetown would not, in effect, be forced to make its own position clear by issuing such a responsive statement condemning the gay student groups' aims. In *Pacific Gas & Electric* and *Tornillo,* the law had forced conversion of a private forum into a public forum, overriding the prerogatives of the proprietors to restrict communication to agendas and opinions of their own. As a consequence, the proprietors were likely to feel compelled to respond, or to withhold provocative messages altogether, to assure that their audiences would not confuse the proprietors' views with those of anyone

about the "purpose" of recognition is ambiguous; it thus requires an evaluation of both the "practical and [the] normative meaning[s]" of "endorsement," an analysis the trial court did not provide. *Id.* at 573. Because the constitutionality of the Human Rights Act, as applied, turns on whether required "recognition" or "endorsement" amounts, in effect, to a coerced expression of religious approval or neutrality— or to something else—the meanings of those terms must be defined as precisely as possible and thus ultimately defined as a matter of law by this court. As discussed earlier, Judge Mack's deference to the trial court for the meaning of "endorsement," therefore, is wrong for two reasons: the trial court did not provide a meaningful definition, and, in any event, this court must be the interpreter of a term that has primarily a constitutional/legal, not factual, definition. As indicated in the text above, I would define "the University recognition/endorsement here ... [to] mean no more than 'official tolerance' of gay rights groups." *Id.* at 574.

16. Judge Belson argues that Georgetown, by permitting student body endorsement of the plaintiff groups, "has tolerated fully the activities of the student groups in the market place of ideas that is a university." *Post* at 68 n. 12. That is simply not true; "student body endorsement" is, relative to "University recognition," a second-class status that inherently reflects less toleration of the plaintiffs' activities than of the activities of other student groups.

17. Georgetown suggests that compelled speech burdening religious beliefs is more odious to the Constitution than compelled speech violating non-religious beliefs. Judge Mack appears to agree, for she distinguishes the present case from *Pacific Gas & Electric Co. v. Public Utilities Comm'n,* 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), in part on the ground that the latter involved only a free speech defense rather than a (presumably weightier) free exercise claim. *Ante* at 24 n. 19. Georgetown, however, has provided no authority to indicate that religious speech rights as such receive greater protection than non-religious speech rights. In fact, the precedents suggest no difference in the level of protection. The compelled-speech cases on which both Judge Mack and Georgetown principally rely concerned forced speech in violation of a person's religious beliefs, but two of these decisions struck down the government actions solely on free speech grounds equally applicable to cases implicating no specifically religious beliefs. *See Wooley v. Maynard,* 430 U.S. 705, 714–15, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed.2d 1628 (1943); *see also* L. TRIBE, AMERICAN CONSTITUTIONAL LAW 864–65 (1978). The third case struck down a religious oath as a condition of public office but gave no indication that freedom of religious conscience deserved greater protection than freedom of conscience generally. *See Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).

else. In contrast, Georgetown University is, *by its very nature*, a forum for its students, teachers, administrators, and alumni. It is akin to a public forum in that a variety of constituent groups has automatic access, there is a tradition of wide open debate, and thus, given this very nature of a university, there is no implication that the corporation/administration—the academic proprietor—would reasonably feel identified with, and thus compelled to dissociate itself from, the views of student groups as diverse as the Jewish Students Association, the Organization of Arab Students, the Young Americans for Freedom, the Democratic Socialist Organizing Committee, the Women's Rights Collective, and the Gay People of Georgetown University. *See Gay Rights I*, 496 A.2d at 573–74. Any such statement of disassociation, in context, would be gratuitous.

In short, the Human Rights Act requirement that Georgetown officially "recognize" its student gay rights groups does not force the university to "speak" in violation of its free exercise rights.

## IV.

That should end the matter but for Judge Belson's effort to persuade the court to permit Georgetown to withhold on constitutional grounds even the tangible benefits the student plaintiffs seek.[18] Judge Belson takes Judge Mack to task for concluding that Georgetown may be ordered to provide tangible benefits to gay rights groups without violating the university's first amendment rights. As indicated earli-

er, I agree there can be no meaningful constitutional distinction between enforced intangible "recognition" and compelled tangible benefits. But I do not agree that Judge Belson has a legitimate basis for asking this court, under the circumstances, not to order Georgetown to provide the half loaf of tangible benefits a majority of the en banc court believes required. *See supra* note 1.

On appeal, Georgetown has chosen to defend solely on its asserted right to withhold "recognition." Although Georgetown has not conceded that it must provide the narrow set of tangible benefits inherent in "University recognition," *supra* note 11, the university has not raised a separate defense to compelled provision of the tangible benefits. In fact, in its brief Georgetown characterized the tangible benefits as "relatively insignificant," and at en banc oral argument, as Judge Belson recognizes, *post* at 69, n. 14, Georgetown specifically disavowed any argument that compelled provision of tangible benefits constituted a forced subsidy of speech which in itself would violate the university's first amendment rights. On appeal, therefore, the university has sought to play down the significance of the tangible benefits and to prevent the court from pinning its constitutional analysis to the denial of tangible benefits that accompanies the denial of "recognition."

Perhaps the university considers such a subsidy legally insignificant because it already is willing to provide some of that

**18.** Judge Belson would affirm the judgment for Georgetown only because he resolves the constitutional issue in Georgetown's favor. It is interesting to note that, although Judge Belson would remand for determination of the university's motive, in order to evaluate whether the Human Rights Act has been violated, he is willing to "discuss the constitutional issues here on the premise that Georgetown denied recognition to the student groups at least in large part because of the groups' sponsorship and promotion of ideas and activities." *Post* at 67. He acknowledges, however, that Georgetown's "free speech defense would be diluted to the extent, if any, that Judge Bacon's findings can be read to imply that Georgetown acted on the basis of the sexual orientation of individuals." *Post* at 68 n. 10. It appears clear, therefore, that if Judge

Belson's constitutional analysis depends upon a university motivated "in large part" by a desire to suppress speech, and if he is not sure on this record how large a part that motivation played (obviously not large enough to avoid violation of the Human Rights Act as a matter of law), then a remand presumably should be required to determine whether there is, in fact, any reason for addressing that constitutional defense. Rather than dealing directly with this obvious deterrent to applying his constitutional analysis, Judge Belson states in a footnote that a diluted free speech defense "would not affect Georgetown's free exercise defense." *Id.* He does not explain why the latter would receive greater protection than the former, and I do not understand that it does. *See supra* note 17.

subsidy anyway (in connection with the permitted student government charters) by allowing the plaintiffs access to meeting rooms, to the student activities calendar, and to the services of the Director of Student Activities. Or perhaps, more fundamentally, the university simply does not want a matter of high principle to be diminished, and the parties and the courts distracted, by legal haggling over relatively small amounts of money. Alternatively, perhaps Georgetown, anticipating the approach proposed by Judge Mack, sought to avoid that result by advocating an all-or-nothing analysis in which the university had greater confidence than in a bifurcated one. Whatever Georgetown's reasoning, the university has elected not to address the intangible/tangible dichotomy and, as I see it, has therefore waived any separate defense specifically going to tangible benefits.

In any event, I believe that both *Abood* and *Pacific Gas & Electric* support plaintiffs' right to tangible, as well as intangible benefits. In *Abood,* the Supreme Court noted that a local union representing public employees may lawfully impose compulsory service fees on non-members whom the union represents in collective bargaining pursuant to an agency shop arrangement, provided that, consistent with the first amendment, such fees may not be used on behalf of any objecting employee for "ideological activities unrelated to collective bargaining," 431 U.S. at 236, 97 S.Ct. at 1800, such as expression of political views or contributions to political candidates. In *Pacific Gas & Electric,* the Court, relying heavily on *Tornillo,* held that a state public utilities commission order requiring utility companies to send flyers of a ratepayers' organization to their customers along with the utility bills violated the first amendment, "absent a compelling interest." 475 U.S. at 17, 106 S.Ct. at 912.

Although *Abood* and *Pacific Gas & Electric* held that public employees and utility companies, respectively, could not be forced to finance, and thus in effect to sponsor, any idea they found objectionable, the Court was careful to demonstrate the limits on those opinions. In *Abood,* the Court stressed that financial contributions could be compelled in furtherance of collective bargaining, 431 U.S. at 236, 97 S.Ct. at 1800, even though an "employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role of exclusive representative" —including, for example, "moral or religious views about the desirability of abortion ... [which do] not square with the union's policy in negotiating a medical benefits plan." 431 U.S. at 222, 97 S.Ct. at 1793. And in *Pacific Gas & Electric,* the Court was careful to note that "the Commission's order could be valid if it were a narrowly tailored means of serving a compelling state interest." 475 U.S. at 19, 106 S.Ct. at 193.

As applied to the present case, therefore, *Abood* and *Pacific Gas & Electric* would support, not stand in the way of, the constitutionality of plaintiffs' nondiscriminatory access to "University recognition," including tangible benefits from the university. Required recognition with related financial support of student organizations (which, institutionally, are central to university life) is analogous, for purposes of this case, to compelled dues for support of collective bargaining: despite ideological disagreement, an employee is compelled to support collective bargaining, and a university is required to give nondiscriminatory access to student activity benefits, because public policy has put a premium on such bargaining and on such nondiscriminatory student activity programs. Because first amendment interests are implicated, however, the government must have a "compelling state interest," *Pacific Gas & Electric,* 475 U.S. at 19, 106 S.Ct. at 913, to justify such a premium, and the burden imposed must be "narrowly tailored," *id.,* to achieve the state's objective and must "substantially outweigh[ ] whatever burden" is placed on the exercise of first amendment rights. *Bob Jones University v. United States,* 461 U.S. 574, 604, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983) (free exercise); *see United States v. Lee,* 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) (free exercise); *Gay Rights I,* 496 A.2d at

576–77, 581 & n. 19 (discussing Supreme Court cases).

V.

For reasons elaborated at length earlier, *Gay Rights I,* 496 A.2d at 575–82, I am satisfied that "the District's expressed interest in eliminating discrimination in educational institutions on the basis of sexual orientation is as 'compelling' or 'overriding' as it is in the more traditional areas of race and sex." *Id.* at 576 (citations omitted). In this connection, I agree with Part VI of Judge Newman's concurring opinion. Moreover, "[t]he District of Columbia's interest in enforcing the Human Rights Act's prohibition of discrimination based on sexual orientation 'substantially outweighs whatever burden' the Act places on Georgetown's 'exercise of [its] religious beliefs.'" *Id.* at 582 (quoting *Bob Jones,* 461 U.S. at 604, 103 S.Ct. at 2035). That includes not only the burden of intangible "recognition," as discussed earlier, but also the burden of the tangible benefits of facilities and services which Georgetown has not expressly questioned but which, analytically, present the same issue. Accordingly, I believe the law requires Georgetown University and its Law Center to grant "University recognition," in full, to the Gay People of Georgetown University and to the Gay Rights Coalition of Georgetown University Law Center, respectively.

BELSON, Associate Judge, with whom NEBEKER, Associate Judge, Retired, joins, concurring in part and dissenting in part:

This appeal requires the court to evaluate the constitutional rights of Georgetown University to free speech and the free exercise of religion and the statutory right of certain Georgetown students and their organizations to be free from discrimination based on homosexual orientation. On the basis of the analysis I set forth below, I conclude that, to the extent those rights conflict in the context before us, Georgetown's constitutional rights are paramount. This conclusion results from a balancing of

the rights secured by the Constitution against those rights created by the District of Columbia Human Rights Act,[1] and is not deprecatory of the efforts of the District of Columbia Council to prevent discrimination on the basis of the several factors that the Council has identified in the Human Rights Act. I would affirm the trial court's ruling in favor of Georgetown University on constitutional grounds. I join Judge Mack in concluding that the Human Rights Act should not be applied to require Georgetown University to grant "university recognition" and its concomitant endorsement to the Gay People of Georgetown University (GPGU) and the Gay Rights Coalition (GRC). I disagree, however, with her conclusion, and this court's ruling, that the statute requires the university to provide facilities and services to those groups. Even if it should be concluded, upon appropriate findings of fact, that the statute so requires, the free exercise of religion and free speech clauses of the first amendment would prevent its application to Georgetown in this case.

Two aspects of Judge Mack's opinion give rise to my partial disagreement. One relates to procedure. The opinion overlooks the fact that, in granting summary judgment against Georgetown University on the issue of whether it had violated the Human Rights Act, Judge Braman mistakenly concluded that there was no genuine issue as to material facts. In actuality, there were obvious factual issues concerning the university's reasons for withholding recognition from the groups. One central issue was whether the university withheld recognition because of the sexual orientation of the members of the groups, or instead because of the groups' advocacy of homosexual life-styles, conduct inconsistent with religious beliefs to which Georgetown adheres. Judge Mack's opinion, I suggest, compounds Judge Braman's error by going on to make its own findings of fact to support its conclusion that the university's purpose was discriminatory.

My second disagreement with Judge Mack's opinion relates to substantive law.

1. D.C.Code §§ 1–2501 to –2557 (1987).

After concluding correctly that the first amendment protects Georgetown University against being required to endorse the appellant student groups, Judge Mack's opinion reaches the inconsistent conclusion that Georgetown can be forced to subsidize activities by those groups that offend the religious beliefs to which the university adheres. In my view, if the Act cannot require endorsement, it cannot require subsidy either. If it should require either, the Act on this record would abridge Georgetown's first amendment rights of the free exercise of religion and free speech.

My disagreement with Judge Ferren's opinion[2] arises principally from its consistent short-weighting of Georgetown's first amendment rights in the constitutional balancing process. Judge Ferren urges that the Act requires that the university exercise "tolerance" with regard to the student groups, "tolerance" being defined as "an expressed willingness to let someone else have a say without indicating what you think about it." *Ante* at 58. Georgetown indisputably is already permitting such expression by the student groups. What Georgetown has declined to do is to endorse or subsidize the groups' promotion of ideas and activities antithetical to the religious doctrines that Georgetown espouses.[3]

## I.

As Judge Mack's opinion notes, *ante* at 16, although Georgetown did not appeal from Judge Braman's ruling that it had violated the District of Columbia Human Rights Act in denying recognition to the student groups, we must consider a statutory basis for ruling before undertaking to

decide this case on the basis of whether the Constitution requires a certain result. In interpreting the statute, of course, we should attempt to avoid a construction that would bring it into conflict with the Constitution. I would hold that Judge Braman erred in entering summary judgment on the basis that Georgetown had violated the Human Rights Act by discriminating against the student groups.

The first reason that summary judgment on the statutory issue was inappropriate is that GPGU and GRC never asserted, and could not have asserted, that there was no genuine issue concerning facts that control the outcome of their suit. Most important, there was sharp dispute concerning the reason that Georgetown denied recognition to those groups. In their statement of undisputed facts, the student groups set forth the facts that they asserted entitled them to summary judgment, including the fact that Georgetown denied them recognition but, at the same time, granted recognition to a wide range of other cultural and political organizations. At most, such facts may have permitted an inference that Georgetown acted out of discriminatory motives, but such an inference cannot be resolved against Georgetown to form the basis for summary judgment. *See Murphy v. Army Distaff Found., Inc.,* 458 A.2d 61, 62 (D.C.1983). Therefore, even if Georgetown had not opposed GPGU's and GRC's motion for summary judgment, Judge Braman would have erred in granting it since the student groups did not allege facts sufficient to show that they were entitled to judgment as a matter of law. *See Milton Properties, Inc. v. Newby,* 456 A.2d

---

**2.** In his opinion, Judge Ferren has included numerous reformulations of my positions on various issues. Many I cannot accept. It would lengthen this opinion unduly to address all of them. It should suffice to say that my positions are as stated in this opinion. One recurrent theme, however, merits brief mention. With respect to the reach of the Human Rights Act, Judge Ferren's opinion repeatedly blurs the distinction I draw between (1) taking an action, such as the denial of recognition, *because of the content of one's speech or advocacy,* and (2) blocking another's speech or advocacy, *because of some other, possibly impermissible, reason.*

*See* opinion of Judge Ferren, *ante* at 47–48, 55, 56. My position is that the Act does not reach the former, but may reach the latter.

**3.** With respect to Judge Ferren's reference to the use of the university's name by the student groups, *ante,* p. 47 at n. 1, I point out that this issue is not before us. I also point out, however, that the use of the university's name would appear to be an assertion of the endorsement denied the groups by this court's ruling.

349, 354 (D.C.1983); *Burch v. Amsterdam Corp.*, 366 A.2d 1079, 1983–84 (D.C.1976).

Moreover, papers filed by Georgetown in opposition to the motion manifestly precluded summary judgment. Georgetown presented competent, sworn evidence—affidavits from those officials responsible for the decision to deny recognition to GPGU and GRC—that provided more than ample basis for a finding that the university's decision resulted from its determination that the objectives and activities of those groups conflicted with the teachings of the Roman Catholic Church. (R. 346–47, 354–55, 540, 542–44) For example, the affidavit of Timothy S. Healy, President of Georgetown University, included the following explanation for the university's decision to deny recognition to the student groups:

8. I determined that it would be contrary to the role of Georgetown University as a Roman Catholic and Jesuit University for the University officially to recognize and endorse these organizations. This decision was made in part upon my understanding that the organizations at issue embody the idea that human beings should be identified and their essential nature classified in terms of their sexual preference. In addition, my decision was based upon my understanding that the organizations at issue approved, and by such approval necessarily encouraged, homosexual conduct. It was my further understanding that the two organizations at issue would foster among students a belief that the University approved and accepted homosexuality as merely an alternative way of life.

9. Based upon these understandings, I concluded that the University's official recognition and endorsement of these organizations would be contrary to and in conflict with the traditional and consistent teachings of the Roman Catholic Church on the question of human sexuality. Organizations such as those at issue, which are based on a view of human nature which emphasizes the sexual aspects of human nature as dominant to the exclusion of other values, and which encourage and foster homosexuality, are totally incompatible with teachings of the Roman Catholic Church on human sexuality, teachings which are central to the beliefs of Roman Catholics.

(R. 346) Affiant William C. Schuerman, Assistant Vice-President and Associate Dean for Student Affairs, provided a similar account:

... I concluded that endorsement of such an organization by the University through official recognition would be inconsistent with the teachings of the Roman Catholic Church. Such recognition would mean lending the University's name to an organization which espoused the legitimacy and acceptability of the homosexual life-style, which necessarily includes homosexual conduct. An organization with such goals and objectives is in direct conflict with my understanding of the teachings of the Roman Catholic Church on the issue of homosexuality.

(R. 540) These affidavits would have supported a finding that it was the groups' activities promoting conduct antithetical to Catholic teachings on human sexuality that led Georgetown to deny recognition. Thus, because Judge Braman had before him conflicting facts concerning the central issue in the case, *i.e.*, whether Georgetown had a discriminatory reason for denying recognition to GPGU and GRC, *see* D.C.Code § 1–2520(1) (1987), Judge Braman erred in granting summary judgment to appellants on the statutory question. *See, e.g., Reliance Ins. Co. v. Market Motors, Inc.*, 498 A.2d 571, 573–74 (D.C.1985); *Word v. Ham*, 495 A.2d 748, 751–52 (D.C.1985) (per curiam).

Before completing this discussion of the grant of summary judgment, I acknowledge the possibility that Judge Braman disagreed with a basic premise of my last conclusion, and granted summary judgment to appellants on the mistaken theory that the reasons proffered by Georgetown were themselves discriminatory within the meaning of the Human Rights Act. Because the order granting summary judgment was terse, I turn to the colloquy between court and counsel for an indication of whether this was the court's approach. (R. 857) Although the record is not entire-

ly clear, Judge Braman appears to have interpreted those provisions of the Human Rights Act that prohibit educational institutions from discriminating against any person on the basis of sexual orientation as prohibiting discrimination against individuals and groups that *promote* homosexuality regardless of the sexual preference or practice of the individuals or the members of the groups. (R. 867, 887) Under that construction of the Human Rights Act, a private actor like Georgetown would be prohibited from treating the promotion of ideas or activities with which it disagreed differently from the promotion of ideas or activities with which it agreed. Presumably, such a private actor would also be prohibited from treating a person or group that promoted ideas or activities with which it disagreed differently from a person or group that promoted ideas or activities with which it agreed.

The Human Rights Act, by its plain language, does not prohibit discrimination against persons or groups based upon their advocacy. Rather, it prohibits discrimination against persons based upon their "sexual orientation" which, in the words of the statute, "means male or female homosexuality, heterosexuality and bisexuality, by preference or practice." D.C.Code § 1–2502(28) (1987).[4] It follows that Judge Braman erred if he granted summary judgment against Georgetown on the theory that it violated the Act by denying recognition because of the groups' advocacy of homosexual life-styles.

As I discuss in Part II, below, a construction of the Act that would prohibit a private actor from differentiating among persons based on their advocacy of ideas would not only be untrue to the Act, it would also abridge the first amendment's guarantees of free speech and, in this case,

the free exercise of religion. Judge Mack interprets the Act to prohibit the public and private educational institutions covered by it from engaging in certain types of conduct but, in an attempt to avoid conflict with the first amendment, she construes the Act not to reach the speech activities of a private institution. Judge Mack's opinion, *ante* at 21. Judge Mack concludes that the Act therefore does not require one private actor to "endorse" another. *Id.*

I would use a different analysis to determine whether Georgetown's denial of recognition to the student groups falls outside the scope of the Human Rights Act. I interpret the Act to prohibit adverse action taken against persons on the basis of their status as members of a protected class. The Act does not purport to prohibit actions taken against persons because of their promotion of ideas or activities (here, for example, promotion of ideas and conduct antithetical to Catholic teachings). Thus, in my view, if an entity covered by the Act fails to grant facilities and services to an individual because of his or her status as a member of a protected group, the Act is violated. In contrast, if an entity covered by the Act fails to provide facilities and services to an individual because of his or her promotion of ideas or activities, that conduct does not violate the Act. Furthermore, as developed in Part II, below, a construction of the Act that would prevent a private actor from differentiating among others on the basis of the content of their speech would be unconstitutional, at least in the absence of a compelling state interest.[5] Thus, a statutorily imposed requirement of neutrality toward the promotion of an idea, *viz.*, the morality of homosexual life-styles, would abridge first amendment rights. Similarly, an imposed duty either

---

**4.** Judge Mack's opinion reaches no conclusion as to whether the Human Rights Act prohibits discrimination against persons or groups that advocate homosexuality. It instead finds that Georgetown in fact took homosexual orientation into account in deciding to deny recognition. Judge Mack's opinion, *ante* at 27–29.

**5.** For the same reason that the Human Rights Act cannot require Georgetown to endorse or subsidize the student groups, *i.e.,* that such an

interpretation of the Act would be inconsistent with the dictates of the first amendment, the so-called "effects" clause of the Act, D.C.Code § 1–2532 (1987), cannot be interpreted to proscribe Georgetown's conduct here. Section 2532 should not be interpreted to prohibit constitutionally protected conduct even though such conduct may have an adverse impact on a protected group.

to endorse or to subsidize a position on that issue would also abridge those rights.[6]

An analogy is illustrative. It could not seriously be suggested that the Human Rights Act could force a private, church-affiliated school to lend its endorsement or subsidy to a group that advocated or purposely facilitated fornication or adultery. Such a group, however, could argue that those activities reflect the group members' heterosexual orientation, an orientation that triggers the Act's protection to the same extent as does homosexual orientation. There can be no doubt that university authorities in such a case could recognize that the purposes and activities of an organization of this type would foster or promote acts that the Church deems immoral. While Catholic doctrine deems all homosexual acts immoral and only some heterosexual acts immoral, the principle is the same. Both this hypothetical group and the groups before us can properly be denied endorsement and subsidy by a religious institution because of their sponsorship and promotion of acts that the institution considers immoral, rather than on the basis of their members' status as homosexuals, heterosexuals, or bisexuals. *See* Tr. 541 (Georgetown would not subsidize activities of student "playboy" club); Tr. 628–30 (Georgetown would not support group that distributes information about abortion clinics to students).

In its review of Judge Braman's conclusion that the university violated the statute as a matter of law, Judge Mack's opinion is grievously at odds with accepted precepts of summary judgment procedure in that it undertakes a review of the evidence and, in effect, finds as a matter of fact that the "homosexual status of group members entered into Georgetown's assessment of the 'purposes and activities' of the student groups, albeit unconsciously." Judge Mack's opinion, *ante* at 57, 60–61. In reviewing grants of summary judgment, the appellate court reviews the record *de novo*, but has no more authority to make findings on disputed issues of fact than has the trial court. *See Holland v. Hannan*, 456 A.2d 807, 814–15 (D.C.1983). At the very least, Georgetown raised a disputed issue of fact with respect to whether it was withholding recognition of the student groups for a reason proscribed by the statute. *See RAP, Inc. v. D.C. Comm'n on Human Rights*, 485 A.2d 173, 177–78 (D.C.1984).

Normally, where a grant of summary judgment was erroneous because genuine issues exist as to material facts, we should remand for a trial of the disputed facts. Remand to determine whether Georgetown violated the Human Rights Act would be unnecessary here, however, if Judge Bacon's findings upon the trial of the free exercise defense require the conclusion that Georgetown denied the groups recognition for reasons other than the sexual orientation of its members. The determination of this issue is not simple, principally because the trial judge, of course, structured her findings of fact and conclusions of law to deal with the free exercise issue rather than the statutory issue. It is particularly difficult to apply the statutory definition of sexual orientation of an individual, D.C.Code § 1–2502 (28) (1987), to findings made in the free exercise framework and concerning the university's dealings with groups rather than individuals. The result is a degree of ambiguity and lack of focus that counsels against what would be, in effect, a summary judgment in favor of Georgetown. I reach this conclusion even though Judge Bacon made no explicit finding that Georgetown denied recognition because of the sexual orientation of any individuals, and even though I think that the better reading of Judge Bacon's findings is that the primary, if not sole, reason for Georgetown's denial of recognition was that the groups sponsored activities and promoted ideas antithetical to Catholic doctrine. But for the fact that Georgetown should prevail on appeal on

---

6. I point out that, as I view the record, this appeal does not present the issues of statutory construction and constitutional law that would arise if a private actor treated another adversely merely because of the latter's personal ideas, values, or beliefs. This case involves a private actor, Georgetown, that asserts that it treats the appellant groups differently because of their promotion of ideas and conduct antithetical to the religious views adhered to by Georgetown.

the constitutional defenses I next address, the appropriate course under the circumstances would be to remand for findings of fact and conclusions of law addressed specifically to the statutory issues.[7]

## II.

Even if there were a valid finding that Georgetown had violated the Human Rights Act, Georgetown should prevail in this litigation on the basis of its constitutional rights under the free speech and free exercise clauses of the first amendment. I

discuss the constitutional issues here on the premise that Georgetown denied recognition to the student groups at least in large part because of the groups' sponsorship and promotion of ideas and activities.[8] Although it has not yet been determined by a factfinder whether sexual orientation entered at all into Georgetown's motivation, it is clear from the record and from Judge Bacon's findings that Georgetown's concern over the groups' advocacy and speech activities permeated its consideration of the question of whether to grant them recognition.[9] Therefore, Georgetown's right of

7. Judge Ferren's opinion, *ante* at 55–56 would try to stretch Judge Bacon's findings to cover the statutory issue, but the coat does not fit. As I pointed out, Judge Bacon made no finding that Georgetown denied recognition because of the "sexual orientation of any individuals," which is what the statute proscribes. Judge Ferren relies upon Judge Bacon's finding that Georgetown's leadership concluded that "the gay student *organizations* ... were *participating* in and promoting homosexual life styles" (emphasis added), a part of her findings I quote more fully in footnote 9 below. But that does not satisfy the statute. Organizations, obviously, do not engage in sexual "practice[s]," the word contained in the statutory definition of "sexual orientation" that Judge Ferren emphasizes. *See* D.C.Code § 1–2502(28) (1987). They have no "sexual orientation" within the meaning of the statute. Moreover, it is plainly the thrust of Judge Bacon's findings that Georgetown's concern was with the organizational actions of the groups.

8. We need not reach the issue of how the Act should be applied if there was evidence that Georgetown had more than one motive for denial of recognition, and one such motive was proscribed by the Act.

9. Judge Bacon's findings of fact and conclusions of law are at R. 1687–1698. Among her findings of fact are the following:
 10. In applying these teachings [those of the Catholic Church], the President of Georgetown University, the Dean of the Law Center, and defendants' expert witness, concluded *inter alia* that:
 a. The gay student organizations, as evidenced by their charters and their activities, were participating in and promoting homosexual life styles. *Pl.Ex. 21 and 25, Def.Ex. 70–82, 88, 90, 91,* and *Tr.* 85–86, 145–146, 385 and 393.
 b. Recognition of the student organizations would be inconsistent with Church normative teachings and with the basic obligation not to undermine the normative teachings of the Church. *Testimony of Father McCormick,*

*Tr.* at 280; *Testimony of Dean McCarthy, Tr.* at 474; *Testimony of Father Healy, Tr.* at 605.
 11. There was no evidence that the beliefs on which the University acted were bizarre, without foundation, or otherwise not entitled to recognition as sincerely-held religious beliefs....

Judge Bacon also found that "[t]he major purpose of 'university recognition' is official endorsement, an endorsement which the University believes will conflict with the normative findings of the Church on homosexuality." (Footnote omitted). (R. 1693). Judge Bacon's findings are amply supported by the record. *See, e.g.,* Letter from President T. Healy, S.J., to Dean D. McCarthy (May 8, 1980) [Pl.Ex. 24]; Memorandum from Dean W. Schuerman to P. Cleary, President of Undergraduate Student Government (Feb. 6, 1979) [Pl.Ex. 28]; Memorandum from Dean W. Schuerman to S. Ozmun (Nov. 21, 1979) [Pl.Ex. 33]; Letter from Dean W. Schuerman to J. Ryan (Feb. 21, 1980) [Pl.Ex. 36]; Letter from Dean W. Stott, Jr., to J. Ryan and S. Riel, GPGU (March 5, 1979). In her findings of fact, Judge Bacon quoted from Georgetown's correspondence with the student groups in which it advised them of Georgetown's reasons for denying them "university recognition" as follows:
 Georgetown University is a private university with a history and tradition which is specifically Catholic. University administrators must make decisions in light of the conscience and value system identified with this tradition. The University, in terms of this responsibility, cannot concur with an argument that official "recognition" would not imply endorsement.

 \* \* \* \* \* \*

 This situation involves a controversial and complex matter of faith and the moral teachings of the Catholic Church. "Official" subsidy and support of a gay law student organization would be interpreted by many as endorsement of the positions taken by the gay movement on a full range of issues. While the University and its Law Center cherish the individual lives and rights of its students, they

free speech comes strongly into play.[10] With respect to free exercise, Judge Bacon's findings firmly established that Georgetown denied recognition "because recognition would be inconsistent with its duties as a Catholic institution." (R. 1694)

Georgetown has a free speech defense based on its right not to endorse or subsidize the groups' promotion of ideas and activities with which it disagrees.[11] I agree

with Judge Mack that Georgetown cannot constitutionally be required to endorse an organization with the views of which it disagrees.[12] *See* Judge Mack's opinion, *ante* at 20–26. I part ways with Judge Mack's opinion, however, with respect to the constitutionality of requiring Georgetown to provide tangible benefits to the student groups.[13] Any such forced subsidization of these groups will abridge Georgetown's free speech and free exercise

cannot allow this deep respect for individual rights to become an inappropriate institutional endorsement and subsidization of a group cause involving controversial matters of faith and the moral teachings of the Catholic Church.

\* \* \* \* \* \*

The fact that the University has chosen not to grant endorsement to the "Gay People of Georgetown" as a University approved student activity, does not demonstrate a lack of concern, a lack of sympathy for the gay student in particular, or students in general. It simply means that after the facts have been considered and discussion has taken place, there remains a point of disagreement as to whether endorsement of the "Gay Students of Georgetown" as a student activity is appropriate for a Catholic University. The University's decision, therefore, is not a reflection on or a judgment of the personal choices of its individual members, but rather represents a judgment of what is appropriate for Georgetown as an institution.

(R. 1690 [1643]–91)

10. While the free speech defense would be diluted to the extent, if any, that Judge Bacon's findings can be read to imply that Georgetown acted on the basis of the sexual orientation of individuals, such a reading would not affect Georgetown's free exercise defense. As quoted in footnote 9, *supra*, Judge Bacon found that the beliefs on which Georgetown acted were entitled to recognition as sincerely held religious beliefs. Accordingly, Georgetown was entitled to assert fully a free exercise defense to any alleged violation of the Act which sprung from its acting upon those religious beliefs. I point out that although the first amendment itself contains several guarantees against intrusive governmental conduct, one's ability to invoke any single one of these guarantees is not contingent upon one's ability to invoke all other first amendment guarantees. *See, e.g., Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 1266, 8 L.Ed.2d 601 (1962) (although the first amendment's free exercise clause and establishment clause "may in some instances overlap, they forbid two quite different kinds of governmental encroachment upon religious freedom"). Thus, while the first amendment guarantees of freedom of speech and freedom of religion are in harmony, each has a reach of its own. A

freedom of religion defense to intrusive governmental conduct is in no way dependent on assertion of a free speech defense. A litigant can assert the former without reference to the latter. *See, e.g., United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

11. In the trial court and here, Georgetown has placed principal reliance on its free exercise defense. It relied in part on precedents, however, in the free speech area, and Judge Mack, correctly I think, decided to take into consideration free speech principles in analyzing the issues.

12. In arguing his disagreement with Judge Mack's conclusion that recognition amounts to endorsement, Judge Ferren develops his position that recognition actually signifies tolerance. *Ante* at 51–52, 53–54, 57, and 58–59. In my view, his analysis gives insufficient weight to the undisputed fact that Georgetown has tolerated fully the activities of the student groups in the market place of ideas that is a university. (I use the word "tolerate" here in its primary sense: "to not interfere with; allow; permit [to *tolerate* heresy]," WEBSTER'S NEW WORLD DICTIONARY 1495 (2d ed. 1982), rather than its secondary meaning: "to recognize and respect (others' beliefs, practices, etc.) without sharing them...." *Id.*) Without raising the issue of whether it can be required to do so, Georgetown has permitted the student government to grant status to the gay groups, and has thereby allowed these groups to function and to speak on campus. What Georgetown has declined to do is to endorse or subsidize them.

13. Judge Ferren describes as "separate but equal" the access to facilities afforded by Judge Mack's approach, under which Georgetown would have to provide tangible benefits to the student groups but would not grant them official endorsement. Judge Ferren's opinion, *ante* at 49. I point out, however, that under Judge Mack's approach, GPGU and GRC would be "separate" from other student groups at Georgetown only in that Georgetown, a private university, has refused to endorse the views they espouse.

rights.[14]

Georgetown's free speech defense is not dependent on its status as a Catholic institution. No private actor ordinarily can be compelled to subsidize speech with which it disagrees. The Supreme Court has recognized this principle in a long line of cases. Most recently, in *Pacific Gas & Electric Co. v. Public Utilities Commission*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) (plurality opinion), the Supreme Court addressed a first amendment challenge to a state regulatory ruling that required a public utility company to include in its billing envelopes flyers of a ratepayers' organization. *Id.* at 106 S.Ct. at 905–06. The Court held that the government may not impose a content-based grant of access to private property absent a compelling state interest. *Id.* at 16–17, 106 S.Ct. at 912. Since the Court found no compelling interest, it held unconstitutional the requirement that the utility company, a private corporation, make its mailing services available to the ratepayer group. *Id.* at 19–20, 106 S.Ct. at 913.

Similarly, in *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Supreme Court decided that a union shop could not use any portion of the service fees collected from non-member employees to contribute to political candidates or express political views unrelated to the union's role as the exclusive collective bargaining agent for its members. *Id.* at 234, 235–36, 97 S.Ct. at 1799, 1799–1800. The Supreme Court held that first amendment principles "prohibit [the Detroit Board of Education] from re-

quiring [a non-union employee] to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." *Id.* at 235, 97 S.Ct. at 1799; *cf. Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 256, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974) (Florida's right of reply statute interfered with newspaper's first amendment rights by requiring it to print replies, that it otherwise would not print, to the newspaper's editorials). *Pacific Gas* and *Abood* together make it clear that when the first amendment proscribes requiring a subsidy, it matters not whether the subsidy is in the form of services or money.[15]

The principle that a private individual cannot be forced either to endorse or to subsidize a view with which he or she disagrees is long-established first amendment doctrine. The Supreme Court unmistakably ruled out such endorsements in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed.2d 1628 (1943). In *Barnette*, the Court held that students could not be compelled to affirm their loyalty to the United States consistent with the dictates of the first amendment's free speech clause. *Id.* at 642, 63 S.Ct. at 1187. The symbol involved, a salute to the flag of the United States, was held to be an utterance that could not be compelled, not because these students' religious beliefs conflicted with the salute (although that was the basis for the students' refusal to salute the flag), but because the government lacks the power to force any citizen to profess any belief

---

**14.** Although Georgetown does not argue specifically that providing tangible benefits to the student groups would amount to a forced subsidy of speech to which it is opposed, I find it appropriate to reach this issue for three reasons. First, it is squarely presented by the facts of this case. In fact, one of the reasons Georgetown gave at the time it denied recognition to GPGU and GRC was that it found it inappropriate for a Catholic institution to give financial support to the activities of these groups. Def.Ex. 97, 102. Second, it has been forcefully argued by amicus curiae Arthur B. Spitzer, Esq., and has been addressed in appellants' briefs. Third, as Judge Mack notes, "[a]t no stage of this litigation have the parties requested that the 'endorsement' and the tangible benefits be treated separately. The

case has been litigated throughout on an 'all or nothing' basis." Judge Mack's opinion at 20 n. 16. It was not until Judge Mack's analysis split "University Recognition" into the two components of endorsement and "facilities and services" that subsidization became a separate issue from that of endorsement of the student groups' views. Previously, the provision of facilities and services was included under the rubric of "university recognition."

**15.** It is interesting to note that the specific tangible benefits the student groups seek, a mailbox, mailing services, and computer labeling services, are resources that would directly increase their capability for disseminating their ideas.

or to engage in any ceremony of assent to one. *Id.* at 634–35, 63 S.Ct. at 1183; *see also Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977) ("A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts"); *Int'l Ass'n of Machinists v. Street,* 367 U.S. 740, 791, 81 S.Ct. 1784, 1811, 6 L.Ed.2d 1141 (1961) (Black, J., dissenting) ("[T]he First Amendment, fairly construed, deprives the Government of all power to make any person pay out one single penny against his will to be used in any way to advocate doctrines or views he is against, whether economic, scientific, political, religious or any other").

Although Judge Mack's opinion discusses many of the Supreme Court cases that hold that the government cannot compel a private institution to support speech with which it disagrees, the opinion backs away from the implications of this line of authority as it relates to the case at hand. It is clear that, for the same reason the Detroit Board of Education or the California Public Utilities Commission cannot constitutionally compel private citizens or corporations to fund the dissemination of views they oppose, the District of Columbia Council cannot require a private university, such as Georgetown, to subsidize the speech of student groups whose speech is contrary to the university's religious creed.

Judge Ferren's opinion falters over the same issue, but for a different reason. It first takes the view that the activities of the homosexual student groups here are the analogue of the matters relating to collective bargaining discussed in *Abood.* It goes on to argue that public policy has placed a comparable premium on both collective bargaining and non-discriminatory treatment. This, I submit, is not the relevant comparison. Rather, it is relevant to compare collective bargaining, the means of settling labor-management disputes long preferred in the nation's laws and policies, with the advocacy of a homosexual lifestyle. Collective bargaining is a broad process that a worker can be required to support even though the worker may have a

moral objection to one aspect of the union's multifaceted bargaining position, *e.g.*, medical benefits covering abortions. To be required to support such a process differs from being required to support a group whose organizing principle is the advocacy of a homosexual life-style incompatible with one's religious beliefs. It would be, at the least, far-fetched to argue that such advocacy enjoys a status or plays a role remotely comparable to that of collective bargaining in the affairs of our city or nation. Rather, it is obvious that the student groups' activities are more analogous to the promotion of political views to which, under *Abood,* workers cannot be forced to contribute.

The Supreme Court's decision in *Prune-Yard Shopping Center v. Robins,* 447 U.S. 74, 85–88, 100 S.Ct. 2035, 2042–44, 64 L.Ed. 2d 741 (1980), does not suggest that Georgetown can be forced to subsidize the speech of student groups whose speech is at odds with religious tenets to which the university subscribes. In *PruneYard,* the Supreme Court upheld a California state constitutional provision construed to require a privately-owned shopping center to permit individuals to distribute pamphlets and collect signatures for a petition on the shopping center grounds. *Id.* at 76–77, 88, 100 S.Ct. at 2038, 2044. The Court rejected the argument of the shopping center owner that he had "a First Amendment right not to be forced by the State to use his property as a forum for the speech of others." *Id.* at 85, 100 S.Ct. at 2043.

The burden on Georgetown, if it is required to endorse and subsidize the speech of the student groups, is substantially greater than that on the shopping center owner in *PruneYard.* Several significant differences in their relative burdens arise directly from the fact that Georgetown is a religiously-affiliated university. First, since shopping centers do not normally endorse particular views, it is unlikely that any endorsement of the diverse views of the persons distributing pamphlets would be attributed to the shopping center owner. An apprehension on the part of Georgetown, as a university affiliated with the

Catholic Church, that the subsidy of the groups would be viewed as an endorsement is not unrealistic. *See* footnote 9, *supra.* Second, in *PruneYard* the state did not dictate a particular message to be displayed in the shopping center. *See id.* at 87, 100 S.Ct. at 2044. In contrast, as Judge Mack's opinion construes the statute, the Human Rights Act requires Georgetown to provide facilities and services to support a particular message, *viz.*, the morality of a homosexual life-style. Third, Georgetown cannot as easily disavow a connection with the multifaceted activities of student groups it would be required to subsidize as the PruneYard shopping center could by posting signs in the areas where the pamphleteers were standing. *See id.* As a university, Georgetown is more than just bricks and mortar; it has a presence beyond its physical confines, and must be concerned with its relationship with several categories of persons who are not physically present at its campus, *e.g.*, potential students and potential benefactors. Fourth, the shopping center owner in *PruneYard* did not allege that he objected to the content of the pamphlets. Here, Georgetown specifically objects to the content of the student groups' speech on moral and religious grounds. *See Pacific Gas, supra,* 475 U.S. at 12, 106 S.Ct. at 910 (distinguishing *PruneYard*, which "does not undercut the proposition that forced associations that burden protected speech are impermissible") (footnote omitted). Finally, the shopping center was not being required to grant official recognition or affirmatively to subsidize the pamphleteers; rather, it was merely being required to permit their activity on the property, something Georgetown has already volunteered by its tolerating the results of student government endorsement of the groups. Thus, the burden on Georgetown of being required to endorse and subsidize the advocacy of a particular view with which it disagrees is much heavier than that on the *PruneYard* shopping center.

In addition to its free speech rights, Georgetown's free exercise rights would also be infringed if it were required to subsidize ideas or activities that are contrary to Catholic doctrine. This defense applies with full force not only to the speech-related activity of the groups, but also to all other activities of the groups that are antithetical to Catholic doctrine. It was to this defense that Judge Bacon directed her findings of fact and conclusions of law, and they fully support her ruling in favor of Georgetown.

The leading Supreme Court case invoking this principle is *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), in which a member of the Amish faith contended that the payment of social security taxes would violate his religious beliefs. The Supreme Court accepted Lee's interpretation of his own Amish religious tenets, and accordingly acknowledged that compulsory participation in the social security system interfered with the free exercise rights of the Amish. *Id.* at 257, 102 S.Ct. at 1055. The Court held, however, that given the government's strong interest in ensuring the fiscal vitality of the social security system, the burden imposed on those Amish who employ others (as opposed to the self-employed Amish, who are exempt from participation in the social security system) is not unconstitutional. *Id.* at 258–59, 261, 102 S.Ct. at 1055–56, 1057; *cf. Wisconsin v. Yoder,* 406 U.S. 205, 221, 234, 92 S.Ct. 1526, 1536, 1542, 32 L.Ed.2d 15 (1972) (state's interest in its system of compulsory education did not override right of Amish to educate their children at home).

It has long been part of this country's first amendment jurisprudence that an individual cannot be compelled to fund the dissemination of religious views of others. James Madison, a drafter of the first amendment, wrote: "Who does not see ... [t]hat the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" J. MADISON, MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS ASSESSMENTS, *reprinted in Everson v. Board of Education,* 330 U.S. 1 app. at 65–66, 67 S.Ct. 504 app. at 535, 91 L.Ed. 711 (1947). Thom-

as Jefferson expressed his agreement when he drafted the Virginia Bill for Religious Liberty, which stated in its preamble that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." 12 HENING, STATUTES OF VIRGINIA 84 (1823), *quoted in Everson, supra*, 330 U.S. at 13, 67 S.Ct. at 510.

Since Georgetown is a private, Catholic-affiliated institution and since the promotion of homosexuality is incompatible with Catholic doctrine, it would infringe Georgetown's right to the free exercise of religion if it were required to subsidize student groups that foster and promote a homosexual life-style. Georgetown's interest in not being compelled to subsidize activities antithetical to Catholicism must be given great weight under our Constitution. *See Barnette, supra*, 319 U.S. at 633, 642, 646, 63 S.Ct. at 1187, 1189 (Murphy, J., concurring).

It can be argued that Georgetown's free speech and free exercise defenses are absolute and not subject to balancing with any countervailing state interests. *See Tornillo, supra*, 418 U.S. at 256, 94 S.Ct. at 2839 (statute compelling newspapers to print replies to editorials is unconstitutional; no balancing test used); *see also Barnette, supra*, 319 U.S. at 642, 63 S.Ct. at 1187 (grave and immediate danger necessary before first amendment freedoms may be infringed). Because other Supreme Court precedents apply balancing tests to determine whether a first amendment burden is unconstitutional, however, I will proceed to such a balancing here as well. Under this approach, a violation of Georgetown's free speech and free exercise rights would be justified only if it is essential to accomplish an overriding governmental interest. *Hobbie v. Unemployment Appeals Comm'n*, — U.S. —, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987); *Lee, supra*, 455 U.S. at 257–58, 102 S.Ct. at 1055; *Thomas v. Review Bd.*, 450 U.S. 707, 718, 101 S.Ct. at 1432 (1981).

In evaluating the District of Columbia's governmental interest in eradicating discrimination based on sexual orientation, it is appropriate to give great weight to the judgment of the District of Columbia Council. The Council identified and proscribed a number of bases for discrimination. The Human Rights Act forbids an educational institution from discriminating

> based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, political affiliation, source of income or physical handicap of any individual. . . .

D.C.Code § 1–2520 (1987). While neither the statutory language nor its legislative history indicates whether the Council intended to assign any hierarchy to the several proscribed bases for discrimination, it is reasonable to postulate that it did not intend them to be equal. One must doubt, for example, that the eradication of discrimination based upon source of income or personal appearance was meant to be as compelling an interest as the eradication of discrimination based upon race.

In any event, it cannot be said that the goal of eliminating discrimination on the basis of sexual orientation, as undesirable as such discrimination may be, has attained the same high priority as public policy, in the District of Columbia or nationally, as has the goal of eliminating racial discrimination. This difference of emphasis is manifested in many ways. One is the equal protection clause jurisprudence of the United States Supreme Court. Under it, for example, a racial classification leading to different treatment has been identified as one that demands strict scrutiny—but no such scrutiny has been demanded of sexual orientation discrimination. *See Padula v. Webster*, 261 U.S.App.D.C. 365, 822 F.2d 97 (1987) (homosexuals not a suspect or quasi-suspect class for equal protection purposes); 2 R. ROTUNDA, J. NOWAK & J. YOUNG, TREATISE ON CONSTITUTIONAL LAW; SUBSTANCE AND PROCEDURE, § 18.3, at 325 (1986) (suspect classifications under equal protection analysis include race, national origin, and alienage). The very statistics cited in Judge Mack's opinion, which indicate that only one state and the District of Columbia have adopted legislation of the

type being interpreted here, make the same point. Judge Mack's opinion at 69 n. 24.

Needless to say, the act of a state legislature, or of the District of Columbia Council, in identifying a governmental interest and adopting legislation to serve it, cannot, of itself, establish that the interest is so compelling as to override competing constitutional rights.[16] Nor can such an enactment, of its own force, give each identified interest the same stature as the goal of eliminating racial discrimination. In the end, the judiciary must complete the task of determining whether a particular governmental policy is sufficiently compelling to override a claimed constitutional right. *See, e.g., Bd. of Dir. of Rotary Int'l v. Rotary Club of Duarte,* — U.S. ——, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987) (state's interest in eliminating discrimination against women compelling despite slight infringement on expressive association right of service club members); *Roberts v. United States Jaycees,* 468 U.S. 609, 624, 104 S.Ct. 3244, 3253, 82 L.Ed.2d 462 (1984) (same); *Thomas, supra,* 450 U.S. at 709, 718–19, 107 S.Ct. at 1427, 1432 (Indiana's interest in fiscal soundness of unemployment compensation scheme not sufficiently compelling to justify denying unemployment compensation to Jehovah's Witness who left job to avoid participation in manufacture of military tanks); *Yoder, supra,* 406 U.S. at 221, 233–34, 92 S.Ct. at 1536, 1542 (state's interest in compulsory education system not sufficiently compelling to justify infringement of free exercise rights of Amish). In doing so here, the court must accord substantial weight to the Council's determination of the importance of the governmental interest in eliminating discrimination based upon sexual orientation.

Weighing the District of Columbia's interest in eradicating sexual orientation discrimination, I observe too that not every application of that interest is equally compelling. Indeed, in deciding what weight to assign to that interest, the most pertinent question is not simply whether the District's interest in proscribing sexual orientation discrimination is, in the abstract, compelling. Rather, it is how important this application of the Human Rights Act is to the accomplishment of that interest. *Cf. United States v. Robel,* 389 U.S. 258, 263, 88 S.Ct. 419, 423, 19 L.Ed.2d 508 (1967) ("the phrase 'war power' cannot be invoked as a talismanic incantation to support any exercise of congressional power which can be brought within its ambit"). Therefore, in weighing the competing interests involved, one can consider that in addition to endorsement petitioners are seeking only the tangible benefits of a mailbox, mailing services, and computer labeling services, and also the right to apply for university funds. This case does not involve denial of fundamental aspects of higher education such as admission to the university, course selection, or use by a student of the physical facilities of the university.[17] Nor does it involve such deprivations as discriminatory discharge from employment or exclusion from a place of public accommodation based on sexual orientation, the elimination of which may well be compelling.[18] In-

---

**16.** The Council, of course, did not discuss or weigh the competing concerns at issue in this case. Indeed, in adopting D.C.Code § 1–2520 (1987), the Council made no express finding that the elimination of discrimination by educational institutions based on personal appearance, sexual orientation, family responsibilities, or any of the other factors enumerated there was a compelling state interest.

**17.** It is significant that GPGU and GRC acknowledged in their statement of undisputed facts in support of *their motions for summary judgment* that all Georgetown students (including homosexuals and bisexuals) are permitted to "(a) receive a degree, (b) participate in student activities, (c) attend classes, (d) participate in loan programs, (e) participate in athletic programs, (f) participate in awards and honors programs, [and] (g) use the placement service." (R. 909) No students, as individuals, have been denied any university facility or service by reason of sexual orientation.

**18.** It is impossible to decide, in a vacuum, whether eradication of discrimination on the basis of sexual orientation could be, in other circumstances, a compelling state interest. I merely conclude that the student groups' claim to the endorsement, facilities, and services at issue here is inadequate to create a sufficiently compelling interest to override Georgetown's constitutional rights.

deed, Georgetown permits these student organizations to conduct their activities without hinderance, merely requiring that they do so without university subsidization or endorsement. On this point, Judge Bacon found that "the interests of Georgetown students in gay issues and their needs can be served without 'university recognition' of the plaintiff organizations." (R. 1693) She noted specifically that "[w]ithout 'university recognition,' clubs may be formed, meetings may be held on campus and application may be made for lecture funds." *Id.*

On the other side of the balance, Georgetown is claiming constitutional rather than statutory rights, and they are the fundamental rights of freedom of speech and the free exercise of religion. Moreover, the burden on Georgetown would be direct compulsion, *i.e.*, an injunction ordering the university to violate its religious beliefs.[19] Therefore, upon considering the constitutional issues and balancing the opposing interests, I would find the District's interest in preventing the asserted sexual orientation discrimination regarding endorsement and limited tangible benefits is outweighed by Georgetown's interest in not endorsing and subsidizing activities and an ideological message repugnant to its religious creed. This is the conclusion Judge Bacon reached upon weighing Georgetown's free exercise rights against the statutory right of petitioners to receive the benefits in question. That decision is supported by the record and by the applicable case law.

In sum, the facts of this case did not justify the entry of summary judgment that Georgetown had violated the Human Rights Act with respect to homosexual students at Georgetown. Instead, this case represents an attempt by the appellant groups to use the coercive power of the government to compel a private university to endorse and subsidize their cause, the fostering and promotion of homosexual life-styles, a cause which Georgetown University has found incompatible with the Catholic doctrine to which it adheres. Since I believe that the best way to protect the legal rights of homosexuals is to protect the constitutional rights of all persons, including those institutions and individuals who, for religious reasons, disapprove of homosexual practices, I would affirm.

TERRY, Associate Judge, concurring in part and dissenting in part:

Although I agree with a considerable part of what Judge Mack has written in her opinion—especially in part III–D, *ante* at 26–30—I cannot join in that opinion because it does not go far enough. I see no meaningful difference between the tangible and intangible benefits which these appellants are seeking from the university. To sustain the granting of the former without the latter would be, as Judge Ferren suggests, a regression to the unlamented days of "separate but equal" access to public facilities. I am not willing to give the appellants only half a loaf when they are entitled to a whole one.

Furthermore, I find no basis in the record for concluding that "University Rec-

---

**19.** Although the record bears out Judge Newman's observation that discrimination against homosexuals is not a tenet of the Catholic faith, *ante* at 45, I disagree with his conclusion that providing facilities and services to the student groups is, therefore, only an *indirect* burden on Georgetown's free exercise of religion. Forcing Georgetown to subsidize the dissemination of a doctrine of sexual ethics deemed immoral by the Catholic Church is a direct burden on its free exercise rights. In this respect, this case differs from *Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). There the burden on that university's free exercise of religion from the denial of its tax-exempt status was much lighter than the

burden that would be imposed here. The Supreme Court said in *Bob Jones* that although "[d]enial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, [it] will not prevent those schools from observing their religious tenets." *Id.* at 603–04, 103 S.Ct. at 2035. In contrast, the burden on Georgetown would constitute direct compulsion to violate its religious tenets by subsidizing a group whose purposes are antithetical to Catholicism. Furthermore, Bob Jones University ran afoul of the public policy against racial discrimination, which has constitutional underpinnings, *see id.* at 593, 103 S.Ct. at 2029, while the "state" interest at issue here is the enforcement of a statutory provision.

ognition" includes, even by implication, any kind of "endorsement" of the views and activities of its recipients. Anyone who considers that "University Recognition" is simultaneously granted to "such diverse bodies as the Jewish Students Association, the Organization of Arab Students, the Young Americans for Freedom, and the Democratic Socialist Organizing Committee," groups which "occupy a broad range of the political, social and philosophical spectrum," *ante* at 17, cannot rationally conclude that the university is somehow "endorsing" the goals of any group on which it bestows such "recognition." If the university believes this is not self-evident, it may accompany any grant of "University Recognition" with a public statement of its position, but it may not withhold "recognition" on grounds which are forbidden by law, such as sexual orientation. The university's violation of the Human Rights Act is clear. Because the Act does not compel it to "endorse" anything, and because "University Recognition" does not constitute an "endorsement," its free exercise defense is unavailing. *See Bob Jones University v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

I would therefore hold that the Human Rights Act requires Georgetown to grant to these appellants "University Recognition" as well as tangible benefits; accordingly, I join in Judge Ferren's separate opinion. I also join in part VI of Judge Newman's opinion.

NEBEKER, Associate Judge, Retired, concurring in part and dissenting in part:

I join Judge Belson's thoughtful opinion. Today the court uses the state's power to force a religious body, contrary to its basic tenets, to provide services and facilities to those who advocate and proselytize abnormal and criminal sexual practices. *See* D.C.Code § 22–3502 (1981); *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92

L.Ed.2d 140 (1986). *See generally Cain v. United States,* 532 A.2d 1001 (D.C.1987).

Judge Belson's analysis respecting a balancing between the "sexual orientation" right expressed in the District of Columbia Human Rights Act and the first amendment assertions of Georgetown (*ante* at 72–74) prompts me to add an additional observation. If, as he assumes, a balancing test is appropriate, or if no balancing of interests is needed at all, it is important to recognize that the homosexual orientation, as defined by one's sexual practice (*see* D.C.Code § 1–2502(28) (1987)), at issue here has a stark inconsistency with established criminal law. The conduct inherent in homosexual "life-style" is felonious. *Id.* Accordingly, I find no factor favoring a state interest under the Act which can be balanced against Georgetown's rights. Indeed, there is every reason in law to hold absolute Georgetown's first amendment rights.

One has but to look at three of the record exhibits, which are attached, to see how intrusive our holding is on asserted and clear first amendment protections. These exhibits were produced by plaintiff, Gay People, on demand by the defendants for documents. They are examples of propaganda used to announce dances and gatherings (one for the "benefit for gay people of Georgetown University") in the Washington, D.C. area. They are also examples of the sort of promotion the court's holding would require a religiously affiliated university to subsidize. One might ask whether by our holding a student group dedicated to heterosexual relations with girls under the age of sixteen would likewise derive "sexual orientation" benefits under the Act in the face of first amendment assertions.

Surely this court's holding against Georgetown University raises first amendment issues warranting closest review by the ultimate adjudicators of the meaning of these most important provisions.

Record at 589.

GAY PEOPLES ALLIANCE OF GWU PRESENTS

SATURDAY, MAY 17
9:00PM-1:30AM
3RD FLOOR BALLROOM
MARVIN CENTER
800 21ST STREET NW

A BENEFIT FOR
1980
GAY PRIDE DAY

D

Def.Exh. 43

$3.50 MINIMUM COVERS UNLIMITED BEER, WINE, SOFT DRINKS, ETC.

GAY PEOPLES ALLIANCE OF GWU PRESENTS

Record at 590.

9:00 - 1:30
FRIDAY SEPTEMBER 26TH.
THIRD FLOOR BALLROOM MARVIN CENTER
800 21ST STREET NW
$3.50/MIN. COVERS UNLIMITED BEER, WINE, SODA, ETC.

disco

Attachment F

A BENEFIT FOR GAY PEOPLE OF GEORGETOWN UNIVERSITY

*received 12/5/80*

## GAY PEOPLES ALLIANCE OF GWU PRESENTS

Record at 591.

FRIDAY DECEMBER 5.
9:00PM-1:30AM
1ST FLOOR CAFETERIA
MARVIN CENTER 800 21ST ST NW
WASHINGTON DC
BENEFIT FOR GCC OF DC

Attachment G

$3.50 INCLUDES UNLIMITED BEER, WINE, SOFT DRINKS, MUNCHIES, ETC.